UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| REBECCA COELHO,<br><br>                    Plaintiffs,<br><br>vs.<br><br>WAL-MART STORES, INC., RUDI<br>ECKERMAN, CHAD GAUCHER,<br>WARREN "BODIE" MOORE,<br>and KEVIN CORREIA,<br><br>                    Defendants. | CIVIL ACTION NO. 05-10703-RWZ |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION TO REOPEN DISCOVERY AND FOR THE LIMITED PURPOSE OF COMPELLING RULE 35 PHYSICAL AND MENTAL EXAMINATION OF PLAINTIFF

Plaintiff, Rebecca Coelho, filed suit against Defendant Wal-Mart Stores, Inc. and certain members of its management seeking $400,000 in damages based on what she alleges to be "severe emotional distress" stemming from alleged sexual harassment and retaliation.  As set forth in detail below, the Court should require Coelho to undergo a Rule 35(a) Exam because she has put her physical and mental condition in controversy.  For good cause set forth herein, Defendants Wal-Mart, Moore, Eckerman and Gaucher, seek a Court Order requiring the Plaintiff to submit to a Physical and Mental Examination by an independent qualified, licensed psychiatrist pursuant to Fed. R. Civ. P. 35(a).

I.    Relevant Factual Background

The Plaintiff worked as an associate earning approximately $9.50 per hour

at Wal-Mart Stores, Inc. in Falmouth, Massachusetts for approximately 5 months in 2003.  She claims in her Complaint that a co-worker's[1] sexual harassment and management's failure to remedy that sexual harassment led to her departure from employment in December 2003.  Plaintiff's Complaint asserts $400,000 in "[l]ost wages and benefits,[2] severe emotional distress, [and] attorneys' fees."  In her Cover Sheet, Plaintiff reasonably anticipated lost wages at $50,000, attributing the other $350,000 to emotional distress damages and attorneys' fees. (*See* Complaint).  Although subsequent demands have been slightly lower, the emotional distress component has remained the bulk of damages sought. (Affidavit of Counsel, Exhibit ("Ex.")1, ¶¶ 4, 5, 7)

According to Plaintiff, as the result of Defendants' alleged wrongdoings she began suffering emotional distress and physical effects resulting from that distress "close to the time before she quit" Wal-Mart employment.  At that time, she "began" having stomach problems, including stomach pain and nausea. (Ex. 2, Deposition Transcript of Rebecca Coelho ("Coelho 113-14").  Plaintiff also claims that around the same time, she had more severe migraines than those she usually suffered.  (Coelho 114)  These conditions that she claims to have endured during her Wal-Mart employment, according to Plaintiff, were the result of Defendants' actions.

Plaintiff also maintains that after her Wal-Mart employment ended, and on an on-going basis, she has suffered extreme distress, which has had physical

---

[1] Kevin Correia, the co-worker who allegedly sexually harassed Plaintiff, is named as a Defendant to this lawsuit but is not a proper party because he was not served with process.
[2] Despite her claim for lost benefits, Plaintiff had no benefits while employed with Wal-Mart and thus is not entitled to any recovery for lost benefits.  (See Ex. 2, Coelho 27)

manifestations.  These ailments have substantially impacted her life.  For example, Plaintiff claims that she has been unable to work subsequent to her Wal-Mart employment because she is physically ill and "housebound" due to emotional distress caused by Defendants' purported wrongdoings.[3]  ("Coelho 122, 125; Complaint ¶ 63)  Plaintiff further claims that Defendants' behavior has led to excessive daytime sleeping:  During the school year, she wakes only to get her daughter off to school in the morning then returns to bed until her daughter gets home from school.  Plaintiff further maintains that her distraught state caused by Defendants' wrongdoings has, on occasion, resulted in her complete inability to care for her young daughter.  (Complaint ¶ 64; Coelho 122, 131-34)  Plaintiff also claims that she suffers "severe emotional distress," cannot sleep, cannot eat, suffers from panic attacks and nightmares, and even has stomach ailments that have landed her in the hospital *multiple* times. (Coelho 133-138, 145-146; Complaint ¶¶ 61-64)  She attributes all medical and psychological issues to Defendants' conduct.  (Ex. 3 at Answer to Interrogatory 4.)

Despite Plaintiff's own conclusion that Defendants' behavior is to the sole source of her emotional and physical problems, Plaintiff admits she had health issues of the same nature that she attributes to Defendants' alleged wrongdoings prior to the time their purportedly improper behavior occurred.  Specifically, she admits that prior to her Wal-Mart employment, she had suffered from migraines for many years, treated with neurologists and had been prescribed a variety of

---

[3] Subsequent to her 2003 separation from employment at Wal-Mart, Plaintiff worked only during part of the summer of 2004 and for one week in May, 2005, allegedly because the mental and physical effects of Defendants' wrongdoings have prevented her from working more.  (See Ex. 4, to Plaintiff's Supplemental Answers to Defendant Wal-Mart Stores, Inc. and Chad Gaucher's First Set of Interrogatories, Answer 8.)

medications over the course of that treatment.  (Coelho 114-117)  Plaintiff also has suffered from upset stomachs and pain caused by gallbladder issues and an inflammation to the colon and intestines, likely attributable to either Crohns disease or Celiac Sprue.  (Coelho Dep. 119-121)  Indeed, she treated with Dr. Patel, a gastroenterologist at various times from January 2002 – December 2003, and she saw numerous other physicians for medical issues similar to those she now attributes to Wal-Mart.  (See Ex. 3, at Answer to Interrogatory 4.)  She also admits that she has suffered from depression in the past.  (Coelho 131-132)  Further, Plaintiff admits that she has had life-long comprehension issues for which she has received special education and which are on-going.  (Coelho 66-69)  Plaintiff has even had other life stressors, including a divorce which occurred post-Wal-Mart employment; however, oddly, she claims that the divorce was not at all stressful.  (Coelho Dep. 5, 121)  According to Plaintiff, Defendants' actions have been the sole cause of her mental and physical suffering since December 2003.  Accordingly, as Plaintiff continues to maintain that the bulk of her damages are for emotional and physical ailments attributable to Defendants' wrongdoings, a Rule 35(a) examination is appropriate.

II.    <u>Discussion</u>

Coelho should be compelled to undergo a psychiatric and physical examination because her claim meets the standards the federal courts have set forth for such examinations.  To warrant examination, the moving party must show that (1) the condition that is the subject of the examination is in controversy; and (2) good cause exists to grant the motion.  <u>Schlagenhauf v.</u>

Holder, 379 U.S. 104, 118, 85 S. Ct. 234, 237 (1964). The Court in

Schlagenhauf also noted that Rule 35(a) should be liberally construed in favor of

granting discovery. Id.

A.    Plaintiff's Mental and Physical Health are "In Controversy."

The evolution of case law interpreting Rule 35(a) in employment

discrimination cases has given rise to five circumstances in which a moving party

may establish the "in controversy" requirement of the rule. *See* Stevenson v.

Stanley Bostich, Inc., 201 F.R.D. 551, 554 (N.D. Ga. 2001). In Stevenson, the

court noted that a majority of the federal courts have concluded that a Rule 35

motion is properly granted if *one or more* of the following factors are present:

> 1) a tort claim is asserted for intentional or negligent infliction of
> emotional distress; 2) an allegation of a specific mental or
> psychiatric injury or disorder is made; 3) a claim of unusually
> severe emotional distress is made; 4) the plaintiff intends to offer
> expert testimony in support of a claim of emotional distress
> damages; and/or 5) the plaintiff concedes that [his] mental condition
> is "in controversy" within the meaning of Rule 35.

Id. (collecting cases; citations omitted.)

The Court should order Coelho to undergo a psychiatric exam because

she has made a claim for unusually severe emotional distress warranting a

psychiatric exam under the third factor of the test articulated in Stevenson, 201

F.R.D. at 554. *See* Complaint at ¶ 61 ("In the wake of Wal-Mart's mistreatment,

Ms. Coelho suffered, and continues to suffer, severe emotional distress.")

In cases where a plaintiff "alleges extreme and severe emotional distress based

on actions for which [she] seeks compensatory and punitive damages," courts

have found good cause to compel a psychiatric examination. Bethel v. Dixie

Homecrafters, Inc., 192 F.R.D. 320, 323 (N.D. Ga. 2000).  Coelho's own statements revealed the depth of her emotional distress, which is ongoing, nearly two years since her termination.

Indeed as set forth in Section I. above, Plaintiff claims that as a result of the alleged acts of Defendants in 2003 she was injured, sustaining "severe emotional distress."  According to Plaintiff, this manifestation of this distress in physical symptoms has kept her "housebound" and prevented her from obtaining alternate employment.  Also a result of Defendants' alleged wrongdoings, Plaintiff has experienced symptoms of depression, including without limitation, sleeplessness and excessive sleep and anxiety.  She also claims she cannot care for her daughter due to her mental state.  She even claims to have been hospitalized *several* times due to Defendants' actions.

Additionally, the amount of emotional distress damages sought compared to actual lost wages demonstrates that she claims her emotional distress was *unusually* severe and substantial.  Coelho's economic damages are relatively minimal:  Her lost wages from the date of her termination to the present amount to approximately $30,000-$35,000.  The majority of the damages she claims she attributes to her alleged emotional distress.  (Affidavit of Counsel ¶¶4, 5)

Under circumstances like those present in this case, it is appropriate for a court to order an examination.  Indeed, Courts frequently order mental examinations in discrimination and retaliation cases.  In a case factually similar to this case, Jansen v. Packaging Corp. of America, 158 F.R.D. 409 (N.D. Ill. 1994), the employer which was being sued for discrimination, sought leave to obtain a

psychological examination of Jansen because Jansen claimed that she had

suffered, and continued to suffer, ongoing emotional distress attributable to

alleged sexual harassment and retaliation by the former supervisor.  The <u>Jansen</u>

court allowed the exam, stating as follows:

> There is no question that by advancing such intangible harms as a
> component of her damages claim that Jansen has not only placed
> her mental condition "in controversy" but has confirmed the
> existence of "good cause" for Packaging's motion…

<u>Id.</u> at 410.  *See also* <u>Lowe v. Philadelphia Newspapers, Inc</u>., 101 F.R.D. 296,

298-9 (E.D. Pa. 1983);  <u>Galieti v. State Farm Mut. Auto. Ins. Co</u>., 154 F.R.D. 262,

263 (D. Colo. 1994) (Rule 35 examination appropriate in wrongful discharge

lawsuit brought where plaintiff's emotional condition was at issue); <u>Usher v.

Lakewood Eng'g & Mfg. Co.,</u> 158 F.R.D. 411, 412 (N.D. Ill. 1994) (Rule 35

examination appropriate because plaintiff in sex discrimination case put her

mental state in controversy by asserting "intangible" emotional damages and by

seeing psychiatric for depression); <u>Shepherd v. American Broadcasting Co., Inc</u>.,

151 F.R.D. 194, 212 (D.D.C. 1993) (in state law race discrimination case, Rule

35 examination appropriate because plaintiffs "placed their mental conditions in

controversy by demanding damages to compensate them for emotional

distress"), rev'd on other grounds, 62 F.3d 1469 (D.C. Cir. 1995).  <u>Smedley v.

Capps, Staples, Ward, Hastings & Dodson</u>, 820 F. Supp. 1227, 1232 (N.D. Cal.

1993) (requiring Plaintiff in wrongful discharge case to undergo a psychological

examination even though the plaintiff did not intend to present any expert

testimony at trial); <u>Zabkowicz v. West Bend Co.</u>, 585 F. Supp. 635 (E.D. Wis.

1984) (ordering psychiatric exam of husband and wife where they claim they

suffered "extreme emotional distress" as a result of sexual harassment suffered by female plaintiff at work). Plaintiff's claim of severe emotional distress warrants an order compelling a mental and physical evaluation.

B.   Good Cause Exists for a Mental and Physical Examination.

Defendants have also met the standard for good cause. *See* Schlagenhauf, 279 U.S. at 119, 85 S. Ct. at 243. "The factors reviewed in determining 'good cause' often merge with those requirements necessary to find that a plaintiff's mental condition is 'in controversy.'" Bethel, 192 F.R.D. at 322 (quoting Lahr v. Fulbright & Jaworski, L.L.P., 164 F.R.D. 196, 200 (N.D. Tex. 1995)); see also Duncan v. Upjohn, 155 F.R.D. 23, 24 (D. Conn. 1994); Eckman v. University of Rhode Island, 160 F.R.D. 431, 434 (D.R.I. 1995) (where plaintiff's mental condition will play central role in litigation, "good cause" for Rule 35 examination exists). Defendants seek a Physical and Mental Examination to determine the existence, causation, and extent of Plaintiff's claims of severe emotional mental distress for which she seeks substantial emotional distress damages.

In this case, only such examination will "preserve the equal footing of the parties to evaluate the plaintiff's mental state." Lahr, 164 F.R.D. at 200 (quoting Duncan, 155 F.R.D. at 25). Without a psychiatric examination, Defendants will be deprived of any meaningful opportunity to challenge the Plaintiff's claims. *See* id. Indeed, Plaintiff has claimed to have intense emotional suffering, but allegedly due to her physical conditions caused or exacerbated from that suffering, has been entirely unable to seek *any* psychological or psychiatric

treatment for her mental condition or to take any medication for her depression. In fact, Plaintiff claims that her emotional distress was so severe that "everyone," including her mother and step-father with whom she lives, recommended that she consult with a psychologist or a psychiatrist for stress.  However, Plaintiff claims she did not do so because extreme nausea, also purportedly caused by Defendants' actions, prevented her from doing so.  (Coelho Dep. at 121-122) Also, Plaintiff claims that she was prescribed medication for depression but as of her deposition on June 28, 2005 had *never* taken it.  (Coelho 137-138)

Moreover, Plaintiff's testimony at her deposition in June 2005 concerning her mental and physical state and alleged treatment therefore was not proven in accordance with medical documentation subsequently produced.  To date although Defendants have requested documentation from all healthcare providers with whom Plaintiff sought treatment, consultation or diagnosis for conditions she attributes to their behavior, they have received documents only from two physicians.  (Affidavit of Counsel ¶ 6)  They have not received any documents pertaining to the alleged hospital visits or any other medical treatment that Plaintiff claimed to have undergone as the result of Defendants' alleged wrongful acts. (Affidavit of Counsel ¶¶6, 8)  Plaintiff admits to having had an underlying comprehension problem that may be the cause of confusion regarding when or whether some of the treatment for physical ailments took place or as to the cause(s) of such ailments.  Thus, despite this allegedly severe distress, there are no doctors to depose nor medications to review that would allow Defendants to defend against her self-serving contention that she has been almost

completely unable to work because of her allegedly severely impaired mental and physical health.  Further, the fact that Plaintiff has admitted to having had some of these conditions *prior* to Defendants' alleged wrongdoing and further demonstrates that good cause exists to order a mental and physical exam to assess the source of these conditions.

Further, Plaintiff's testimony indicated that there may be other underlying mental or physical conditions.  These conditions, and not Defendants' actions, may be the cause of her alleged severe distress.  Plaintiff has gone through a divorce since her separation from employment from Wal-Mart.  This divorce may have contributed to her mental and physical distress despite her claim that she suffered no stress from the divorce.  As it now stands, Defendants are left without any opportunity to substantiate or challenge Plaintiff's claim for substantial emotional distress damages.

For the foregoing reasons, the Defendants, Wal-Mart, Eckerman, Gaucher and Moore, hereby respectfully request that the Court Order that the Plaintiff undergo mental and physical evaluation by Dr. Albert Drukteinis at a location convenient to the Plaintiff at a mutually convenient time and date, such examination to include, among other things, level of current emotional distress, including physical symptoms thereof, and its relationship to her employment with the Defendant Wal-Mart, and the cause of any emotional distress experienced by the Plaintiff since her separation from employment in December 2003.

Respectfully submitted:

                                        /s/ Marylou Fabbo_____
                                        Marylou Fabbo, Esq.
                                        BBO #566613
                                        Counsel for Defendant
                                        Skoler, Abbott & Presser, P.C.
                                        One Monarch Place, Suite 2000
                                        Springfield, Massachusetts 01144
Dated:  July 18, 2006                   Tel:(413) 737-4753/Fax: (413) 787-1941

## COUNSEL CERTIFICATION

In accordance with Local Rule 7.1(A)(2) of the United States District Court for the District of Massachusetts, I certify that I conferred with counsel for the Plaintiff, John F. Tocci, Esq., on July 12, 2006, in a good-faith effort to resolve or narrow the issues presented in this Motion and have been unsuccessful in those efforts.

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the above document was served upon the attorney of record for each other party electronically, on July 18, 2006.

                                        /s/ Marylou Fabbo_____
                                        Marylou Fabbo, Esq.

# EXHIBIT
# 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

REBECCA COELHO,

               Plaintiffs,

vs.

WAL-MART STORES, INC., RUDI
ECKERMAN, CHAD GAUCHER,
WARREN "BODIE" MOORE,
and KEVIN CORREIA,

               Defendants.

CIVIL ACTION NO. 05-10703-RWZ

## AFFIDAVIT OF COUNSEL

I, Marylou V. Fabbo, Esq., under the pains and penalties of perjury, do hereby state:

1.     I have personal knowledge of the facts set forth in this affidavit.

2.     I am counsel for the Defendants Wal-Mart, Gaucher, Moore and Eckerman in the above-captioned matter.

3.     During a Status Conference in April 2006, the parties discussed possible resolution of this matter.

4.     Subsequent to the Status Conference, Plaintiff sent Defendants a demand for monetary settlement that was not significantly lower than Plaintiff's claim for damages of $400,000 set forth in her original Complaint.  The demand was not categorized according to lost wages, emotional distress, attorney's fees and/or costs.

5.     During a subsequent discussion with Plaintiff's counsel on June 15, 2006 regarding the demand, Plaintiff's counsel stated that the

largest portion of damages sought in the demand was attributable to emotional distress damages.

6.    Defendants have served on Plaintiff Interrogatories and Requests for Documents that have sought the identities of healthcare providers and copies of documents (or authorization to obtain copies) from all healthcare providers with whom Plaintiff sought treatment, consultation or diagnosis for any condition(s) she attributes to their behavior.  To date, Defendants have received documents from only two healthcare providers.  Of the documents received from the two healthcare providers, one of the healthcare providers' records are related to a lung condition, which Plaintiff has *not* attributed to Defendants' wrongdoings.  Defendant has not received documents pertaining to the alleged hospital visits or all the other medical treatment that Plaintiff claimed to have undergone as the result of Defendants' alleged wrongful acts. Defendants were surprised by the substantial amount Plaintiff continues to maintain is attributable to emotional distress damages as such damages have not been substantiated; because Plaintiff admitted to having had underlying health issues; and because Plaintiff became divorced after her separation from Wal-Mart's employment.

7.    Defendants have been unable to assess reasonable settlement value of this case because of the uncertainty of actual emotional

distress damages.

8.     If this Court orders the Plaintiff to undergo an Independent

Psychiatric Examination, that examination will be conducted by Dr.

Albert Drukteinis at a location convenient to the Plaintiff at a

mutually convenient time and date, such examination to include,

among other things, level of current emotional distress and its

relationship to her employment by the Defendant, and the cause of

any emotional distress experienced by the Plaintiff since her

separation from employment with Wal-Mart in December 2003.  Dr.

Drukteinis is a qualified, licensed, and experienced psychiatrist

engaged in private practice.  *A true and accurate copy of Dr.*

*Drukteinis' Curriculum Vitae is attached as Exhibit A* to this

Affidavit.

Signed under the pains and penalties of perjury, this 18th day of July 2006.

_Marylou Fabbo_

Marylou Fabbo, Esq.

# EXHIBIT
# A

Curriculum Vitae

# ÁLBERT M. DRUKTEINIS, MD, JD
New England Psychodiagnostics
1750 Elm Street, Suite 601, Manchester, NH 03104-2943
(603) 668-6436 or (603) 668-1495 – FAX (603) 668-4226
Website: www.psychlaw.com   e-mail: Aldruk@aol.com

Woburn, MA  (781) 933-7768  •  Portland, ME  (207) 756-6037
Burlington, VT  (802) 860-2909

**Professional Work:**   Comprehensive psychiatric and neuropsychiatric evaluations, and psychiatric treatment; medical-legal consultation; independent psychiatric assessment and expert testimony. *Videoconferencing evaluations and testimony available.*

## Education:

| | |
|---|---|
| 1980 - 1984 | Suffolk University Law School, Boston, MA<br>*JD cum laude* |
| 1971 - 1974 | University of Texas Medical Branch, Galveston, TX<br>*Internship and Residency in Psychiatry* |
| 1967 - 1971 | University of Louisville, School of Medicine, Louisville, KY<br>*MD* |
| 1965 - 1967 | University of Dayton, Dayton, OH<br>*BS Biology* |
| 1963 - 1966 | Xavier University, Cincinnati, OH |

## Licenses & Certifications:

Diplomate American Board of Psychiatry and Neurology (1976) with added qualifications in Forensic Psychiatry (1998)

Diplomate, American Board of Forensic Psychiatry (1985)

Diplomate, American Academy of Pain Management (1992)

Massachusetts Bar (inactive status; 1984)

Medical Licenses: New Hampshire, Massachusetts, Maine, Vermont

## Academic Appointments:

| | |
|---|---|
| 1999-Present | Adjunct Associate Professor of Psychiatry<br>Dartmouth Medical School, Hanover, NH<br>Director of Forensic Psychiatry Training (1999 - 2004)<br>Teacher of the Year (2004) |
| 1983-1999 | Adjunct Assistant Professor of Psychiatry<br>Dartmouth Medical School, Hanover, NH<br>Forensic Psychiatry |
| 1973-1974 | Instructor<br>University of Texas Medical Branch, Galveston, TX<br>Freshman Behavioral Science |

1972-1974      Instructor
               School of Allied Health Sciences
               University of Texas Medical Branch, Galveston, TX
               General Psychiatry

**Professional Positions:**

1977-Present   Private Psychiatric Practice
               Director of New England Psychodiagnostics
               Manchester, NH; Woburn, MA; Portland, ME; Burlington, VT

1989-1995      Member, State of New Hampshire Board of Registration in
               Medicine
               President (1994-1995)

1978-1989      Chief of Psychiatry,
               Elliot Hospital, Manchester, NH

1976-1978      Assistant Superintendent for Professional Services,
               New Hampshire Hospital, Concord, NH

1974-1976      Chief of Psychiatry, Marine Corps Recruit Depot
               US Naval Regional Medical Center, San Diego, CA

1974-1976      Psychiatric Practice and Consultation
               Psychiatric Centers at San Diego County Mental Health,
               San Diego, CA
               Part-time private psychiatric practice

**Professional Organizations:**

               American Psychiatric Association, Distinguished Fellow

               American College of Legal Medicine, Fellow

               New Hampshire Psychiatric Society
                   (Secretary-Treasurer  1979 - 1985)
                   (President  1986 - 1987)

               American Medical Association

               New Hampshire Medical Society

               American Academy of Psychiatry and the Law

               American College of Forensic Psychiatry (Advisory Board 2000 - )

               Phi Delta Phi International Legal Fraternity

               Massachusetts Bar Association

               American College of Occupational and Environmental Medicine

               New England College of Occupational and Environmental Medicine
                   (Board of Directors 2000 - 2002)

               International Association for the Study of Pain

               North American Spine Society

               South Eastern Admiralty Law Institute

**Current Hospital Affiliations:**

>     Elliot Hospital, Manchester, NH, Affiliate Staff

**Publications and Presentations:**

>     "The Role of Suggestibility in Mental Damage Claims"
>     AM J FORENSIC PSYCH (winter 2005, in press);
>     also at American College of Forensic Psychiatry
>     Rancho Mirage, CA (April 2003)
>
>     "Disability"
>     in TEXTBOOK OF FORENSIC PSYCHIATRY
>     (R. Simon and L. Gold eds.) Washington DC, APA Press (2004)
>
>     "Somatoform Disorders, Malingering, PTSD, and other
>     Psychiatric Issues" (co-panelist)
>     Vermont Trial Lawyers Association
>     Burlington, VT (May 2004)
>
>     "Labor Issues in Medical Practice: Managing
>     the Troubled Worker and Avoiding Stress Claims"
>     New England Opthalmological Society
>     Boston, MA (April 2004)
>
>     "Forensic Skills Workshop: Civil Issues" (panel moderator)
>     American College of Forensic Psychiatry
>     San Francisco, CA (March 2004)
>
>     "Forensic Skills Workshop" (panel moderator)
>     American College of Forensic Psychiatry
>     Rancho Mirage, CA (April 2003)
>
>     "Mental Health Issues and the Law: Criminal Law"
>     New Hampshire Bar Association
>     Concord, NH (October 2002)
>
>     "Disability Determination in PTSD Litigation"
>     in POSTTRAUMATIC STRESS DISORDER IN LITIGATION II
>     (R. Simon ed.) Washington, DC, APA Press (2002)
>
>     "Forensic Psychiatry IME's"
>     Vermont Department of Labor and Industry
>     Adjusters Conference
>     Burlington, VT (June 2002)
>
>     "Forensic Issues in Complex Regional Pain Syndrome" (workshop co-panelist)
>     American College of Forensic Psychiatry
>     San Francisco, CA (April 2002)
>
>     "Workplace Stress and Violence" (panel chair)
>     New England College of Occupational and Environmental Medicine
>     Boston, MA (December 2001)
>
>     "Neuropsychiatric Assessment of Whiplash Injuries" (workshop co-panelist)
>     American College of Forensic Psychiatry,
>     Toronto, ONT, (April 2001)

"Overlapping Somatoform Syndromes in Personal Injury Litigation"
American College of Forensic Psychiatry,
Newport Beach, CA (April 2000); also in AM J FORENSIC PSYCH
Vol. XXI, No. 4 (2000)

"A Head Injury Is Not a Brain Injury"
THE JOURNAL OF WORKERS COMPENSATION,
Vol. 9 (1), (Fall 1999)

"The Psychological History — A Mythical Narrative?"
Grand Rounds, New Hampshire Hospital,
Concord, NH (May 1999)

"Evaluating Mild Traumatic Brain Injury"
Acadia Insurance Company Adjusters,
Bedford, NH (April 1999)

"Chronic Back Pain: Physiological or Psychological?"
THE JOURNAL OF WORKERS COMPENSATION, Vol. 7(4),
(Summer 1998)

"Workers Compensation Stress Claims - The Employers Perspective"
NH TRIAL BAR NEWS, Vol. 20 (Spring 1998)

"The Psychology of Back Pain Disability"
National Workers' Compensation and Occupational Medicine Seminar,
Hyannis, MA (July 1997)

"Organizational Behavior and Stress Claims"
National Association of State Personnel Executives,
Portsmouth, NH (July 1997)

"Legal and Psychological Aspects of Disability"
New Hampshire Rehabilitation Association,
Manchester, NH (June 1997)

"Personnel Issues in Workers' Compensation Claims"
American College of Forensic Psychiatry,
Vancouver, BC (April 1997); also in AM J FORENSIC PSYCH,
Vol. XVIII, No. 3 (1997)

"Psychiatry and Law"
Monthly Columnist,
MAINE LAWYERS REVIEW (1996-1998)

"The Growth of Employment Stress Claims"
American Academy of Psychiatry and the Law,
San Juan, PR (October 1996)

"Advanced ADA: Reasonable Accommodation from A to Z"
Personnel Law Update 1996 (co-panelist),
Council on Education in Management,
Nashua, NH (September 1996)

"Psychological Evaluation of Maritime Stress Claims"
Annual Conference and Manual,
SOUTH EASTERN ADMIRALTY LAW INSTITUTE,
Charleston, SC (June 1996)

THE PSYCHOLOGY OF BACK PAIN.  A Clinical and Legal Handbook.
Springfield, IL Charles C. Thomas (1996)

"Mental Stress as a Work Related Injury"
National Human Resources Association, NH Affiliate,
Nashua, NH (November 1995)

"Emotional Distress Damages Due to Sexual Harassment and Discrimination
in the Workplace"
Hill and Barlow – 3rd Annual Employment and Labor Law Update for
Employers,
Woburn, MA (October 1995)

"Industrial Stress Claims"
New Hampshire Adjusters Association, Workers Compensation Conference,
Nashua, NH (October 1995)

"The Workers' Compensation Patient and the Law"
Pathophysiology and Treatment of the Unstable Lumbar Motion Segment,
North American Spine Society,
Chicago, IL (August 1995)

"Psychiatric Testimony"
New Hampshire Bar Association CLE Program,
Bedford, NH (January 1995)

"Psychogenic Pain and Disability"
Grand Rounds, Dartmouth Medical School,
Hanover, NH (June 1994)

"Building Bridges:  Where Medicine, Law and Social Policy Merge"
The Institute for Health, Law and Ethics at Franklin Pierce Law Center,
Concord, NH (June 1994); also in NEW HAMPSHIRE BAR JOURNAL,
Vol. 36, No. 4 (December 1995)

"Sources of Pain Disability"
New Hampshire Adjusters Association Workers Compensation Conference,
Nashua, NH (October 1993)

"Psychiatric Testimony and Expert Preparation"
Forensic Science Experts on Criminal Cases, New Hampshire Attorney
General's Conference, Concord, NH (June 1993)

"The Use and Misuse of Psychological Testing"
The Difficult Back, North American Spine Society, Atlanta, GA
(March 1993)

"Serial Murder – The Heart of Darkness"
PSYCHIATRIC ANNALS, Vol. 22, No. 10 (1992)

"Pain Syndromes in the Workplace"
Aetna Claims Seminar, Portsmouth, NH (May 1992)

"Evaluating Emotional Illness in the Workplace"
OCCUPATIONAL STRESS UNDER THE NEW HAMPSHIRE
WORKERS' COMPENSATION ACT, National Business Institute
Seminar & Manual (November 1991)

"The Insanity Defense"
Portsmouth Pavilion, Portsmouth, NH (October 1991)

"Workers' Compensation Back Injuries"
Panel Discussion, New Hampshire Adjusters Association, Manchester, NH
(December 1990)

"Evaluating Emotional Illness in the Workplace"
ADVANCED WORKERS' COMPENSATION IN NEW HAMPSHIRE,
National Business Institute Seminar & Manual (February 1990)

"Legal and Ethical Issues in Psychiatric Emergencies"
Keynote Speaker, New Hampshire Hospital, Concord, NH (November 1989)

"Issues in Forensic Psychiatry"
Lake Shore Hospital, Manchester, NH (June 1988)

"The Psychiatrist in the Courtroom"
Grand Rounds, Dartmouth Medical School, Hanover, NH (April 1988)

"Dementia and Competency"
Medical Continuing Education Program, Elliot Hospital, Manchester, NH
(February 1988)

"Suicide: Sin, Sickness, or Solution"
Medical Continuing Education Program, Elliot Hospital, Manchester, NH
(February 1987)

"Criminal Responsibility of Juvenile Offenders"
AM J FORENSIC PSYCH, Vol. VII, No. 2, pp 25-40 (1986)

"Liability for Suicide"
Veterans Administration Hospital, Manchester, NH (May 1986)

"Legal and Ethical Issues in Suicide"
Grand Rounds, New Hampshire Hospital, Concord, NH (May 1986)

"Psychiatric Perspectives on Civil Liability for Suicide"
BULL AM ACAD PSYCHIATRY LAW, Vol. 13, No. 1 (1985)

"Legal and Medical Perspectives on the Insanity Defense"
Medical Continuing Education Program, Elliot Hospital, Manchester, NH
(December 1984)

"Effects of Flurazepam on Sleep EEG Tracings"
Hoffman La Roche Grant, University of Texas Medical Branch (1972)

"EEG Changes in Psychosis"
NIMH Grant, University of Louisville School of Medicine (1970)

# EXHIBIT
# 2

Volume I, Pages 1-180

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10703-RWZ

RECEIVED
JUL 17 2006
By_____

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

REBECCA COELHO,                        *

      Plaintiff                   *

vs.                                    *

WAL-MART STORES, INC., RUDI            *

ECKERMAN, CHAD GAUCHER,                *

WARREN "BODIE" MOORE, and              *

KEVIN CORREIA,                         *

      Defendants                  *

* * * * * * * * * * * * * * * * * * * * * * * * * * * *


DEPOSITION OF:  REBECCA LEE COELHO

SKOLER, ABBOTT, & PRESSER, P.C.

255 Park Avenue

Worcester, Massachusetts

June 28, 2005      10:50 a.m.


Sharon Waskiewicz

Court Reporter

**2**

APPEARANCES:

Representing the Plaintiff:
  TOCCI, GOSS & LEE, P.C.
  35 India Street
  Boston, MA 02110
  BY: JOHN F. TOCCI, ESQ.
  617-542-6200    Fax: 617-542-6201

Representing the Defendants:
  SKOLER, ABBOTT & PRESSER, P.C.
  255 Park Avenue
  Worcester, MA 01609
  BY: MARYLOU FABBO, ESQ.
  508-757-5335    Fax: 413-787-1941

**3**

I N D E X

WITNESS:      REBECCA LEE COELHO

EXAMINATION BY:              PAGE:
Ms. Fabbo                      4

EXHIBITS:                    PAGE:
Exhibit RC-1, orientation checklist..............20
Exhibit RC-2, CBL scores.........................23
Exhibit RC-3, handbook...........................27
Exhibit RC-4, associate's commendation..........27
Exhibit RC-5, associate's commendation..........33
Exhibit RC-6, doctor's note.....................33
Exhibit RC-7, out-of-work note..................73
Exhibit RC-8, letter............................74
Exhibit RC-9, out-of-work note..................74
Exhibit RC-10, job description.................160
Exhibit RC-11, complaint.......................165

**4**

```
 1      MS. FABBO:  Usual stipulations?
 2      MR. TOCCI:  Yes, and read and sign.
 3      REBECCA LEE COELHO, Deponent, having first been
 4  duly sworn, deposes and states as follows:
 5      EXAMINATION BY MS. FABBO:
 6   Q.  Good morning.  As I said, my name is
 7  Marylou Fabbo, and I represent the defendants in a
 8  lawsuit that you have brought against your former
 9  employer and some of its management personnel.  I
10  represent some of the individuals as well as
11  Wal-Mart.  Have you ever had your deposition taken
12  before?
13   A.  No.
14   Q.  I'm going to explain the process to you a
15  little bit.  I'm sure your attorney has told you,
16  but I'm going to ask you a bunch of different
17  questions.
18   A.  Right.
19   Q.  You have to answer verbally rather than
20  an uh-huh.
21   A.  Right.
22   Q.  If at any time you don't understand my
23  questions, let me know.  Otherwise, I am going to
24  assume that you did understand it.  Is that okay?
```

**5**

```
 1   A.  Yes.
 2   Q.  Make sure you speak loud enough to make
 3  sure the court reporter can get down what you are
 4  saying.  Try not to talk at the same time as me,
 5  and I will try not to talk at the same time as you,
 6  because it is difficult for the court reporter.
 7      If you need to take a break at any time,
 8  let me know.  I would just ask that you let me
 9  finish the question and give your answer.
10   A.  Okay.
11   Q.  Would you state your full name and your
12  current address for the record?
13   A.  Rebecca Coelho, No. 2 22nd Avenue,
14  Pocasset, MA.
15   Q.  How long have you been at that address?
16   A.  Four or four and a half years.
17   Q.  Who else lives with you there?
18   A.  My stepdad, I consider him my stepdad, my
19  mother, and my daughter.
20   Q.  Has anyone else ever lived with you at
21  that residence?
22   A.  No.
23   Q.  Are you married?
24   A.  No.
```

**Rebecca Lee Coelho**
**June 28, 2005**

| | 6 |
|---|---|
| 1 | Q. Have you ever been married? |
| 2 | A. Yes. |
| 3 | Q. When were you married, during what time |
| 4 | period? |
| 5 | A. May 22, 1999. |
| 6 | Q. Until when? |
| 7 | A. Just recently. |
| 8 | Q. Are you divorced now? |
| 9 | A. Yes. |
| 10 | Q. Is your divorce final? |
| 11 | A. As far as I know. We filed December 31, |
| 12 | so 90 days after that, I would assume so. |
| 13 | Q. December 31, in 2004? |
| 14 | A. Yes. |
| 15 | Q. Where did you live immediately before the |
| 16 | residence that you are at now? |
| 17 | A. I don't really understand. |
| 18 | Q. Where you live now, where did you live |
| 19 | before that? |
| 20 | A. With my husband. |
| 21 | Q. Where? |
| 22 | A. 301 Grant Street in Framingham. |
| 23 | Q. When did you leave that residence? |
| 24 | A. Two years after that. |

| | 7 |
|---|---|
| 1 | Q. So approximately 2001? |
| 2 | A. Yes, that sounds right. |
| 3 | Q. What was your husband's name? |
| 4 | A. Everadas Coelho. |
| 5 | Q. Is he employed? |
| 6 | A. Yes. |
| 7 | Q. Where is he employed? |
| 8 | A. He is employed with a granite company. I |
| 9 | don't know the name of that company. |
| 10 | Q. Has he ever been employed by Wal-Mart? |
| 11 | A. No. |
| 12 | Q. Prior to beginning your employment with |
| 13 | Wal-Mart, had you known anyone that worked at the |
| 14 | Wal-Mart store that you worked at? |
| 15 | A. No. |
| 16 | Q. Have you consumed any medications today? |
| 17 | A. Yes. |
| 18 | Q. What medications? |
| 19 | A. A special medication for my stomach. |
| 20 | Q. What is that, do you know? |
| 21 | A. It goes by a generic name. I couldn't |
| 22 | tell you. |
| 23 | Q. What is the purpose of the medication? |
| 24 | A. To reduce acid and stomach pain. |

| | 8 |
|---|---|
| 1 | Q. How long have you been taking that |
| 2 | medication? |
| 3 | A. For a while. |
| 4 | Q. For approximately how long? |
| 5 | A. On and off for several months. |
| 6 | Q. Who prescribed that for you? |
| 7 | A. Dr. Dickstein. |
| 8 | Q. Did you take any other medications today? |
| 9 | A. No. |
| 10 | Q. Is there any reason why you don't believe |
| 11 | you can testify honestly or accurately today? |
| 12 | A. No. |
| 13 | Q. Are you a high school graduate? |
| 14 | A. Yes. |
| 15 | Q. What year did you graduate? |
| 16 | A. 12th grade, in high school. |
| 17 | Q. What calendar year? |
| 18 | A. 1992. |
| 19 | Q. From what high school? |
| 20 | A. Riverview. |
| 21 | Q. Where is that? |
| 22 | A. In East Sandwich, Massachusetts. |
| 23 | Q. Did you attend any other formal education |
| 24 | after high school? |

| | 9 |
|---|---|
| 1 | A. No. |
| 2 | Q. If you would just briefly go over your |
| 3 | employment history from the time you graduated high |
| 4 | school until the time you started Wal-Mart, giving |
| 5 | me general time frames. |
| 6 | A. I can't. |
| 7 | Q. Where did you work right after high |
| 8 | school? |
| 9 | A. I didn't. |
| 10 | Q. When did you first get a job after high |
| 11 | school? |
| 12 | A. I can't remember. |
| 13 | Q. What jobs do you remember before coming |
| 14 | to Wal-Mart? |
| 15 | A. I worked at McGar Services. |
| 16 | Q. Would you spell that? |
| 17 | A. M-C-G-A-R, Services. |
| 18 | Q. Do you know what they do? |
| 19 | A. It is an industrial cleaning company. |
| 20 | Q. How long did you work there? |
| 21 | A. A year and a half, down on the Cape. |
| 22 | Q. What did you do there? |
| 23 | A. Cleaning. |
| 24 | Q. Did you clean business or residences? |

Rebecca Lee Coelho
June 28, 2005

10

1    A.  No, businesses.
2    Q.  Any other jobs that you did before
3  Wal-Mart?
4    A.  I worked at a toy store.
5    Q.  When was that?
6    A.  2000, 2001.
7    Q.  Anywhere else?
8    A.  The Radisson, right before that in
9  Milford.
10   Q.  Doing what?
11   A.  Waitress.
12   Q.  Any other jobs that you can think of?
13   A.  No.
14   Q.  How did you become employed at Wal-Mart?
15   A.  I filled out an application.
16   Q.  Were you working at the time?
17   A.  Yes, for McGar Services.
18   Q.  How did you -- was there any
19  advertisement or how did you learn of an opening?
20   A.  I just walked in.
21   Q.  When was that?
22   A.  Sometime in -- I don't really know.  I
23  can't really tell you.
24   Q.  Do you remember when you were hired,

11

1  approximately?
2    A.  I've been told it was August 14th.
3    Q.  Of what year?
4    A.  2003.
5    Q.  So you applied in 2003 as well?
6    A.  I think so.  2002 or 2003.  I'm a little
7  bit lost.
8    Q.  After you filled out an application, did
9  you get interviewed by someone at Wal-Mart?
10   A.  Yes.
11   Q.  Who was that with?
12   A.  Bruce.  I don't know his last name.
13   Q.  Is he a manager?
14   A.  Yes.
15   Q.  Anyone else?
16   A.  With Lauren in the jewelry department.
17   Q.  Anyone else?
18   A.  No.
19   Q.  Were you looking at a particular position
20  that you were going to fill?
21   A.  Just a floor associate.
22   Q.  How much time elapsed between the time
23  that you filled out an application and the time you
24  had the interviews?

12

1    A.  I don't remember.
2    Q.  Do you remember if it was the same day?
3    A.  No, it definitely wasn't.
4    Q.  How did you learn that you had received a
5  job offer from Wal-Mart?
6    A.  They called me.
7    Q.  Do you know who called you?
8    A.  Rich from personnel.
9    Q.  Prior to speaking with Rich, and after
10  interviews with Bruce and Lauren, did you speak to
11  anyone else that was employed at Wal-Mart, at the
12  store you were working at?
13   A.  No.
14   Q.  Did you accept the job offer over the
15  phone?
16   A.  No.
17   Q.  By some means I assume you accepted the
18  offer?
19   A.  Yes, when I was there for the interview.
20   Q.  What was your starting pay?
21   A.  I'm going to say it was $9.50.
22   Q.  Are you sure or are you just
23  approximating?
24   A.  Approximating.

13

1    Q.  Did you receive any raises when you were
2  with Wal-Mart?
3    A.  Not that I was aware of.
4    Q.  When was the last day of your employment?
5    A.  December 11th.
6    Q.  Of 2001?
7    A.  Yes.
8    Q.  Can you tell me the departments you
9  worked in?  First of all, were you always a sales
10  floor associate; was that always your job title?
11   A.  Yes.
12   Q.  Did you work in different areas while you
13  were at Wal-Mart?
14   A.  Yes.
15   Q.  Can you tell me where you started in and
16  where you moved to?
17   A.  I started in jewelry, and I didn't know I
18  was going to be put in jewelry at all.  It wasn't
19  brought to my attention.
20   Q.  How long did you work in jewelry,
21  approximately?
22   A.  I don't remember.
23   Q.  Who was your manager?
24   A.  Lauren.

**Rebecca Lee Coelho**
**June 28, 2005**

(Pages 14 to 17)

14

| | |
|---|---|
| 1 | Q. Do you know her last name? |
| 2 | A. No. |
| 3 | Q. At some point you moved to a different |
| 4 | area? |
| 5 | A. Yes, to domestics. |
| 6 | Q. When was that? |
| 7 | A. I don't remember. |
| 8 | Q. Who was your manager in domestics? |
| 9 | A. Nicole. |
| 10 | Q. Any other areas that you worked? |
| 11 | A. Then I was moved to infants. |
| 12 | Q. Who was the manager there? |
| 13 | A. Crystal. |
| 14 | Q. Do you have knowledge of why you were |
| 15 | moved from jewelry to domestics? |
| 16 | A. Yes. |
| 17 | Q. What was the reason? |
| 18 | A. They tried to have me ring on the cash |
| 19 | register, and I didn't feel comfortable with it. |
| 20 | Then they had me ringing up underneath Lauren's |
| 21 | numbers and scanning jewelry with Lauren's numbers. |
| 22 | I knew that you were not allowed to do that. |
| 23 | Q. How did that come about, you moving to |
| 24 | another area? |

15

| | |
|---|---|
| 1 | A. They were annoyed with the fact that I |
| 2 | brought it to their attention. |
| 3 | Q. Whose attention did you bring it to? |
| 4 | A. Bruce. |
| 5 | Q. Is that Bruce Barney? |
| 6 | A. I think that is his last name. I am not |
| 7 | absolutely sure. |
| 8 | Q. When did you tell Bruce? |
| 9 | A. I had spoken to Lauren it. |
| 10 | Q. Did you also speak to Bruce about it? |
| 11 | A. At one point. It was just briefly. |
| 12 | Q. When you said "they were annoyed," who |
| 13 | are you talking about? |
| 14 | A. Lauren, and then when it was brought to |
| 15 | Bruce's attention, Bruce. |
| 16 | Q. What did you say to Lauren about it? |
| 17 | A. Just that I wasn't hired to ring on the |
| 18 | cash register. I was just hired as a sales |
| 19 | associate. She wasn't told that. |
| 20 | Q. Lauren? |
| 21 | A. Right. |
| 22 | Q. What did you say to Bruce? |
| 23 | A. Bruce came to me and asked me |
| 24 | specifically why I didn't have numbers, and why I |

16

| | |
|---|---|
| 1 | hadn't been on the CBLs, doing my CBLs, and why I |
| 2 | didn't have numbers. I told him I wasn't given |
| 3 | any. I didn't know anything about it. No one had |
| 4 | told me about anything about training or anything |
| 5 | like that. |
| 6 | Q. When you say the CBLs, do you mean the |
| 7 | computer based learning? |
| 8 | A. Yes, right. |
| 9 | Q. Did he offer to move you to domestics? |
| 10 | How did you end up going to domestics? |
| 11 | A. They just made that decision. I don't |
| 12 | even know. |
| 13 | Q. Had you indicated that you didn't want to |
| 14 | work in jewelry? |
| 15 | A. Yes, and I had spoke to Rich about it in |
| 16 | personnel. |
| 17 | Q. What did you do in domestics? Tell me |
| 18 | what your job was. |
| 19 | A. Stocking. |
| 20 | Q. Anything else? |
| 21 | A. No. |
| 22 | Q. What had you done in jewelry besides |
| 23 | ringing up? |
| 24 | A. I didn't do that for very long. I might |

17

| | |
|---|---|
| 1 | have rung up three or four people. |
| 2 | Q. What did you do besides that? |
| 3 | A. When people wanted to view the jewelry, I |
| 4 | would do it. |
| 5 | Q. You just got it out and showed them? |
| 6 | A. Yes, and stocked the shelves, inventory |
| 7 | stuff. |
| 8 | Q. Did you get along well with Lauren as the |
| 9 | manager? |
| 10 | A. Yes. |
| 11 | Q. You were happy with her? |
| 12 | A. Yes. |
| 13 | Q. And Nicole was your manager in domestics? |
| 14 | A. Yes. |
| 15 | Q. Did you have a good relationship with |
| 16 | her? |
| 17 | A. Not really, no relationship. |
| 18 | Q. Can you tell me what your interaction |
| 19 | with Nicole was like? |
| 20 | A. Hardly nothing at all, very little |
| 21 | talking. There wasn't much of a relationship. |
| 22 | Q. Do you know when you moved to infants? |
| 23 | A. No, I don't remember the exact time. |
| 24 | Q. Do you know how that move came about or |

| 18 |
|---|
| 1 the reasons for that move?<br>2       MR. TOCCI: Objection. You can<br>3 answer.<br>4       THE WITNESS: Because we were having<br>5 problems in the department, and she wasn't<br>6 able to communicate and train me.<br>7     Q.  (By Ms. Fabbo) Was that Nicole?<br>8     A.  Yes.<br>9     Q.  Did you bring those issues to someone's<br>10 attention?<br>11     A.  Yes.<br>12     Q.  Whose attention?<br>13     A.  Bodie, Tye, Chad.<br>14     Q.  Were there any specific problems with<br>15 Nicole and her training of you?<br>16     A.  She didn't train me at all. She didn't<br>17 even try.<br>18     Q.  Was there any specific kind of training<br>19 that you were looking for that you were not<br>20 getting?<br>21     A.  Well, they wanted me trained to do an<br>22 assistant manager's job, department manager's job,<br>23 excuse me.<br>24     Q.  When you say they, who are you referring |

| 20 |
|---|
| 1 command there. You get confused after a while.<br>2     Q.  Do you know what department?<br>3     A.  She did soft wear or soft lines.<br>4     Q.  So you don't remember the dates that you<br>5 moved around?<br>6     A.  Right.<br>7     Q.  Do you remember having an orientation<br>8 when you began employment with Wal-Mart?<br>9     A.  No. We were just filling out our W-2<br>10 forms and it was more about what our capabilities<br>11 were, like that. I didn't feel like that was an<br>12 orientation because you weren't shown anything<br>13 specifically.<br>14     Q.  Is that the day you were talking about<br>15 when you filled out forms?<br>16     A.  Right.<br>17     Q.  Can you tell me if you have seen this<br>18 document before?<br>19     A.  Right, yes.<br>20       MS. FABBO: Can you mark that, please?<br>21       (Exhibit RC-1, orientation checklist,<br>22       marked)<br>23     Q.  (By Ms. Fabbo) Is that your signature on<br>24 Exhibit RC-1? |

| 19 |
|---|
| 1 to?<br>2     A.  Management.<br>3     Q.  Who told that to you?<br>4     A.  Chad.<br>5     Q.  So he indicated that you were going to be<br>6 trained to be an assistant manager?<br>7     A.  Yes.<br>8     Q.  Is that something that you wanted to do?<br>9     A.  No.<br>10     Q.  You didn't want to do that?<br>11     A.  No.<br>12     Q.  At some point you complained to the<br>13 managers that you are weren't being trained?<br>14     A.  Right. They knew that. They were well<br>15 aware.<br>16     Q.  What response did you get from each of<br>17 them?<br>18     A.  They were annoyed.<br>19     Q.  Did you have any other problems with<br>20 anyone in the department, the domestics department?<br>21     A.  No.<br>22     Q.  Who is Gigi? I've seen that name.<br>23     A.  She is a department manager or assistant<br>24 manager. I don't know. There's so many chains of |

| 21 |
|---|
| 1     A.  Yes.<br>2     Q.  Do you remember going through the<br>3 orientation items listed in the section?<br>4     A.  Yes, I do.<br>5     Q.  Do you remember who the manager was, or<br>6 assistant manager was, that went over the handbook<br>7 with you?<br>8     A.  No, that was Rich in personnel.<br>9     Q.  Did all these things happen with Rich or<br>10 did you meet with anyone else?<br>11     A.  No, just Rich.<br>12     Q.  So when you met, he gave you the handbook<br>13 and went over it with you; do you remember?<br>14     A.  He just briefly went through it. We<br>15 watched a movie most of the time during the<br>16 orientation, and the movie would tell us bits and<br>17 pieces.<br>18     Q.  Different things about Wal-Mart and<br>19 policies?<br>20     A.  Yes.<br>21     Q.  When you say "we", are there other people<br>22 going through the orientation at the same time?<br>23     A.  Right.<br>24     Q.  Was it a full day of orientation? |

Rebecca Lee Coelho
June 28, 2005

(Pages 22 to 25)

22

1    A.  Yes.
2    Q.  Do you have any recollection of talking
3  about or hearing about the inappropriate conduct
4  policy?
5    A.  Can you rephrase?
6    Q.  One of the items that are checked off on
7  the checklist is the inappropriate conduct policy.
8  Do you recall any discussions about that?
9    A.  Yes.
10    Q.  What do you recall?
11    A.  I did the CBL on it.  I remember watching
12  the video.
13    Q.  Was that on the same day?  This
14  indicates that it is July 14, 2003.  Does that
15  sound right?
16    A.  Yes.  I didn't remember.
17    Q.  You did the CBL the same day?
18    A.  No.  That was weeks later or possibly
19  months later.  They didn't give me my numbers or
20  anything.
21    Q.  I have brought a list of what Wal-Mart
22  believes to be the different CBLs that you went
23  through during your employment.  If you would just
24  take a look at it and see if those seem to be the

23

1  CBLs that you took and completed.  Take a minute
2  and look through it.
3    A.  It seems correct.
4    Q.  Do the dates seem about right?
5    A.  I don't recall the exact dates.  I know
6  it was weeks or it could have been even months
7  later.  I wasn't given my numbers to go on the
8  computer to do my CBLs.
9    Q.  That is what you were referring to
10  before?
11    A.  Right.
12    Q.  About midway down, you did a CBL about
13  appropriate behavior?
14    A.  Right.
15    Q.  Do you think that is about the date that
16  you took that?
17    A.  I don't remember.
18    Q.  Are these, as far you remember, all the
19  CBLs that you took?
20    A.  Yes.
21      MS. FABBO:  Could you mark this?
22      (Exhibit RC-2, CBL scores, marked)
23    Q.  (By Ms. Fabbo) It suggests that you took
24  the sexual harassment CBL on or about August 12,

24

1  2003.  Do you have any recollection of taking it on
2  that date?
3    A.  No.
4    Q.  Do you recall going through the sexual
5  harassment program?
6    A.  Yes.
7    Q.  Can you explain to me what happens
8  through the CBL process.  What do you do?  It has a
9  score here.  Are you tested at the end somehow?
10    A.  Right.
11    Q.  So what happens?
12    A.  You punch in your code that is given to
13  you.  You get on and you watch a movie about it and
14  then it questions you at the end, and you answer
15  it.  It gives you a list of questions to pick from
16  and you pick the right one and punch it in, and
17  that is it.  At the end, if you fail you have to do
18  the whole thing over again.
19    Q.  Do you do it the same day?
20    A.  Well, you have a certain amount of time.
21    Q.  How long is the process, the video for
22  the sexual harassment, the CBL?
23    A.  I couldn't tell you.
24    Q.  Do they vary in length?

25

1    A.  I think that they do.  I don't know.
2    Q.  When do you do them, during the workday?
3    A.  The people out on the work floor, the
4  department managers or whatever, send you up.
5    Q.  It is done in a different area, I am
6  assuming?
7    A.  Right.  It was in the human resource
8  room.
9    Q.  After you completed any of these CBLs,
10  did you have any questions you wanted answered
11  about the subject matter?
12    A.  No.
13    Q.  What was your understanding of the sexual
14  harassment policy at Wal-Mart?
15      MR. TOCCI:  Objection.  You can answer.
16    Q.  (By Ms. Fabbo) Did you have any sexual
17  harassment training prior to Wal-Mart?
18    A.  No.
19    Q.  At any other jobs?
20    A.  No.
21    Q.  Did you have any knowledge of what could
22  constitute sexual harassment before you went to
23  Wal-Mart?
24    A.  Yes.

**Rebecca Lee Coelho**
**June 28, 2005**

(Pages 26 to 29)

26

1    Q.  What was that based on?
2    A.  Hearsay.
3    Q.  After you completed this computer module
4  on sexual harassment, did that change in any way
5  what you believed to be sexual harassment?
6    A.  No.
7    Q.  Did you understand Wal-Mart's policy to
8  be broader than just prohibiting sexual harassment?
9  By that I mean that Wal-Mart was not tolerant of
10  any kind of harassment?
11     MR. TOCCI: Objection.  You can answer.
12     THE WITNESS:  They weren't tolerant of
13  any kind of harassment?
14    Q.  (By Ms. Fabbo)  Right, that that was the
15  policy.
16    A.  I don't know how to answer that.
17    Q.  I'm not asking you what they did in
18  practice, because I understand you might have a
19  dispute with that.  The policy as far as you
20  understood it, did it prohibit all types of
21  harassment, one employee harassing another on
22  whatever basis?
23    A.  I would assume so.
24    Q.  Did you ever ask anyone, a manager, about

27

1  sexual harassment?
2    A.  No.
3    Q.  Did you read the employee handbook?
4    A.  We went over it.
5    Q.  Is that your signature on the
6  acknowledgment?
7    A.  Yes
8     MS. FABBO:  Would you mark that?
9     (Exhibit RC-3, handbook, marked)
10     MS. FABBO:  And this one also.  It is an
11  associate's commendation.
12     (Exhibit RC-4, associate's commendation,
13     marked)
14    Q.  (By Ms. Fabbo)  The document that has
15  been marked as Exhibit RC-3, would you take a
16  minute and look at this and see if this is the
17  handbook that you went over?
18    A.  I couldn't tell you.  It looks the same,
19  but I'm not positive.
20    Q.  When you said you went over it, can you
21  explain what you mean?
22    A.  As a group, we all reviewed it with Rich.
23  Certain parts were read, and stuff like that.
24    Q.  Certain parts were read; Rich read some

28

1  of the parts?
2    A.  Yes, or other people there.  We just
3  glanced over it quickly.
4    Q.  Do you remember any of the sections that
5  Rich may have brought to your attention?
6    A.  No.
7    Q.  Did you keep a copy of the handbook?
8    A.  Yes.
9    Q.  Do you still have one?
10    A.  I'm not sure.
11    Q.  Did you feel you that you understood the
12  handbook as it was explained to you?
13    A.  Yes.
14    Q.  Did you ask any questions about any of
15  the policies in the handbook during your
16  orientation?
17    A.  No.
18    Q.  What about after you're orientation; did
19  you ever have the opportunity to look through this
20  handbook for anything?
21    A.  No.
22    Q.  Did you ever ask anyone at Wal-Mart any
23  questions about what was in the handbook after
24  the orientation?

29

1    A.  No.
2    Q.  Was Coelho your married name?
3    A.  Yes.
4    Q.  What was your maiden name?
5    A.  Hathorne.
6    Q.  H-A-W?
7    A.  No, H-A-T-H-O-R-N-E.
8    Q.  Have you ever gone by any other names?
9    A.  No.
10    Q.  Have you ever been married other than to
11  Mr. Coelho?
12    A.  No.
13    Q.  Are you aware of Wal-Mart's open-door
14  policy?
15    A.  Yes.
16    Q.  Can you tell me what your understanding
17  of that policy is?
18    A.  That we were able to talk to management
19  openly.
20    Q.  Anyone in management?
21    A.  Yes.
22    Q.  About what type of issues?
23    A.  Any.
24    Q.  Policy No. 7 in the handbook, could you

Rebecca Lee Coelho
June 28, 2005

(Pages 30 to 33)

30

1  turn to that, please?  Take a minute and read
2  through the open-door policy, and let me know if
3  that is consistent at any time with what Wal-Mart's
4  open-door policy was when you were there.
5      A.  Yes.
6      Q.  Did you ever believe that you were
7  sexually harassed at any other job other than
8  Wal-Mart?
9      A.  No.
10     Q.  What were your hours of work at Wal-Mart?
11     A.  They varied.
12     Q.  From what to what?
13     A.  I couldn't tell you.
14     Q.  Was it daytime hours or nighttime hours?
15     A.  Both.
16     Q.  Was it both day and night in each
17 department or one department days and one
18 department nights?
19     A.  It depended on whether anyone called out.
20 Sometimes you had to cover fabrics or clean up
21 shoes.  It was mostly in my own department.
22     Q.  Did you work more daytime hours than
23 nighttime hours?
24     A.  Yes.

31

1      Q.  Were you generally a daytime associate?
2      A.  That wasn't established.
3      Q.  When you say you worked the nighttime
4  hours, did you ever work the overnight shift?
5      A.  Yes.
6      Q.  What would you do on the overnight shift,
7  stock?
8      A.  Um-hmm.
9      Q.  Is that a yes?
10     A.  I'm sorry.  Yes.
11     Q.  Did you have any benefits when you were
12 at Wal-Mart?
13     A.  No.
14     Q.  Where was your husband employed when you
15 were working at Wal-Mart?
16     A.  Roche Brothers in Natick.
17     Q.  What was that?
18     A.  A grocery store, supermarket.
19     Q.  Has he ever been involved in any lawsuits
20 regarding his employment?
21     A.  No.
22     Q.  Have you ever been involved in any other
23 lawsuits regarding your employment?
24     A.  No.

32

1      Q.  When did you first meet Kevin Correia?
2      A.  The exact time?
3      Q.  Approximately.
4      A.  When I was working in domestics.
5      Q.  That was the second location that you
6  worked in?
7      A.  Yes, from jewelry to domestics, from
8  domestics to infants, yes.
9      Q.  Were you originally a part-time associate
10 or did you always work full time, do you remember?
11     A.  No.  I know I was temporary.
12     Q.  What did that mean, do you know?
13     A.  Temporary until they decided -- temporary
14 until they do your evaluation, and then they decide
15 if you become permanent.
16     Q.  You are in some temporary period for how
17 long?
18     A.  I don't remember how long it was supposed
19 to be.
20     Q.  Take a look at the two documents that I
21 have just placed in front of you.
22         First of all, they both appear to have
23 your signature on both documents.  Is that your
24 signature?

33

1      A.  Yes.  This is when I signed to move from
2  one department to the next.  You have to sign this.
3         MS. FABBO:  Would you mark these two,
4      please?
5         (Exhibit RC-5, associate's commendation,
6      marked)
7         (Exhibit RC-6, doctor's note, marked)
8      Q.  (By Ms. Fabbo)  The document marked as
9  Exhibit 4 indicates -- first of all, correct me if
10 I'm wrong, that you moved effective September 22,
11 2003 to Department 26; does that sound correct?
12     A.  Yes.
13     Q.  Department 26 is domestics?
14     A.  No.
15     Q.  What is that?
16     A.  Infants.
17     Q.  What is domestics?
18     A.  I think -- No, I can't remember.  I don't
19 know if it is confused in my head or not, so I
20 don't want to say anything.
21     Q.  When you moved from domestics, was that
22 approximately in September?
23     A.  When I moved from domestics to infants?
24     Q.  No.  When you moved to domestics from

9

**Accurate Court Reporting**
**413.747.1806        413.747.1818**

Rebecca Lee Coelho
June 28, 2005

34

1  jewelry; or am I confusing this?
2      A.  Yup.
3      Q.  You went from jewelry to domestics,
4  correct?
5      A.  Right.
6      Q.  And then to infants?
7      A.  Right.
8      Q.  Do you remember, approximately, when you
9  went to domestics?
10     A.  No.  I just know it was after jewelry.
11     Q.  This suggests that the first move that
12  you had was in September 2003?
13     A.  This isn't that document.
14     Q.  Okay.
15     A.  The second one isn't either.  This one is
16  to infants.  Crystal name is listed right here and
17  Gigi's name -- this is to sign me over from
18  temporary to full time.  They have to sign off on
19  this, accepting me into that department.
20     Q.  You are pointing to which one?
21     A.  Both of them, Crystal Gilbert and Gigi,
22  right here.
23     Q.  So this document here indicates you moved
24  from this department, Department 20.  Do you

35

1  remember what that was?
2      A.  That must have been domestics, but I'm
3  not positive.
4      Q.  To Department 26?
5      A.  That would have been infants, if that is
6  the correct number.
7      Q.  And the other document you are saying is
8  just changing from temporary to full time?
9      A.  Yes.
10     Q.  That occurred in November of 2003?
11     A.  Yes, that is what it says.
12     Q.  So you said you met Mr. Correia when you
13  moved to domestics?
14     A.  Yes.
15     Q.  That was sometime before September of
16  2003 then?
17     A.  Right.
18     Q.  Could you explain to me where the
19  domestics department is located in the store, if
20  you walk in the front door?
21     A.  If you walk in the front door and take a
22  left, I guess.  I don't know.  The store has
23  changed.
24     Q.  Well, when you were there.

36

1      A.  Right.  You come in the door and you go
2  all the way, basically, to the back of the store.
3      Q.  You go left and go all the way to the
4  back?
5      A.  Yes.  Where the layaway department is,
6  stuff like that, automotive, sporting goods.
7      Q.  Where is jewelry?
8      A.  As soon as you walk in the door, you take
9  a left and a sharp right and it would be on your
10  right.
11     Q.  And infants, where is that?
12     A.  As soon as you walk in the door, you take
13  a right and go all the way to the back of the
14  store, another section of the store.  That's in the
15  right corner.
16     Q.  So it sounds like it is pretty much laid
17  out like most Wal-Marts.
18     Where was Mr. Correia working when you
19  first met him?
20     A.  They bounced him around a lot.  I think
21  he was assigned to automotive.
22     Q.  What was his position?
23     A.  A sales associate.
24     Q.  How did you come to meet him?

37

1      A.  What do you mean?
2      Q.  Do you remember your first meeting him?
3      A.  Not the first time, no.  There were too
4  many.
5      Q.  Where was he physically located in his
6  job?
7      A.  Right across from me.
8      Q.  What hours of work did he work?
9      A.  Almost the same.
10     Q.  Did they vary as well; did he work on the
11  overnight shift?
12     A.  I don't remember.  I don't think so.
13     Q.  Do you know Jason Lund?
14     A.  Yes.
15     Q.  Do you know where he worked, when you
16  first went to domestics?
17     A.  Yes.
18     Q.  Where was that?
19     A.  Sporting goods.
20     Q.  That was in the same area?
21     A.  Yes, side by side.
22     Q.  When you were working at Wal-Mart, were
23  you still living with your husband?
24     A.  No.

Rebecca Lee Coelho
June 28, 2005

(Pages 38 to 41)

38

1    Q.  What precipitated your not living
2  together?  What caused the separation?
3    A.  We just didn't see eye to eye on anything
4  anymore.
5    Q.  I think you said earlier you had been
6  living with him on and off for a while?
7    A.  Yes.
8    Q.  When did you stop living with him?
9    A.  I don't know the exact date.  It was on
10  and off, like I said.
11    Q.  At some time you made a permanent move to
12  where you are now?
13    A.  Yes.  It wasn't permanent.  I still had a
14  residence.
15    Q.  Did you move your things out of your
16  husband's residence?
17    A.  I really didn't have much.
18    Q.  Where did you live before that?
19    A.  With my mother.
20    Q.  Where was that?
21    A.  In Rolling Green in Milford.
22    Q.  Did you ever date anyone that worked at
23  the Wal-Mart store?
24    A.  No.

39

1    Q.  Did you ever socialize with anyone
2  outside of work?
3    A.  No.
4    Q.  Any friends or girlfriends?
5    A.  No.  Oh, I'm sorry.  I need to answer
6  that.  Christine, she worked in fabrics, and Cathy
7  Hennessey.
8    Q.  And you are saying that you did socialize
9  with them, right?
10    A.  Not often.
11    Q.  What did you do with these two woman?
12    A.  I went to their house and visited with
13  their kids.  That was basically it.  Nothing more
14  than that.
15    Q.  Both of them you visited?
16    A.  Yes.
17    Q.  And did you go alone?
18    A.  Yes, and with my daughter.
19    Q.  How old is your daughter?
20    A.  Ten.
21    Q.  What is her name?
22    A.  Avari.
23    Q.  What was Cathy Hennessey's position?
24    A.  She worked right beside domestics and in

40

1  housewares as a sales associate.
2    Q.  Did you ever go out for a coffee with any
3  of them, out for a drink or socialize with them out
4  to dinner?
5    A.  I don't remember.
6    Q.  Did you consider them to be your friends,
7  Christine and Cathy?
8    A.  No, not friend friends.
9    Q.  What was the purpose of going to their
10  homes?
11    A.  They invited me.
12    Q.  Did they have kids about the same age as
13  yours?
14    A.  Yes.
15    Q.  Did you say that was one occasion or more
16  than one occasion for each woman?
17    A.  More for Christine and one for Cathy.
18    Q.  Have you spoken to either one of them
19  since you left Wal-Mart?
20    A.  No.
21    Q.  Have you spoken to any Wal-Mart
22  associates since December 2003?
23    A.  No, not that I can remember.
24    Q.  Have you spoken to any member of

41

1  management there since 2003, your last day of
2  employment?
3    A.  I just bumped into Gigi, or I should say
4  Gigi bumped into me in the Wareham store.
5    Q.  Did you have any discussions with her?
6    A.  She came over to me and said hi and told
7  me about everybody moving to different stores,
8  different locations, and about the new one opening
9  up.  I think it was Plymouth.  But I didn't talk to
10  her.
11    Q.  Did you say anything to her?
12    A.  Hi and bye.  I just listened to her.
13    Q.  Were you shopping at that store?
14    A.  Yes.
15    Q.  No one else from Wal-Mart that you have
16  run into or spoken to since your separation?
17    A.  No.
18    Q.  Did anyone at Wal-Mart other than Mr.
19  Correia ever make any comments that you thought
20  were sexually inappropriate to you?
21        MR. TOCCI:  Objection.  You can answer.
22        THE WITNESS:  Can you rephrase that?
23    Q.  (By Ms. Fabbo)  Sure.  Just putting
24  Mr. Correia aside for now, I'm asking you if there

**Accurate Court Reporting**
**413.747.1806     413.747.1818**

Rebecca Lee Coelho
June 28, 2005

42

1 is anyone from Wal-Mart, other than him who --
2    A.  No.
3    Q.   -- anyone other that Mr. Correia who
4 engaged in any sort of behavior that you thought
5 was sexually inappropriate?
6    A.  No.
7    Q.  Not focusing on behavior or comments
8 directed at you now, have you ever witnessed any
9 sexually inappropriate behavior or comments, other
10 than by Mr. Correia, towards anyone?
11    A.  Inappropriate?  I don't know if I should
12 answer that.
13       MR. TOCCI:  You should.
14       THE WITNESS:  Yes, between other coworkers.
15    Q.  (By Ms. Fabbo)  Who were the coworkers,
16 and what happened?
17    A.  Now, besides Kevin, with other females?
18    Q.  Let's leave Kevin out of the picture now.
19 Anyone other than him?
20    A.  Dave from sporting goods.
21    Q.  What happened with Dave?
22    A.  It seemed to be very apparent that Dave
23 and Andrea were having a relationship.
24    Q.  What department?

43

1    A.  I think she worked in electronics.
2    Q.  They were both associates?
3    A.  Yes.
4    Q.  Why do you say it seemed apparent?  What
5 led you to the conclusion that they were having a
6 relationship?
7    A.  She would jump all over him.
8    Q.  Literally?
9    A.  Yes.  They were hugging, kissing, holding
10 hands.  They made everybody well aware of it.
11    Q.  On the sales floor --
12    A.  Yes.
13    Q.   -- as well as in the break room?
14    A.  Yes.
15    Q.  Did they make any attempts to hide it, in
16 your opinion?
17    A.  No.
18    Q.  Were you offended by their behavior?
19    A.  I just thought it was inappropriate in
20 the work environment.
21    Q.  Did you ever complain about it?
22    A.  No.
23    Q.  I am just going to remind you to let me
24 finish completely even though you know where I am

44

1 getting to.
2    A.  Okay.
3    Q.  She has to write down what we are saying,
4 and it's hard to write down what two people are
5 saying.
6    A.  Okay.
7    Q.  Anything other than Andrea and Dave that
8 you thought was sexually inappropriate behavior or
9 commentary at the store that you worked at, when
10 you were there, keeping Kevin out of this for a
11 moment?
12    A.  Not that I can remember at this moment.
13    Q.  Do you remember ever complaining about
14 any sexual behavior or commentary other than the
15 subject matter of this lawsuit?
16    A.  No.
17    Q.  Tell me when you first felt that
18 Mr. Correia was sexually harassing you.
19    A.  I don't know.  It happened so suddenly.
20 I really didn't take down dates and times in my
21 head.  I really didn't think it was going to be a
22 problem.
23    Q.  When was the first instance that sticks
24 out in your head?

45

1    A.  Just the time then he made it very well
2 known to everybody how he felt about me.
3    Q.  Tell me abut that time.
4    A.  How do you mean?
5    Q.  Where were you; what did he say; who was
6 present?
7    A.  In domestics, and there really wasn't
8 anyone present.  There were people shopping there.
9    Q.  What did he say?
10    A.  Just that I looked good that day, or that
11 he was attracted to me, or he wanted to know if he
12 could go out with me.  I explained to him that I
13 was married and not interested on many occasions.
14    Q.  Prior to the time when he told you that
15 he was interested in you, that you just explained,
16 do you ever remember him saying anything
17 inappropriate to you?
18    A.  Yes.
19    Q.  What?
20    A.  He made comments about my rear end.
21    Q.  That was before this, when he said
22 something about going out with you?
23    A.  This was right after that.
24    Q.  Is that the first thing that you remember

Rebecca Lee Coelho
June 28, 2005

(Pages 46 to 49)

46

1  that happened?
2      A.  It stood out in my mind, yes.
3      Q.  Later, he made other comments?
4      A.  Right.
5      Q.  Tell me what those comments were.
6      A.  At that time I had gained some weight.
7  He said that my butt had gotten too big for the
8  type of underwear I was wearing.  He knew that
9  I was wearing a thong, and I was completely
10 horrified by that remark.
11     Q.  Anything else happen during that
12 particular incident?
13     A.  Other times, when I had been in the break
14 room, he tried grabbing my hand and holding my
15 hand.
16     Q.  Wait.  Wait, before you go on.  I just
17 want to focus first on what he said when he
18 commented that you were wearing a thong.  Did he
19 say anything else during that incident?
20     A.  I can't remember.
21     Q.  What was your reaction?
22     A.  I was shocked.
23     Q.  Did you say anything back?
24     A.  That I thought that it was inappropriate

47

1  for him to talk like that, and I didn't like it.
2      Q.  Where were you when this comment was
3  made?
4      A.  I was in domestics.  I was walking back
5  from layaway to domestics.  I might have had to go
6  back to the back of the building to get something.
7      Q.  Was there anyone else present when this
8  comment was made?
9      A.  I couldn't tell you, because it was a
10 moment.
11     Q.  Right after you had the conversation
12 where he made the comment and you told him it was
13 inappropriate, what did you do?
14     A.  Nothing.
15     Q.  Did you go back to work?
16     A.  Oh, yeah.  I went back to my department
17 and started to work in my department.
18     Q.  Do you know what time of day he made the
19 comment?
20     A.  I don't remember.
21     Q.  Have you told me everything that you can
22 remember about that incident?
23     A.  I'm not really sure.
24     Q.  Were you wearing a thong that day?

48

1      A.  I think I might have been, yes.
2      Q.  Did you ask him how he knew you were
3  wearing a thong?
4          MR. TOCCI:  Objection.
5          THE WITNESS:  I didn't get involved in
6  the conversation.  I didn't keep the
7  conversation going.
8      Q.  (By Ms. Fabbo)  When you went back to
9  work, you didn't tell anyone about it?
10     A.  No.
11     Q.  Were you flattered at all by his interest
12 in you?
13     A.  No, none whatsoever.  I was embarrassed.
14     Q.  Did you make any notes of that incident,
15 or any document, at the time it happened?
16     A.  To myself.
17     Q.  Did you write something down?
18     A.  Yes.
19     Q.  Do you still have that?
20     A.  Yes.
21         MS. FABBO:  Is that part of the
22 discovery?
23         MR. TOCCI:  This is the first time that
24 I heard of that.

49

1      Q.  (By Ms. Fabbo)  Where do you keep these
2  notes?
3      A.  In my house.
4      Q.  On what type of paper, a journal?
5      A.  On a pad of paper.
6      Q.  At the time that it happened you believe
7  that you made notes?
8      A.  Right.
9      Q.  Did you date the notes?
10     A.  No.
11     Q.  What prompted you to write down what he
12 said?
13     A.  Because it was very odd and it was
14 unexpected.
15     Q.  How old is Mr. Correia?
16     A.  I don't know.  At the time I was there I
17 was told he was 20 years old.  I really don't know.
18     Q.  How old were you at the time?
19     A.  2003?  I am 31 now.
20     Q.  So late 20s?
21     A.  I was 29, maybe.
22     Q.  A couple of years ago, so late 20s.
23     A.  Right.
24     Q.  Was that the first thing that you had

**Accurate Court Reporting**
413.747.1806        413.747.1818

13

Rebecca Lee Coelho
June 28, 2005

(Pages 50 to 53)

50

1 written down about something that happened about
2 your employment at Wal-Mart?
3     A.  I couldn't tell you if that was the first
4 thing.
5     Q.  Other than your interaction with Mr.
6 Correia, had you written down anything else that
7 happened?
8     A.  Incidents that happened with Nicole, yes.
9 First, let me correct that.  It started with
10 Lauren, not Lauren specifically, but the jewelry
11 department, and being moved there from domestics.
12     Q.  So since you were in that department,
13 prior to domestics, is it fair to say you wrote
14 things down?
15     A.  Right.
16     Q.  Did you write these things down on the
17 same day as when the incidents happened?
18     A.  Sometimes.
19     Q.  Did you ever wait several days to write
20 things down?
21     A.  Until the next thing happened, yes.
22     Q.  And you still have these notes?
23     A.  Right.
24     Q.  Did you ever have any telephone

51

1 conversations with Mr. Correia?
2     A.  No.
3     Q.  Anyone at Wal-Mart, did you have telephone
4 conversations of a social nature?
5     A.  Christine.
6     Q.  Other than the woman you have spoken to
7 me about, anyone else?
8     A.  Jason Lund.
9     Q.  What was your conversation with him?
10     A.  I actually bumped into him at the mall.
11     Q.  When?
12     A.  I don't know.  It was back in the winter.
13     Q.  This year?
14     A.  Yes.  I forgot about him.
15     Q.  You said you had a telephone conversation
16 with him as well?
17     A.  By accident he dialed my number.  I had
18 given it to him, we exchanged numbers.
19     Q.  When?
20     A.  Back in the winter months.  I am not
21 really sure exactly when it was.
22     Q.  Winter of this year?
23     A.  Yes.  He had dialed my number by
24 accident.

52

1     Q.  Did you talk to him?
2     A.  About?
3     Q.  Anything?
4     A.  No.  He realized he had made a mistake
5 and that he had called the wrong Becky.
6     Q.  Any other conversations with him?
7     A.  No.
8     Q.  Why is it that you exchanged telephone
9 numbers?  Had you planned on staying in touch with
10 him?
11     A.  I don't know.  He just wanted to exchange
12 numbers.
13     Q.  Had you spoken to him at all since you
14 had left Wal-Mart?
15     A.  No, not that I can remember.
16     Q.  Is he still employed by Wal-Mart?
17     A.  No.  Actually, I need to correct that.  I
18 don't really know if he is still employed at
19 Wal-Mart.  I am assuming not, because he was
20 working at a cellular company.  I could be wrong.
21     Q.  What mall is this?
22     A.  The Cape Cod mall.
23     Q.  Did Mr. Correia ever make any other
24 comments about your clothes?

53

1     A.  On occasion he would say I looked sexy.
2 I don't know.  He made odd comments.  It was just
3 wicked inappropriate.
4     Q.  Like what?
5     A.  Just about my hair, how my hair was.
6     Q.  What were his comments?
7     A.  About how sexy I looked or I should wear
8 different types of clothes.
9     Q.  What did he want you to wear?
10     A.  Tighter clothes, tighter fitting clothes.
11     Q.  Anything else that he said about your
12 clothes?
13     A.  Like my shirt was too big, stupid
14 remarks.
15     Q.  What about your appearance?  Did he make
16 any other comments about your appearance?
17     A.  Like my face?
18     Q.  Anything.  Your body, your face, how you
19 looked.
20     A.  I can't remember off the top of my head.
21 There were so many incidents.  I can't really --
22     Q.  Did you write these all down?
23     A.  Yes.
24     Q.  Is there any reason why you haven't given

**Rebecca Lee Coelho**
**June 28, 2005**

---

54

1 this information to your attorney, the documents
2 actually?
3    A. No.
4    Q. Do you know whether anyone was present
5 when he made any of those comments, anyone you can
6 identify?
7    A. The whole store heard him. He was very
8 loud.
9    Q. Who specifically?
10    A. On many occasions supervisors heard him
11 talking.
12    Q. Who?
13    A. Bodie, Tye, Bruce, Gigi, they all thought
14 it was cute. They would laugh it off.
15    Q. Anyone else?
16    A. Other coworkers.
17    Q. Who?
18    A. Christine, Cathy, Cory, Jason. People
19 became very annoyed with him, other coworkers.
20    Q. Like who?
21    A. Jason, Cory, Roger, Lance. I said
22 Christine, right? I don't remember.
23    Q. The people that you said were annoyed
24 with him, was that Jason, Cory, Roger, Lance and

---

55

1 Christine?
2    A. Yes, and Dave from toys and sporting
3 goods.
4    Q. Why did you say they were annoyed with
5 him?
6    A. He was just too loud.
7    Q. About everything?
8    A. Yes. About everything that he thought
9 about me.
10    Q. Was he loud about other things as well?
11 Was he just a loud person in general?
12    A. Pretty much, but he was mostly loud about
13 the way he felt about me.
14    Q. What makes you say that Jason was annoyed
15 with him; did Jason say something to you about
16 that?
17    A. Yes.
18    Q. What did he say?
19    A. That his behavior was ridiculous and
20 uncalled for.
21    Q. What about Cory? Is that a male?
22    A. Yes.
23    Q. What did Cory say about it?
24    A. Just that Cory thought it was ridiculous

---

56

1 too, and that it became dangerous.
2    Q. Dangerous how?
3    A. He became jealous of Roger and Cory and
4 other males. They would bring out stuff from
5 receiving to where our department is, to unload it,
6 like the pallets. He became very annoyed with --
7 Kevin became very annoyed with males being around
8 me, talking to me about dropping off certain items,
9 stuff like that.
10    Q. What leads you to that conclusion that he
11 was annoyed; what did he say?
12    A. He would get angry and frustrated and he
13 would yell out to them and say, "Stay away from her,
14 she is mine. I love her."
15    Q. It was your impression that he was
16 serious and was not joking around?
17    A. I never really thought it was serious
18 until the day I was walking up into the break room
19 and he literally pushed Cory down the stairs. I
20 was walking up in front and Cory was behind, a
21 little behind and Kevin was right in the middle.
22    Q. What did Cory do about this?
23    A. Cory went and reported it.
24    Q. To who?

---

57

1    A. I think it was to Bodie.
2    Q. Do you know what Cory's last name is?
3    A. Silva.
4    Q. Did he ever take any physical action
5 against anyone else, as far as you know?
6    A. Who, Cory?
7    Q. No, Mr. Correia. I'm sorry. Did he ever
8 have any physical contact with anybody else?
9    A. Her name is not Amanda -- there was
10 another girl there. What did I say her name was,
11 in electronics? Andrea.
12    Q. What happened with Andrea?
13    A. He slapped her on the rear end and got
14 reprimanded, from what I heard from Chad.
15    Q. You didn't see this?
16    A. No, I heard it.
17    Q. Heard what?
18    A. The whack. I heard him slap her.
19    Q. What did she do?
20    A. Her and Dave both went to speak with
21 Chad, and supposedly after that, Chad had
22 reprimanded him.
23    Q. She was in what department, electronics?
24    A. Yes.

---

**Rebecca Lee Coelho**
**June 28, 2005**

**58**

1    Q.    What department was Cory in?
2    A.    In receiving.
3    Q.    Do you know Andrea's last name?
4    A.    No.
5    Q.    Anything else, any other physical
6  episodes?
7    A.    Him grabbing my hand while I am walking.
8    Q.    If you could just direct your attention
9  to any other people where he was somehow physical
10  with them.
11    A.    Not that I can remember, no.
12    Q.    What happened with him grabbing your
13  hand?
14    A.    He would just get in front of me so that
15  I couldn't walk past him and demand a hug or he
16  wouldn't get out of the way.
17    Q.    Did you ever hug him?
18    A.    I had to.  There was no way around him.
19  It was ridiculous.
20    Q.    Where did this happened?
21    A.    Out on the sales floor.
22    Q.    Where?
23    A.    Anywhere between domestics and toys, I
24  guess.

**59**

1    Q.    How many times?
2    A.    Maybe once or twice.  Before that I had
3  told him that I wasn't a hugging type of person.  I
4  didn't like it.
5    Q.    Why did you tell him that?
6    A.    Because he offered to hug me many times
7  and tried to grab me for a hug.  I was just
8  irritated by it.
9    Q.    Did you ever hug any other Wal-Mart
10  associate?
11    A.    Not that I can remember.
12    Q.    What about Jason; did you ever hug him?
13    A.    No.
14    Q.    These two hugs took place on the sales
15  floor?
16    A.    Right.
17    Q.    After he hugged you, then what did you
18  do?
19    A.    Pushed him aside and kept walking.
20    Q.    Did you tell anyone?
21    A.    They saw it.
22    Q.    Who is they?
23    A.    Anyone who was working in the store.
24    Q.    Do you remember anyone specifically who

**60**

1  might have seen?
2    A.    No.
3    Q.    Did you go and tell anyone; did you go
4  back to work; what did you do?
5    A.    I spoke to Rudi Eckerman.  Bodie, the
6  store manager wasn't there.  I could only seem to
7  find the district office manager.
8    Q.    Other than going to Mr. Eckerman, did you
9  talk to any of your coworkers about Mr. Correia
10  having hugged you?
11    A.    I'm not really sure if I spoke to Crystal
12  or not about it.
13    Q.    Did you talk to anyone in your personal
14  life, your family?
15    A.    Yes.
16    Q.    Who?
17    A.    My husband.
18    Q.    Even though you weren't together at the
19  time?
20    A.    We were on and off.  We weren't living
21  together, but we were on and off.
22    Q.    What did you tell your husband about it?
23    A.    I told him that I was annoyed and that I
24  couldn't stand it anymore and that it was getting

**61**

1  worse.  Every single day when I went in there, if
2  he was working the same hours, it was unbelievable.
3  It was very uncomfortable.
4    Q.    Anyone other than your husband?
5    A.    My mom and my stepdad.
6    Q.    What is your mother's name?
7    A.    Roberta Hathorne.
8    Q.    Where does she live?
9    A.    With me.
10    Q.    What is your stepfather's name?
11    A.    Norman.
12    Q.    What is his last name?
13    A.    Sasville, S-A-S-V-I-L-L-E.
14    Q.    He lives at the same address as well?
15    A.    Yes, and he is a senior.
16    Q.    Anyone else that you told?
17    A.    My girlfriend Jamie.
18    Q.    What is her last name?
19    A.    Berger, B-E-R-G-E-R.
20    Q.    Where does she live?
21    A.    Milford, Massachusetts.
22    Q.    Do you know her address?
23    A.    I think it is 11 Senate Road.
24    Q.    Anyone else?

62

1    A.  My lawyer.
2    Q.  Other than your lawyer.
3    A.  I didn't have to tell Christine, because
4  she already knew how Kevin felt for me.
5    Q.  I'm talking about the specific hugging
6  incident.  Is that what you are responding to, who
7  you told about the hugging?
8    A.  Like I said, Rudi Eckerman.  I'm trying
9  to think of other people.  Nothing is coming to my
10 mind right now.
11   Q.  Did you make notes of who you told about
12 these incidents?
13   A.  When it came to Rudi Eckerman, yes.
14   Q.  Would you have written down that you told
15 your friend Jamie and your mother?
16   A.  I haven't reviewed those notes in a long
17 time.  I just wrote them down.
18   Q.  When was the last time you looked at
19 them?
20   A.  I don't know.  It's been a while.  It's
21 not like something that I want to keep reading.
22 Cory Silva, I didn't have to tell him.  He had
23 witnessed it.
24   Q.  He witnessed the hug?

63

1    A.  Yes, on many occasions, along with trying
2  to grab my hand and stuff like that.
3    Q.  Kevin you are talking about?
4    A.  Yes.
5    Q.  Is he still employed by Wal-Mart?
6    A.  Kevin?
7    Q.  Cory.
8    A.  No.
9    Q.  Do you know when he left his employment?
10   A.  I heard he left in February.
11   Q.  Who did you hear that from?
12   A.  Other people.
13   Q.  Who?
14   A.  I don't know exactly.
15   Q.  Was it someone that works there?
16   A.  It was like hearsay.  You don't know if
17 it is legit or not if you are not there.
18   Q.  Was it someone that worked there that
19 told you?
20   A.  Yes, but I can't remember who I bumped
21 into.
22   Q.  Do you know where he lives, Cory?
23   A.  The last I knew, he lived in Falmouth.
24   Q.  When was the last time you spoke to him?

64

1    A.  Oh, my god.  I don't remember the exact
2  date.
3    Q.  Do you know the circumstances of his
4  departure?
5    A.  Cory's?  No.
6    Q.  Is it your understanding that he just
7  quit?
8    A.  Right.
9    Q.  Can you think of anyone else that
10 witnessed the hugs or attempts at the hugs?
11   A.  I told you Dave, in toys, right?
12   Q.  Dave?
13   A.  Yes, in toys.
14   Q.  What is his last name?
15   A.  I don't know.  We don't go by last names.
16   Q.  How do you know Cory's last name?
17   A.  Because I knew Cory, and he made himself
18 known to me.  We don't go by last names in the
19 store.
20   Q.  When you say you knew Cory, what do you
21 mean?
22   A.  I knew him from receiving, when we had to
23 go and pick up our shipment and bring it to our
24 department.

65

1    Q.  He told you his last name?
2    A.  No.  We had talked up in the break room,
3  and it was brought to my attention.
4    Q.  Is Dave an associate in toys?
5    A.  Yes.
6    Q.  And he witnessed the hugs or attempts to
7  hug?
8    A.  Yes.
9    Q.  So after the hugs or the attempts at hugs
10 occurred, did you go on break or back to work or
11 something else?
12   A.  Yes, I went back to work.
13   Q.  At what point did you decide that you
14 were going to bring Mr. Correia's behavior to the
15 attention of Wal-Mart's management?
16   A.  When he kept paging me over the intercom
17 when I was on break, for a UPC code on a baby gate.
18   Q.  When you moved to infants, is that what
19 happened, in September of 2003; is that what you are
20 saying?
21   A.  Right.
22   Q.  So you were no longer by Mr. Correia at
23 that point?
24   A.  Right.

**Rebecca Lee Coelho**
**June 28, 2005**

66

1    Q.  How long did you work in the department
2  right next to him?
3    A.  I can't tell you the exact amount of
4  time.  I kept getting moved from place to another.
5  I don't have an estimate in my head.
6    Q.  Did you have less interaction with him
7  after you moved to infants?
8    A.  In the beginning, I had less, and then it
9  became worse.
10    Q.  Even though he was at the other side of
11  the store?
12    A.  Right.
13    Q.  Were you ever over at his end of the
14  store?
15    A.  We had to walk by there.  The layaway
16  department goes into -- you have to go up into the
17  break room that way.  The back of the store is
18  there.  You have to punch out there and go to your
19  locker there.  And he was just there.
20    Q.  Did he come over to your area?
21    A.  Yes, on many occasions.
22    Q.  Mr. Ackerman's notes had indicated that
23  you spoke with him on October 29th; does that seem
24  correct?

67

1    A.  That sounds pretty accurate.
2    Q.  Is he the first member of management you
3  complained to about Mr. Correia?
4    A.  No.
5    Q.  Who did you speak to before?
6    A.  I am pretty sure I spoke to Bodie.  It
7  was a brief moment.  It wasn't like we sat down in
8  an office and talked.
9    Q.  So what was said during that conversation
10  with Bodie that you just referenced?
11    A.  That I was annoyed that Kevin wouldn't
12  leave me alone.  That he kept bothering me on the
13  sales floor, and he kept yelling out and
14  campaigning his love for me in front of customers.
15  It was embarrassing.
16    Q.  Did any customers say anything about it?
17    A.  They would roll their eyes.  I think they
18  were embarrassed for me.
19    Q.  What else did you say to Bodie in that
20  conversation?
21    A.  Just that I felt that it was
22  inappropriate and that I felt that it was
23  unnecessary.  I was very uncomfortable with it and
24  I would like to know that he would go and speak

68

1  with him to make it stop.
2    Q.  When did that conversation take place?
3    A.  Like I told you, I have no idea.
4    Q.  You believe it was before Mr. Eckerman?
5    A.  Right.
6    Q.  Where did that conversation take place?
7    A.  I don't remember if it was on the sales
8  floor or in the break room.  He just said he would
9  handle it.
10    Q.  How long?
11    A.  I don't know.  Before I went to speak to
12  Rudi Eckerman, I couldn't tell you.  It was maybe
13  weeks before.
14    Q.  No.  I mean how long was the conversation
15  with Bodie?
16    A.  Not even five minutes.  It was very
17  brief.
18    Q.  Did you make a document?  Did you note
19  that you had spoken to him?
20    A.  I had noted that I spoke to him, but I
21  didn't note the date or time or how long the
22  conversation was.
23    Q.  Did you know what you spoke to him about?
24    A.  I just told you.

69

1    Q.  Did you write that down, what you just
2  told me, in your notes?
3    A.  I would assume that I did, because I
4  remembered it.
5    Q.  Between the time you mentioned it to
6  Bodie and you spoke to Mr. Eckerman, did you speak
7  to any other members of management?
8    A.  No, not that I recall.
9    Q.  Did you meet with Mr. Eckerman to discuss
10  this with him?
11    A.  Yes, because Bodie was not there.
12    Q.  Where was Bodie, do you know?
13    A.  I have no idea.  He wasn't in the store,
14  as far as I knew.
15    Q.  Was Mr. Eckerman in the store?
16    A.  He was supposed to be.  Actually, yes.  I
17  am sorry.  He was there that day.  I did speak with
18  him.  The day that I left, my last day there, I
19  went to speak with him.  That day he wasn't there,
20  though.
21    Q.  Back in October when you went to speak to
22  Mr. Eckerman, did you arrange a meeting with him?
23    A.  No.  I just went up there and saw him.
24    Q.  In his office?

**Rebecca Lee Coelho**
**June 28, 2005**

(Pages 70 to 73)

---

70

1    A.  Right.
2    Q.  Can you tell me what took place during
3  that meeting?
4    A.  We were speaking about the main reason
5  why I was there was because of Kevin and the way he
6  was treating me and talking to me.  And then it
7  came up something about Gigi in that department.
8  It was just a fluke thing.
9    Q.  Do you remember anything else about that
10  conversation?
11    A.  No.  Just that he would speak with Kevin
12  about the hugging issue, and it would be resolved.
13  It would be taken care of.
14    Q.  What specifically you tell Mr. Eckerman?
15    A.  That he was getting in my way, giving me
16  hugs, holding my hand, and making comments out on
17  the sales floor.  It was embarrassing.
18    Q.  Did you complain that Jason had given you
19  hugs too?
20    A.  No.  I know for a fact that they did call
21  a meeting with all male associates about that. .
22  When I came back from being sick, that is what I
23  had heard.  The blamed me for it.  All the guys
24  blamed me for it.

---

71

1        MR. TOCCI:  Can we take a break?
2        MS. FABBO:  Sure.
3        (A recess was taken)
4        MS. FABBO:  Back on the record.
5    Q.  (By Ms. Fabbo) Do you want to make a
6  correction?
7    A.  Yes.  Going back to when you asked me if
8  anybody else knew about what had happened.  When I
9  had spoken --
10        MR. TOCCI:  It was in response to the
11        question of whether she had had any
12        conversations with anyone at Wal-Mart after
13        her departure from Wal-Mart.
14        THE WITNESS:  Right.  That was
15        1-800-Wal-Mart.
16    Q.  (By Ms. Fabbo) Okay.  When did you call
17  1-800-Wal-Mart?
18    A.  Right after I left.
19    Q.  Is that the hotline?
20    A.  Yes.  They are supposed to help you out
21  if you have a problem.
22    Q.  Whom did you speak to?
23    A.  I don't know.
24    Q.  Did you write down who you spoke to?

---

72

1    A.  I can't remember.
2    Q.  When you say it was right after you left,
3  do you mean five minutes later, a day later?
4    A.  As soon as I got home and talked to my
5  mom about what had happened.  I was extremely upset
6  and crying.  She said you can call that hotline
7  number, just do it.
8    Q.  How does your mother know about the
9  number?
10    A.  Because of our associate's handbook.
11    Q.  Did you have it a home with you?
12    A.  Yes.
13    Q.  So you called there and you don't know
14  who you spoke to, right?
15    A.  Yes.
16    Q.  What did you say?
17    A.  They asked me what store number I was
18  from.  I told them.  They asked me what was going
19  on, what was the matter.  I told them everything
20  that happened, and the result was, if you left
21  there, there is nothing that we can do for you
22  because you are no longer an employee there.
23    Q.  So that number was only for employees; is
24  that what you are saying?

---

73

1    A.  Yes.
2    Q.  Specifically what did you tell them?
3    A.  Just that I was having a problem at work,
4  that it had escalated and gotten worse.  I told
5  them about the incident with Kevin, and how I
6  didn't feel like it was handled.  The store
7  manager didn't handle it well.
8    Q.  Anything else?
9    A.  Just what had happened that day between
10  me and Bodie.
11    Q.  Could you tell me if this is the document
12  that you presented to Wal-Mart?
13    A.  It was a work note from a doctor.
14    Q.  Did you give that to someone at Wal-Mart?
15    A.  Probably.
16    Q.  Who did you give it to?
17    A.  Whoever my supervisor was at the time.
18    Q.  Do you remember giving it to anyone
19  specifically?
20    A.  No, I can't remember.
21        MS. FABBO:  Would you mark that?
22        (Exhibit RC-7, out-of-work note, marked)
23    Q.  (By Ms. Fabbo)  Were you out of work May
24  29th?

---

**Accurate Court Reporting**
**413.747.1806        413.747.1818**

74

1    A.   Yes, for kidney stones.
2    Q.   Were you out any day prior to May 29th?
3    A.   Probably.  I can't tell you what the
4  dates were.
5    Q.   Were you out of work related to kidney
6  stones around that time or just the one day?
7    A.   I don't remember.
8        MS. FABBO:  Mark this please,
9    and this one too.
10      (Exhibit RC-8, letter, marked)
11      Exhibit RC-9, out-of-work note,
12      marked)
13   Q.   (By Ms. Fabbo) The document marked as
14 Exhibit 7 indicated that you were out of work 9/3
15 to 9/7.  Were you out of work on those days?
16   A.   If it says I was, I was.
17   Q.   Why were you out of work on that
18 occasion?
19   A.   I'm not really sure.  It could have been
20 for pneumonia or bronchitis.
21   Q.   Exhibit 9 is a note from a doctor
22 indicating that you will be out of work.  It is
23 dated 10/21/03.
24   A.   Right.

75

1    Q.   Were you out on the dates indicated on
2  those notes?
3    A.   I don't remember.  I remember I was out
4  of work.
5    Q.   Do you have any reason to think that that
6  would be inaccurate?
7    A.   It might have been, because I had strep
8  and I was contagious for 24 to 48 hours.  That
9  would be the time to have the antibiotics.  I was
10 extremely contagious.
11   Q.   Were you, in fact, out from 10/21 until
12 10/29?
13   A.   I remember being out of work.  I don't
14 remember how long.  I needed a doctor's note to go
15 back.  I had to prove to them that I was sick.
16   Q.   So you don't have any idea when you came
17 back to work?
18   A.   No.
19   Q.   Do you have a record of it?
20   A.   I would have to call my doctor's office.
21   Q.   But you don't know when you went back to
22 work?
23   A.   No.  I would have a pay stub, though.
24   Q.   Do these look like copies of the doctor's

76

1  note that you gave to Wal-Mart?
2    A.   These right here?
3    Q.   Yes.
4    A.   Yes.
5    Q.   Can you tell me what your diagnosis was?
6    A.   I am ambidextrous with dyslexia and
7  comprehension problems.
8    Q.   When were you diagnosed?
9    A.   When I was four or five years old and
10 every couple of years after that.
11   Q.   When you say you have comprehension
12 problems, is that language comprehension, reading
13 comprehension?
14   A.   All of them.
15   Q.   Do you receive any treatment for that
16 condition?
17   A.   No.
18   Q.   Did you receive special education for
19 those issues?
20   A.   When I was at Riverview.
21   Q.   Since Riverview, have you had any
22 ongoing --
23   A.   No.
24   Q.   Do you currently see anyone in connection

77

1  with those symptoms?
2    A.   No.
3    Q.   When was the last time you spoke with
4  someone regarding those conditions?  I mean a
5  medical professional of some sort.
6    A.   I don't know exactly.
7    Q.   Are you still getting some kind of
8  special education or treatment for those
9  conditions?
10   A.   Right.  I think that I talked to someone
11 when I was asked to obtain this letter for
12 Wal-Mart.
13   Q.   So after Riverview, there was no
14 subsequent health care provider that helped you
15 with these conditions?
16   A.   No.
17   Q.   Do you still have issues with dyslexia?
18   A.   I still have issues with dyslexia.
19   Q.   How does it impact your everyday life?
20      MR. TOCCI:  Objection.  You can
21 answer.
22      THE WITNESS:  I can't.
23   Q.   (By Ms. Fabbo) Does it impact your
24 everyday life?

---

**78**

1    A.  Yes.
2    Q.  Can you give me an example of how it may
3 affect your everyday life?
4         MR. TOCCI:  Objection.  You can
5 answer.
6         THE WITNESS:  I can't.
7    Q.  (By Ms. Fabbo)  Not one example?
8    A.  Depending on the day.  Depending on the
9 issue at hand.
10    Q.  You have to give me an example.
11    A.  I can't.  Because I don't know anything
12 about the condition.  I have trouble reading a
13 book.
14    Q.  Does it take longer to read a book; is it
15 difficult?
16    A.  Yes.
17    Q.  What about your comprehension issues; how
18 does that impact your life?
19    A.  I can read something and not remember it
20 right after I read it, and other times, I can
21 remember it.
22    Q.  What about when people are talking to
23 you?  Are you affected in any way in that manner?
24    A.  It depends on the situation, and to what

**79**

1 degree.
2    Q.  Was anyone else present at that meeting
3 with Mr. Eckerman that you described to me?
4    A.  No.
5    Q.  Did he tell you what he was going to do?
6    A.  Yes.  He told me he was going to get
7 Bodie involved sitting down and talking with Kevin
8 and Rich.  They were going to sit down and have a
9 meeting, and that was the end of it.
10    Q.  Rich in personnel?
11    A.  Right.
12    Q.  Anything else?
13    A.  No, nothing.
14    Q.  Did you discuss issues that you had with
15 Lauren in jewelry?
16    A.  No.
17    Q.  What did you discuss with him about Gigi?
18    A.  Gigi got very upset with me out on the
19 floor when I went to cover another department.  I'm
20 not sure, but I think that it was Bruce that might
21 have asked me to cover fabrics.
22    Q.  What happened?
23    A.  She yelled at me and told me to go back.
24 When I explained why I was there, she freaked out

**80**

1 in front of other associates and everyone that was
2 in the store.
3    Q.  What was she saying?
4    A.  She was upset.
5    Q.  What was she saying that made you say she
6 was upset?
7    A.  She was putting me down for not doing a
8 good job.  I don't remember her exact words that
9 day, but she was very upset and disappointed in me,
10 and she wanted me to do more.
11    Q.  She was upset that you were transferred
12 to another department?
13    A.  Yes, she was annoyed with that.  She
14 believed that her department, the department that
15 she covered, needed to be worked on before the
16 associates were dismissed to go home at the end of
17 the night.
18    Q.  What did you say?
19    A.  She didn't want to hear what I had to
20 say.
21    Q.  Did you speak to Mr. Eckerman?
22    A.  Yes.
23    Q.  What did he say?
24    A.  I will handle it.

**81**

1    Q.  What department was she in?
2    A.  Soft lines.
3    Q.  Did you work in her area usually?
4    A.  Sometimes.  In her area, I mean the
5 infant department in back of that area.  That's
6 soft lines, so she covered that department.
7    Q.  What was in soft lines?
8    A.  The fitting room, men's and women's
9 apparel.  Accessories was attached to jewelry, so I
10 don't know if that was her area, too.
11    Q.  Okay.  Who was your department supervisor
12 at the time?
13    A.  In infants?
14    Q.  When you had the argument, who was your
15 supervisor?
16    A.  Gigi and Crystal were the department
17 managers or assistant managers.  I can't remember
18 the chains of command in that place.
19    Q.  Okay.  Did Mr. Eckerman give you any
20 indication of what he was going to do, if anything?
21    A.  Talk to them.  That was it.
22    Q.  He told you he was going to talk to
23 them?
24    A.  Yes.

**Rebecca Lee Coelho**
**June 28, 2005**

(Pages 82 to 85)

---

82

1    Q.  You had stated earlier when you got back
2  from being out that people had told you that there
3  was a meeting held about hugging?
4    A.  Right.
5    Q.  Who was it that told you, the people that
6  told you?
7    A.  Jason Lund, Lance, Brian, Roger.  There
8  were a bunch of people, mostly guys, that would
9  come up to me.
10    Q.  What could they say?
11    A.  They assumed it was me that complained.
12    Q.  Did you say anything?
13    A.  No.
14    Q.  Did anyone else say anything, anyone else
15  that assumed it was you that complained?
16    A.  What do you mean?
17    Q.  Did anyone have any other comments about
18  the meeting?
19    A.  No.
20    Q.  Can you remember anything else from your
21  conversation with Mr. Eckerman, the one that you
22  just told me about?
23    A.  No.
24    Q.  Did you make notes of this conversation?

---

83

1    A.  Yes.
2    Q.  When did you make the notes; was it the
3  same day?
4    A.  I can't remember if it was the same day
5  or the day that I left, that I was forced to leave,
6  Wal-mart on December 11.
7    Q.  What did you do after your meeting with
8  Mr. Eckerman?  Was it just the two of you?
9    A.  Yes.
10    Q.  What did you do after that?
11    A.  I don't remember if I went home.
12    Q.  Was it at the end of the day?
13    A.  I don't remember what time it was.
14    Q.  How did you feel coming out of that
15  meeting with him; were you reassured?
16    A.  Yes.
17    Q.  When was the next time that you spoke to
18  anyone in management about Mr. Correia?
19    A.  When we had the incident in the break
20  room, I went right down and asked to speak with
21  Chad.
22    Q.  When was that?
23    A.  That was when Kevin was yelling at me
24  about the UPC code earlier.

---

84

1    Q.  Tell what happened with the UPC code
2  earlier.
3    A.  I was on break.  He kept paging me and
4  paging me and paging me.  I said, "I'm on break."
5  He said he needed help with a customer.  I said
6  that he should call someone that worked in infants.
7  I couldn't remember a UPC code.  I was on a break.
8    Q.  So you have told me everything that you
9  remember about this conversation with Kevin?
10    A.  Yes.  He was screaming at me over the
11  phone.
12    Q.  What was he saying?
13    A.  Just that I needed to help the customer,
14  I needed to come back from break to the floor and
15  help the customer.  He was just yelling at me.
16    Q.  Anything else that you remember?
17    A.  I just told him I couldn't talk to him
18  because I was using the pharmacy phone, and the
19  pharmacy needed the phone.
20    Q.  Why were you in the pharmacy?
21    A.  I was taking my blood pressure.
22    Q.  Do you have high blood pressure?
23    A.  Occasionally low and high.
24    Q.  Do you take any medication for that?

---

85

1    A.  No.
2    Q.  What was your blood pressure?
3    A.  I don't remember what it was that day.
4    Q.  That was your lunch break or your
5  15-minute break?
6    A.  It was the 15-minute break.
7    Q.  Was it in the morning or afternoon or do
8  you just have one?
9    A.  I don't remember what time of day it was.
10    Q.  Who was the pharmacist?
11    A.  I don't know her personally or her name.
12    Q.  Did anyone overhear your conversation
13  with Mr. Correia?
14    A.  Cathy was sitting beside me and could
15  hear him screaming.
16    Q.  Do you know why she was in the pharmacy
17  department?
18    A.  No, not really.  I think she was checking
19  her blood pressure, but I don't really remember.
20    Q.  What did you do after you hung up the
21  phone?
22    A.  I went back to the sales floor.
23    Q.  Do you punch out for lunch breaks?
24    A.  No.

---

Rebecca Lee Coelho
June 28, 2005

(Pages 86 to 89)

---

86

1    Q.  Do you punch out for your 15-minute breaks?
2    A.  No.
3    Q.  Do you let your managers know when you
4 are taking a break?
5    A.  Yes.  In soft lines you always go and
6 tell someone so there is someone there to cover the
7 department.
8    Q.  Was it up to you when to take your
9 breaks?
10   A.  No, they usually tell you when to go.
11   Q.  Who are they?
12   A.  The department manager or the assistant
13 manager will tell you that you need to take your
14 15-minute break, to figure out when you want to
15 take the break?
16   Q.  Did anything happen when you went back
17 from break?
18   A.  Not until later that evening.
19   Q.  What did you do when you went back to
20 work?
21   A.  I don't know.  Stocking the department,
22 stocking the shelves, or putting other stock away.
23   Q.  Did you tell anyone about your
24 conversation with Kevin?

---

87

1    A.  I don't remember that day if I told
2 anyone.
3    Q.  Did you write down that conversation?
4    A.  Yes, I did.
5    Q.  Did you write it down about when that
6 occurred?
7    A.  I'm not really sure.  I'm not positive if
8 I did or not.
9    Q.  Something happened later that evening?
10   A.  Yes.
11   Q.  What happened?
12   A.  We were in the break room and Kevin got
13 annoyed because he saw Roger and Cory sitting at
14 the same table I was at.  And he acted jealous and
15 was annoyed that they didn't find another place to
16 sit.  They were taken back by his attitude.
17   Q.  Did you sit with him in the lunchroom?
18   A.  I sat wherever there was a chair, not
19 next to him.
20   Q.  Did you have any conversations with him?
21   A.  We all had conversations in the group
22 that would be there at break time.
23   Q.  Did you ever have a personal conversation
24 with just him?

---

88

1    A.  No.
2    Q.  What did Kevin say to Roger and Cory?
3    A.  Why couldn't they find other places to
4 sit?  Why were they sitting next to me?
5    Q.  What did they say?
6    A.  They said those were the only chairs
7 available.
8    Q.  What does the break room look like?
9    A.  Three large tables and a couple of
10 chairs.
11   Q.  How many people were in the break room at
12 that time?
13   A.  There was a cleaning girl, someone from
14 the office, maybe eight people, including myself.
15   Q.  Who were the other people?
16   A.  Well, the cleaning girl.
17   Q.  What was her name?
18   A.  I have no idea.  She didn't even speak
19 English, I don't think.  The woman from the cash
20 office.  I don't remember her name.
21   Q.  Who else?
22   A.  Two other co-workers that I didn't
23 associate with.  One was Jason Lund's mother, I
24 think.

---

89

1    Q.  Any others?
2    A.  Just Roger and Cory.
3    Q.  You said there was another co-worker or
4 an associate.  Was it a female?
5    A.  Yes.
6    Q.  I'm sorry.  You said one was possibly
7 Jason's mother and another lady?
8    A.  Yes, another lady, but I didn't know her.
9 I don't know what department she worked in.  People
10 come in and out of the break room, and I don't pay
11 attention to them.  They were in the same room, not
12 specifically at the same table.
13   Q.  What else is in the lunchroom?
14   A.  A kitchen area with a refrigerator, some
15 sort of snack machine, trash barrels, a smoking
16 room.
17   Q.  Did anyone say anything in response to
18 Kevin's comments?
19   A.  One lady made a remark that he needed to
20 lower his voice and that he was acting immaturely.
21   Q.  Who was that?
22   A.  The lady that I didn't know what
23 department she was from.
24   Q.  Did anyone else say anything; did you say

---

90

1  anything?
2      A.  I told him he needed to stop.  Especially
3  when he made the remark that I needed to help the
4  customer and that I acted inappropriately.  He said
5  I should have come back right away and helped the
6  customer.  I don't know.  He started to scream that
7  he thought we had a better relationship than that.
8  I said, "What kind of relationship do you think we
9  have?  Why are you doing this?"
10     Q.  What kind of relationship did you think
11 that he was implying?
12         MR. TOCCI:  Objection.
13         THE WITNESS:  The way he was acting was
14     jealous and possessive.  The way he was acting
15     and speaking, the things that came out of his
16     mouth, everyone knew he was jealous.
17     Q.  (By Ms. Fabbo)  So in the lunch room, he
18 was jealous over where Cory had sat.  What else did
19 he say?
20     A.  He tried to shove Cory down the stairs.
21     Q.  Was there anything else?
22     A.  He made some off-the-wall comments.  I
23 don't know exactly without reading over the notes
24 that I had written down.  I mean, it has been so

91

1  long.
2      Q.  Have you told me everything that you
3  remember about that incident?
4      A.  I am trying to tell you everything.
5      Q.  Is there anything else that you can
6  remember?
7      A.  Just that he indicated that he thought
8  that we had a better relationship than that.  I
9  took it in the sense that he was acting like we had
10 a girlfriend/boyfriend type of relationship, and it
11 freaked me out.
12     Q.  When he mentioned that he thought you had
13 a better relationship than that, did you say
14 anything in response to that?
15     A.  Everyone looked at the both of us.
16     Q.  What did you do?
17     A.  I paged Chad and asked to speak with
18 Chad.
19     Q.  How long had you been in the lunch room
20 when Mr. Correia came into the room?
21     A.  That was my dinner.  He had walked in
22 right after I got there.
23     Q.  Did you eat?
24     A.  I don't think I did.  I didn't have any

92

1  money to get anything.
2      Q.  So how long were you physically in the
3  break room before you went to page Chad?
4      A.  Maybe five minutes.  I'm not sure.  Maybe
5  ten minutes.  I'm not sure.
6      Q.  What happened when you paged Chad?
7      A.  He didn't come right away.  I had to page
8  him again.  He was annoyed with me because I had to
9  page him twice.
10     Q.  What time did you take your lunch break?
11     A.  I don't remember.
12     Q.  Was the store open?
13     A.  Yes.
14     Q.  Chad, at some point, returned your page
15 and came to you?
16     A.  Yes.
17     Q.  Where were you?
18     A.  Outside the assistant manager's office.
19     Q.  Is that downstairs or upstairs?
20     A.  Downstairs.
21     Q.  How long did it take him to get there?
22     A.  A while.  I would say about ten minutes.
23     Q.  What did you do during those ten minutes?
24     A.  I stood there and waited.

93

1      Q.  Was anybody else there?
2      A.  Cory.
3      Q.  Was he waiting there with you?
4      A.  Yes.
5      Q.  Do you know why he was waiting with you?
6      A.  To tell Chad what had happened.  The way
7  that Kevin was acting was so badly, I think Cory
8  was a little bit freaked out by it and concerned.
9      Q.  Did Cory say he was going to take action
10 against Mr. Correia?
11     A.  Yes.  He said he would talk to Bodie
12 about the way the situation had happened.
13     Q.  Let's go back to the time when you waited
14 with Cory for about ten minutes, then Chad arrived.
15 What happened; did you go into the office?
16     A.  No.  Chad wanted to speak out in the
17 hall.  I wanted to go in the office.  Co-workers
18 were leaving the break room and coming down and
19 going out to the sales floor.  It was embarrassing
20 as it was.  I didn't need anyone else to catch wind
21 of it.
22         He said he would not speak to me in the
23 office by himself.  He needed a female with him.
24 Cory was there and enough other people so people

---

**94**

1  still got wind of the situation.
2      Q.  Do you know if that is a Wal-Mart policy
3  to have a female present?
4      A.  That was what I was told.
5      Q.  So it was the three of you?
6      A.  Right.
7      Q.  Tell me who said what.
8      A.  I told Chad what had happened.
9      Q.  Tell me what you had told him.
10     A.  I told him that he was paging me all the
11  time.  Even my assistant manager was getting
12  annoyed.  He was harassing me.  He would go and get
13  the returns and try to bring things to my
14  department that he had no right to bring to my
15  department.
16     Q.  Like what?
17     A.  Baby clothes, whatever was returned to
18  the store.  He would bring back stuff to return to
19  the floor when it wasn't necessary, just to talk to
20  me.  When I would go out to get any items in the
21  storage room, he would go back and talk to me out
22  there.  He got caught and was told he didn't belong
23  there.  There was nothing from his department back
24  there.

---

**95**

1      Q.  What department was he in at the time?
2      A.  In housewares, like the lighting area or
3  where the computer tables were, putting together
4  computer tables with Shawn.
5      Q.  Like in electronics?
6      A.  I don't think so.  It is in domestics
7  where lamps and lamp shades are.  Domestics is on
8  the other side.
9      Q.  You told Chad that he pages you?
10     A.  Yes.  He was harassing me on the phone.
11     Q.  How many times per day?
12     A.  Anywhere from five to ten.
13     Q.  Did you ever complain to management about
14  those pages prior to speaking to Chad about it?
15     A.  I don't remember if I did.  From the way
16  I felt, I didn't need to tell anybody because they
17  heard it.  Every time that he would page me it was
18  an interruption over the intercom.
19     Q.  What was the page?
20     A.  Rebecca from infants, call 109 or
21  whatever.
22     Q.  Did you ever ignore his pages?
23     A.  No.  Because it could have been one of my
24  customers.

---

**96**

1      Q.  What else did you say to Chad during that
2  meeting?
3      A.  Just that he was harassing me.  He kept
4  trying to tickle me.  He commented on my clothes
5  and campaigned his undying love for me.  He said
6  that he was going to marry me, that he loves me.
7  He was following me around the store and trying to
8  return things to me that he didn't need to return.
9  I am very capable of getting my own returns, and so
10  wasn't John at the time.
11     Q.  Was there anything else that you told
12  Chad?
13     A.  Just that he was always in my department,
14  and about the discussion in the break room and the
15  telephone conversation.
16     Q.  The phone conversation?
17     A.  About me coming to sporting goods and
18  helping him find a UPC code.  I couldn't tell him
19  off the top of my head.  I had said to call the
20  department covering me for my break.  He wanted me,
21  and that was it.
22     Q.  Did he say anything in response to what
23  you said, he being Chad?
24     A.  No.

---

**97**

1      Q.  Did you ever observe Kevin or hear him
2  acting inappropriately to any other associates?
3      A.  No.  Well, just on a couple of occasions
4  to Andrea.  He would occasionally say things like
5  he did to me.  He would hug her and hold hands with
6  her.
7      Q.  Was she at one point in another
8  relationship with someone?
9      A.  Yes.
10     Q.  Did you ever discuss this situation with
11  her?
12     A.  Yes.  She just said, "Becky, it is out of
13  control, you need to talk to someone."  She just
14  came up and made that remark to me.  She knew I was
15  annoyed.
16     Q.  Did she say anything to you about Kevin
17  treating her in that manner?
18     A.  No.  But Dave, from toys, had seen it
19  too.  He had made up a petition and a lot of other
20  co-workers had signed up to get rid of him.
21     Q.  When was that?
22     A.  When I was working there.
23     Q.  Did you sign it?
24     A.  No, because I had left the store December

---

**Rebecca Lee Coelho**
**June 28, 2005**

(Pages 98 to 101)

98

1   11th. It was after I had already left, or it was
2   during the time that I was sick and didn't know
3   about it until I returned.
4       Q.  How did you learn about it?
5       A.  He told me.
6       Q.  Dave told you?
7       A.  Yes. He told me he had a lot of
8   signatures and stuff like that.
9       Q.  Did you ever see the petition?
10      A.  No, I can't say I did.
11      Q.  Did Dave tell you what he did with it?
12      A.  He said he brought it to management.
13      Q.  Did he say who in management?
14      A.  No, not specifically.
15      Q.  Did they say the reasons why they wanted
16  to get rid of Kevin?
17      A.  Yes. It was because of harassment.
18      Q.  Harassment of whom?
19      A.  Other co-workers. He said it was because
20  he was never where he was supposed to be and they
21  wanted something done about it.
22      Q.  Who did he harass?
23      A.  Other co-workers.
24      Q.  Who?

99

1       A.  Andrea was one, and Dave. He was
2   annoying to everyone.
3       Q.  Who else?
4       A.  I can't speak for other people. I just
5   know of the list that Dave had. I didn't read the
6   signatures.
7       Q.  Did you ever see him harass anyone else,
8   other than the people that you told me about?
9       A.  No.
10      Q.  How do you know that he was annoying to
11  everyone?
12      A.  Because they would say things to him
13  like: You are not supposed to be here. His
14  department manager said, "I bet I can find ten
15  things you need to be doing in your own
16  department."
17      Q.  Okay. Now, have you covered everything
18  that Cory said to Chad at that meeting?
19      A.  He told him that I was being harassed and
20  it looks ridiculous.
21      A.  The situation was totally out of control,
22  and the way he acted was unbelievable. I don't
23  know word-for-word what Cory had said.
24      Q.  Is there anything else that you can think

100

1   of?
2       A.  No.
3       Q.  Let's just focus on this meeting and
4   anything else that you think Chad said. He was
5   going to investigate and speak to Kevin. Is there
6   anything else during that particular meeting with
7   the three of you?
8       A.  No, nothing more.
9       Q.  How long did that meeting take place?
10      A.  Five or ten minutes, at the most.
11          I know he was agitated from the beginning
12  when I had him paged. He was agitated. I don't
13  know what I took him away from. He got annoyed when
14  I said that I didn't want to speak to him outside
15  the office, I wished to speak to him inside the
16  office. I think that it escalated from there.
17      Q.  Were there certain things you did not get
18  to tell him?
19      A.  No. I feel I told him exactly what had
20  occurred.
21      Q.  Okay. Who was the next member of
22  management that you spoke to about Mr. Correia?
23      A.  I talked to Chad again after he had
24  talked with Kevin.

101

1       Q.  So you spoke to Chad again?
2       A.  Right.
3       Q.  When was that?
4       A.  The same day.
5       Q.  So you stayed at work that day?
6       A.  Yes. It wasn't time to leave yet.
7       Q.  Tell me what you did after your meeting
8   with Chad. Did you go back to the break room to
9   work?
10      A.  I went back to work.
11      Q.  Okay. Where do you punch out?
12      A.  Right outside the locker room.
13      Q.  Did you punch back in?
14      A.  Yes.
15      Q.  Now, you went back to work. When you
16  went back to work, did you tell anybody about what
17  had happened?
18      A.  Nothing that I can recall.
19      Q.  How long was it when Chad got back to you
20  to discuss the situation?
21      A.  Right before I was getting ready to be
22  dismissed to leave.
23      Q.  Do you recall what time of night?
24      A.  No.

Rebecca Lee Coelho
June 28, 2005

(Pages 102 to 105)

---

102

1    Q.  How long did you work after the break;
2  how many more hours did you have?
3    A.  Until I met back up with Chad?
4    Q.  Yes.
5    A.  I don't know.  We were getting ready to
6  leave.
7    Q.  What time of day did you take your
8  break?
9    A.  It varied.
10   Q.  After a certain number of hours?
11   A.  I don't know, four hours, six hours, it
12 depends.
13   Q.  Did you work eight-hour shifts?
14   A.  Yes, sometimes more.
15   Q.  Do you remember how many hours that you
16 worked that particular day?
17   A.  No.
18   Q.  How did it come to your attention that
19 he wanted to see you?
20   A.  He came to my department.
21   Q.  What specifically did Chad say?
22   A.  He told me the woman from the cash office
23 did not back up my story and had, in fact, said
24 stuff against me.

---

103

1    Q.  Did he say that he had to conclude that
2  Kevin wasn't at fault at all?
3    A.  In some ways, yes.
4    Q.  Did he say that Kevin had acted
5  inappropriately?
6    A.  But that I was worse.
7    Q.  Did he tell you anything else in the
8  conversation?
9    A.  Just that I was the one that acted
10 inappropriately and handled the situation badly.
11 I said, "How so?  What do you mean by that?"  And
12 he said, "You didn't handle it appropriately."  I
13 think that I did.
14   Q.  Did you raise your voice?
15   A.  I raised my voice in annoyance, but not
16 screaming.
17   Q.  Did Chad say anyone supported your
18 version of the story?
19   A.  No, he didn't.
20   Q.  Did he tell you what, if anything, that
21 Mr. Correia said?
22   A.  No.  To some degree he just said that
23 Kevin didn't know what I was talking about and he
24 didn't know what I was referring to.  Kevin had

---

104

1  told him that I just didn't handle myself well for
2  the customers' sake.
3    Q.  Did you say anything to Chad in response?
4    A.  I just said what Kevin said wasn't true.
5  Chad was arguing with me in the hallway and said it
6  was my fault and I needed to take responsibility.
7  If I didn't want to, he would write me a slip and
8  fire me.
9    Q.  Did you get any sort of discipline for
10 that matter?
11   A.  No.
12   Q.  Do you know if Mr. Correia did?
13   A.  No, I don't know.
14   Q.  How did you end the conversation with
15 Chad?
16   A.  Badly.
17   Q.  Did you walk away or did he?
18   A.  I told him I didn't want to speak to him
19 anymore.
20   Q.  What did he say?
21   A.  Exactly what I told you, that it was my
22 fault.  I needed to talk to someone.  I could see
23 the conversation was going very wrong very
24 quickly, and I said I didn't have any more to say.

---

105

1    Q.  Then what did you do?
2    A.  I was writing down something, I don't
3  remember what it was.  I sat down at a desk and
4  wrote something up.  I don't remember what it was,
5  maybe a note as to what had just happened.
6    Q.  Where is this desk that you were sitting
7  at?
8    A.  Right outside the office, the cashier and
9  the assistant manager's office.
10       I didn't realize that Bruce was still
11 in the building so I called and spoke to him
12 in the office.
13   Q.  Did you hear his name or something?
14   A.  He walked by the room.
15   Q.  Did you keep what you were writing down?
16   A.  I'm not sure.  I don't remember, it was
17 so long ago.  I have no idea.
18   Q.  How long between the time that Chad left
19 and Bruce arrived?
20   A.  Five minutes later.
21   Q.  What is Bruce's position?
22   A.  He is the department manager.
23   Q.  Of the whole store?
24   A.  No.  They have different parts of the

Rebecca Lee Coelho
June 28, 2005

---

**106**

1  store. Chad has one part; Bruce has one part.
2  They have different parts.
3      Q.  And Bodie is the manager of the whole
4  store?
5      A.  Right.
6      Q.  What happened after Bruce arrived?
7      A.  I had wanted to speak to him in person.
8  He said the situation was handled very poorly,
9  and it was a very serious situation.
10        If I had talked to him first, he would
11  have handled it differently and sat down and talked
12  to all of us at the same time with the open door
13  policy, and that he was definitely going to speak
14  to Bodie and Chad in the morning.
15      Q.  What did you tell him?
16      A.  Everything that happened, everything that
17  was said. He believed that we should have called a
18  meeting, and based on what I was saying about
19  Kevin, he said if he could have had it his way,
20  Kevin would be fired.
21      Q.  What did you say in response?
22      A.  I don't know.
23      Q.  Do you remember anything that you said?
24      A.  I felt kind of bad about the whole

---

**107**

1  situation because now Chad was mad at me.
2      Q.  I'm asking you what you said to Bruce, if
3  anything, in response. Did you say anything? Did
4  you tell him you felt better?
5      A.  No, I didn't make any remark.
6      Q.  How did that conversation end? Did you
7  leave; did he leave?
8      A.  I felt better that he said he was going
9  to speak to Chad and Bodie about the way the
10  situation was handled.
11      Q.  Do you have any knowledge of whether he
12  spoke to them?
13      A.  No.
14      Q.  Okay. Did you go home after?
15      A.  I went home.
16      Q.  Did you speak to any associates before
17  going home?
18      A.  Not that I recall.
19      Q.  What happened when you got home?
20      A.  I called my husband up and told him
21  exactly what happened.
22      Q.  At that time, you were living where you
23  are living now?
24      A.  Right.

---

**108**

1      Q.  Did your husband say anything in
2  response?
3      A.  He said I needed to file a written
4  complaint right away. That this had gone too far,
5  and is too ridiculous.
6      Q.  Where was your husband working?
7      A.  Roche Brothers.
8      Q.  Did he advise you to do anything else?
9      A.  No, just to go and file a written
10  complaint.
11      Q.  With whom?
12      A.  Human resources.
13      Q.  Did you talk to anyone other than your
14  husband?
15      A.  My mom and my stepdad.
16      Q.  That was all in the same day?
17      A.  Yes.
18      Q.  Anyone else?
19      A.  I can't recall anybody else.
20      Q.  Did you make any notes about what had
21  happened?
22      A.  I don't remember. I know I had a
23  notebook and notes. I don't know if I still have
24  them.

---

**109**

1      Q.  Did you say you were scheduled to work
2  the next day?
3      A.  I don't recall. I had a day off. I'm
4  not sure. But I went back and filed a written
5  complaint.
6      Q.  Had you prepared a written complaint?
7      A.  No.
8      Q.  What did you do after you got to work
9  that day?
10      A.  I went to speak to Rich in human
11  resources.
12      Q.  Was he available when you got there?
13      A.  Yes.
14      Q.  Do you know what day we are talking about
15  here?
16      A.  I don't know. I think the incident
17  happened on December 11th and sometime after that I
18  went to try and find the written policy.
19      Q.  Do you mean after the incident with Kevin
20  in the break room?
21      A.  Yes.
22      Q.  You went to Rich in human resources, and
23  what happened there?
24      A.  He said I wasn't going to be able to file

---

Rebecca Lee Coelho
June 28, 2005

(Pages 110 to 113)

---

110

1 a complaint because he wanted to get Kevin's side
2 of the story to see how Chad handled the situation.
3    Q.  Rich wanted to do this?
4    A.  Yes.
5    Q.  What's your understanding of what Rich's
6 position is?
7    A.  He was the human resource manager.
8    Q.  He wanted to arrange a meeting between
9 who?
10    A.  Chad and Bodie.
11    Q.  Were you to be present?
12    A.  No.
13    Q.  What did you tell him about the
14 situation?
15    A.  Exactly what I told you.
16    Q.  Was he aware of it already?
17    A.  Yes.
18    Q.  Did he tell you how he became aware of
19 it?
20    A.  No.  He had already heard about the
21 situation, but he didn't go into detail.
22    Q.  Did you say anything in response to him
23 telling you that there was going to be a meeting?
24    A.  I was just upset because I couldn't file

---

111

1 a written complaint that day.  He wouldn't let me.
2 He said I could not.
3    Q.  Did you try to contact the home office at
4 all?
5    A.  At the time, no.
6    Q.  Did you try to go to Bodie at the time?
7    A.  I tried.  Bodie was not around.
8 Sometimes he was around, but it was very rare that
9 I saw him.
10    Q.  Are you sure he wasn't in the store; did
11 you try to find him?
12    A.  Yes.
13    Q.  And you didn't see him?
14    A.  No.  They said he wasn't in the building.
15    Q.  So how did you leave it with Rich; was he
16 supposed to get back to you?
17    A.  I assumed he would get back to me.  But I
18 didn't hear back.
19    Q.  Who was the next management person that
20 you spoke to?
21    A.  It was Bodie.
22    Q.  Between your conversation with Rich and
23 your conversation with Bodie on December 11th, did
24 you talk to anyone else?

---

112

1    A.  I tried to call Crystal, the department
2 manager, and talk to her.  I had her phone number,
3 and I needed to ask her about something else.
4    Q.  About what?
5    A.  Some emergency days off.
6    Q.  What about when you tried to call her?
7    A.  I couldn't get in touch with her.
8    Q.  Did you speak to anyone else?
9    A.  Her mother.
10    Q.  What was her mother's name?
11    A.  I don't know her name.
12    Q.  Did her mother work at the store?
13    A.  Yes.
14    Q.  What did you say to Crystal's mother?
15    A.  I just told her I needed to speak to her
16 daughter, that it was very important.  I just asked
17 her that if she called in, would she page me so I
18 could speak with her.
19    Q.  Did she agree to do that?
20    A.  Yes.
21    Q.  Did you speak to Crystal that day?
22    A.  I'm not sure if I spoke to her that day.
23    Q.  Did you speak to her on another day?
24    A.  I spoke to her at some time.

---

113

1    Q.  Did you speak on the telephone?
2    A.  Yes.
3    Q.  Is there anyone else at Wal-Mart that you
4 spoke to, associates or management, prior to
5 speaking to Bodie and speaking to Rich?
6    A.  Maybe Christine and Cathy.
7    Q.  Maybe?  You don't remember?
8    A.  No.  I don't know.  There was so much
9 going on at the time.  I can't be positive.
10    Q.  Were you dating anyone at the time?
11    A.  Oh, my god, no.
12    Q.  Did you date anyone when you were
13 separated?
14    A.  No.
15    Q.  Are you dating anyone now?
16       MR. TOCCI:  Objection.
17       THE WITNESS:  No.
18       MS. FABBO:  It is about 1:30.  I
19 would say we need to take a break.
20       (A recess was taken)
21       MS. FABBO:  Back on the record.
22    Q.  (By Ms. Fabbo)  Now, could you tell me,
23 please, about your conversation with Mr. Moore,
24 Bodie Moore, on December 11, 2003?

---

114

```
 1     A.  Just that I was called into the office.
 2     Q.  By whom?
 3     A.  Crystal had paged me.
 4     Q.  Who was present?
 5     A.  Crystal, Gigi, Bodie, and myself.
 6     Q.  Who began the talking?
 7     A.  Bodie.
 8     Q.  What did he say?
 9     A.  He said, "What seems to be the problem?"
10 I told him.
11     Q.  What did you tell him?
12     A.  Just about what had happened between me
13 and Kevin.
14     Q.  Meaning what?  What happened over your
15 whole employment or --
16     A.  The harassment, the conversation that we
17 had in the break room.  That's what I thought he
18 wanted to talk about, then he went into other
19 things.
20     Q.  Like what?
21     A.  My performance.
22     Q.  What about your performance?
23     A.  That he just didn't feel like I was doing
24 a good enough job, things like that.  I just really
```

115

```
 1 wanted to stay on the conversation about Kevin.
 2         Then he asked me what kind of
 3 relationship I had with Kevin.  I said that he is
 4 just another co-worker and what did he mean?  He
 5 asked me if I had ever gone out with Kevin.  Had I
 6 gone out to dinner with Kevin; had I gone out to
 7 the mall, to dinner, for coffee?  I said, no.  He
 8 started to say other things.  I can't really
 9 remember off the top of my head.
10     Q.  Did he indicate to you whether Kevin had
11 told him that you were having a relationship with
12 him?
13     A.  No.
14     Q.  What else did he say?
15     A.  That he believed that we had a
16 relationship.
17     Q.  Based on what?
18     A.  He didn't tell me based on anything.  I
19 didn't even ask him that question.
20     Q.  Was Gigi or Crystal saying anything?
21     A.  No.
22     Q.  Did you say anything?
23     A.  I just asked him, "What do you mean?"  I
24 didn't understand what he meant.  He felt that
```

116

```
 1 maybe I had led him on.  Then he went on further to
 2 ask me if I had a personal relationship with Cory,
 3 and I said no.  He didn't believe me when I said
 4 no.
 5     Q.  Is there anything else that he said
 6 during that meeting?
 7     A.  He just told me that he believed that I
 8 was having a relationship in the work place and
 9 that I wasn't conducting myself very well.  He said
10 that if he got another complaint about me, that he
11 would have to let me go.
12     Q.  Did he tell you that he had received any
13 complaints about you?
14     A.  He got a complaint about me from Nicole,
15 when I worked in Nicole's department.
16     Q.  What was that complaint?  Did he ever
17 discuss it with you?
18     A.  Just that I was unteachable, like
19 untrainable.
20     Q.  He discussed that with you at the time?
21     A.  Yes.
22     Q.  What did you say?
23     A.  Nothing.  That was proven to be untrue.
24 Crystal was training me in infants and had no
```

117

```
 1 problem with me.  She even told me to my face that
 2 I was an excellent worker.
 3     Q.  Did Crystal or Gigi say anything at all
 4 during that meeting?
 5     A.  No.
 6     Q.  So it was just you and Bodie that spoke?
 7     A.  Yes.
 8     Q.  What else do you remember that was said?
 9     A.  I don't know.  Just that I was being
10 blamed for everything.  I went into shock after
11 that.
12     Q.  Did he say that he had conducted an
13 investigation?
14     A.  No, but Chad had.  Chad came up with
15 nothing.
16     Q.  Okay.  Did he tell you whether anyone
17 else had come forward and complained about you?
18     A.  No.
19     Q.  Do you remember anything else from that
20 conversation?
21     A.  Just that he had said that he truly
22 believed that I was having a relationship in the
23 work environment, and that I was the one that
24 caused Kevin to like me.  He said that I had acted
```

Rebecca Lee Coelho
June 28, 2005

---

118

1 inappropriately and conducted myself inappropriately.
2      When he said that, I asked him, "Do you
3 know what you are saying to me?" And he said, "What
4 do you mean?" He got upset with me even more so.
5 He felt like I was being sarcastic. And I said to
6 him that he was essentially telling me that he
7 believed that I would commit infidelity in the work
8 environment or anywhere else. That was insulting
9 me.
10    Q.  Did he say anything in response?
11    A.  He was just shocked that I had come back
12 with that. I said that I wanted my husband in on
13 this conversation.
14    Q.  What did he say to that?
15    A.  That cannot happen.
16    Q.  Did he tell you -- strike that.
17        How long was the conversation when you
18 met in the office?
19    A.  I couldn't tell you.
20    Q.  What time of day?
21    A.  I don't know. I think I left there at
22 2:00.
23    Q.  Had anything occurred with Mr. Correia on
24 that day?

---

119

1    A.  Not to my knowledge, no.
2    Q.  Had you had any incidents with
3 Mr. Correia since the lunchroom issue that you
4 said you thought was December 7th?
5    A.  Other than the fact that he just went
6 along and just kept doing stupid stuff like he had
7 been doing all along.
8    Q.  Like what?
9    A.  Trying to talk to me, asking me what my
10 problem was, talking to other coworkers in the work
11 place and asking what was my problem and why was I
12 accusing him of anything. He didn't do anything
13 wrong. Cathy Hennessey was the one that told me
14 that.
15    Q.  Did you ever tickle Mr. Correia?
16    A.  No.
17    Q.  Do you have any knowledge as to why
18 Ms. Hennessey would suggest that you did?
19    A.  No. I had specifically told Kevin that
20 I'm not ticklish. I poked him and said, "This is
21 what it feels like when someone is tormenting you
22 and you don't enjoy it." I told him to keep his
23 hands to himself and not to touch me anymore.
24    Q.  Did you ever touch him on any other

---

120

1 occasion?
2    A.  No.
3    Q.  Did you ever say anything sexual to him?
4    A.  No.
5    Q.  Did any of the associates at the store
6 indicate to you in any way that they thought that
7 you were leading Mr. Correia to the conclusion that
8 you might be interested in him?
9    A.  No.
10    Q.  So was there anything else that happened
11 during that meeting of December 11th?
12    A.  No. Other than I took my badge off, and
13 I put it on the stack of papers on the table. Then
14 I just left. I got wicked sick, and I thought I
15 was going to vomit. When he told me my husband
16 couldn't be in on the conversation, that is when I
17 lost it.
18    Q.  Do you know if that is the Wal-Mart
19 policy or not?
20    A.  Now I do. That is what he told me. He
21 said, "Your husband does not work for this company,
22 so he cannot be in on this conversation."
23    Q.  Why is it that you wanted your husband
24 there?

---

121

1    A.  Because he was accusing me of infidelity
2 in the work environment, and I was still legally
3 married.
4    Q.  I still don't understand why you wanted
5 your husband there.
6    A.  Because my husband knows me better than
7 anybody else. And he knows that I don't conduct
8 myself in that manner.
9    Q.  So then what, you got upset with him?
10    A.  With who?
11    Q.  With Bodie, when he said that your
12 husband couldn't be present.
13    A.  I just got sick to my stomach, and I
14 started crying. I have never had anybody say
15 something like that to me or accuse me of something
16 like that.
17    Q.  Did you leave the room? Did you tell him
18 that you quit?
19    A.  Yes.
20    Q.  Did he say anything in response?
21    A.  No.
22    Q.  Did anyone get up and follow you, to your
23 knowledge?
24    A.  No.

---

**Rebecca Lee Coelho**
**June 28, 2005**

(Pages 122 to 125)

---

122

1    Q.   What is the last thing you remember
2  anyone saying in that room, other than yourself?
3    A.   Nothing.
4    Q.   So where did you go when you left the
5  meeting room?
6    A.   I went up the stairs to Rudi Eckerman's
7  office and asked to speak to him.
8    Q.   What happened?
9    A.   His secretary told me that he was not in
10 and she would take my name and phone number and
11 have him contact me at home.
12   Q.   What is his secretary's name?
13   A.   I have no idea what her name is.
14   Q.   Did you ever hear from Mr. Eckerman?
15   A.   No.
16   Q.   Did you ever try to contact him yourself?
17   A.   Yes.
18   Q.   When did you try to contact him?
19   A.   Right after that.
20   Q.   When, the same day?
21   A.   Yes.
22   Q.   By what means?
23   A.   By phone.
24   Q.   You tried to call him in his office?

---

123

1    A.   Yes.
2    Q.   After December 11th, did you ever try to
3  reach him again?
4    A.   I can't recall.
5    Q.   Did you leave a second message for him on
6  December 11th?
7    A.   Possibly.
8    Q.   Did you make any notes of what happened
9  on December 11th, on that day?
10   A.   Yes.
11   Q.   Do you still have those notes?
12   A.   I'm not sure.
13   Q.   After you went up there to try and speak
14 to Mr. Eckerman, what did you do?
15   A.   I didn't get to speak to Mr. Eckerman.
16   Q.   Right.  After you went up there to try to
17 speak to him, where did you go?
18   A.   I was crying.  I was explaining the whole
19 story to a secretary.  She wanted to know what had
20 happened.  Bodie came in behind me and tried to
21 intimidate me to leave so he could speak to the
22 secretary alone.  I walked out of there because I
23 was very uncomfortable, and I went to my locker and
24 returned my smock and other things.

---

124

1    Q.   When you said that Bodie tried to
2  intimidate you, what did he try to do?
3    A.   He gave me a nasty look.
4    Q.   Anything else?
5    A.   Shut the door behind me as soon as I
6  walked out of the room.
7    Q.   Did you immediately leave the store or
8  did you speak to anyone on your way out?
9    A.   Yes.
10   Q.   Which one?
11   A.   I spoke to someone on the way out.
12   Q.   Who?
13   A.   Christine.
14   Q.   Do you know her last name?
15   A.   No.
16   Q.   I'm sorry.  Where did she work, what
17 area?
18   A.   Fabrics.
19   Q.   What did you say to Christine?
20   A.   I just told her that I was leaving.  She
21 saw that I had been crying.  She told me she would
22 call me later, but she never called me.
23   Q.   Did you tell her that you quit or that
24 you had been terminated?

---

125

1    A.   No.
2    Q.   Where did you go when you left the store?
3    A.   Home.
4    Q.   Did you stop anywhere on the way?
5    A.   No.
6    Q.   Since that time, have you spoken to
7  anyone at Wal-Mart who is still employed by
8  Wal-Mart?
9    A.   No.
10   Q.   You did say you called 1-800-Wal-Mart.
11 Was that on December 11th?
12   A.   That was at the same time I was trying to
13 get in touch with Rudi.
14   Q.   Did you make any attempts to contact
15 anyone else other than Rudi or calling the 1-800
16 number?
17   A.   No.
18   Q.   Are you currently employed?
19   A.   No.
20   Q.   Have you been employed at all since you
21 left Wal-Mart?
22   A.   I worked for a short time.
23   Q.   Where?
24   A.   Aiding the elderly.  Taking them to

---

**Accurate Court Reporting**
**413.747.1806        413.747.1818**

32

**Rebecca Lee Coelho**
**June 28, 2005**

126

1 appointments, stuff like that.
2    Q.  Who was your employer?
3    A.  His name was Shoal Barina. (Phonetic)
4    Q.  When did you work there?
5    A.  Maybe June or July to August.
6    Q.  Of what year, 2004?
7    A.  I don't recall exactly what year.
8    Q.  So it was after your Wal-Mart employment?
9    A.  Yes.  It was a long time after that,
10 several months.
11    Q.  How did you obtain that employment?
12    A.  An ad.
13    Q.  Why are you no longer employed?
14    A.  It was just a temporary thing, and
15 because of illness.
16    Q.  What illness?
17    A.  Stress, stomach, depression.
18    Q.  Did you leave there because you were sick
19 or was it because it was a temporary situation?
20    A.  Temporary.
21    Q.  So before working with the elderly, you
22 didn't have any other position after leaving
23 Wal-Mart?
24    A.  No.

127

1    Q.  Did you collect unemployment --
2    A.  Yes.
3    Q.  -- during that time period?
4    A.  Yes.
5        MR. TOCCI:  Remember to let her finish
6    her question.
7        THE WITNESS:  Okay.
8        MR TOCCI:  By the way, do you know how
9    to spell that name?
10        THE WITNESS:  I have no idea.  He is
11    Indian.
12    Q.  (By Ms. Fabbo)  How much did you collect
13 from unemployment?
14    A.  I have no idea.
15    Q.  Did you get a certain amount per week?
16    A.  Every two weeks.
17    Q.  Do you remember the amount?
18    A.  It was $100.  I don't know.  It wasn't
19 much.
20    Q.  How many hours a week were you working at
21 Wal-Mart, approximately?
22        MR. TOCCI:  Objection.  What period?
23    Q.  (By Ms. Fabbo)  Any period.  How many
24 hours a week did you work?

128

1    A.  I have no idea.
2    Q.  Do you consider it to be a full-time job
3 or a part-time job?
4    A.  Full time.  I went from temporary to
5 permanent, so it was full time.
6    Q.  When you were temporary, was it part
7 time?
8    A.  I think it was, yes.
9    Q.  Did you collect unemployment for the
10 maximum amount of time?
11        MR. TOCCI:  Objection.  You can answer.
12        THE WITNESS:  I'm not really sure.
13    Q.  (By Ms. Fabbo)  Why did you stop
14 collecting unemployment?
15    A.  It ran out.
16    Q.  Did you have any income from any other
17 source since you left Wal-Mart?
18    A.  My daughter's child support.
19    Q.  Have you consulted with any health care
20 professionals in connection with employment at
21 Wal-Mart?
22        MR. TOCCI:  Objection.  You can
23    answer.
24        THE WITNESS:  I've spoken to my

129

1    primary care physician.
2    Q.  (By Ms. Fabbo)  Who was that?
3    A.  It was George Silva.
4    Q.  Is that the doctor who is on the doctor's
5 note that we looked at?
6    A.  If there is a Silva on there, yes.
7    Q.  Any relation to Cory?
8    A.  No.
9    Q.  When did you stop seeing Dr. Silva?
10    A.  He is no longer my primary care
11 physician.  I had to switch.
12    Q.  When did that end?
13    A.  April 30th of this year.
14    Q.  Other than Dr. Silva, did you see any
15 other health care professionals?
16    A.  No.  Oh, my gastroenterologist.
17    Q.  Who is that?
18    A.  Dr. Dickstein in Framingham.
19    Q.  Is that a male or female?
20    A.  A male.
21    Q.  Do you know his first name?
22    A.  I'm not really sure.
23    Q.  Do you know how to spell his last name?
24    A.  Dickstein.

**Rebecca Lee Coelho**
**June 28, 2005**

---

130

1    Q.   Do you know the address of where he is
2 located or what practice he is with?
3    A.   It is Boston Gastroenterology.
4    Q.   Anyone else?
5    A.   That knows about this situation?
6    Q.   Any health care provider that you spoke
7 to about your work situation or stress related to
8 that.
9    A.   No.
10   Q.   No therapist or counselors?
11   A.   No.
12   Q.   When did you first start seeing
13 Dr. Dickstein?  Was it when you were still employed
14 with Wal-Mart or before employment or after
15 employment?
16   A.   No, before.  Before Dr. Dickstein, I had
17 been seeing Dr. Patell, and I was referred over.
18   Q.   When did you first start -- so you went
19 for your stomach issues?
20   A.   Yes.
21   Q.   When did you first start having problems
22 with your stomach?
23   A.   I would say like close to the time before
24 I quit.  I got very sick right before, like in

---

131

1 December.
2    Q.   What were your symptoms then?
3    A.   Pain.
4    Q.   Stomach pain?
5    A.   Yes.
6    Q.   Anything else?
7    A.   Nausea.
8    Q.   Any other symptoms as of December, before
9 you quit?
10   A.   Sometimes migraines.
11   Q.   Had you ever had any of these before?
12   A.   I had migraines, but they were more
13 severe than usual.
14   Q.   Any other symptoms while you were still
15 employed?
16   A.   No.
17   Q.   Did you see any health care professionals
18 while you were employed at Wal-Mart?
19   A.   Yes.
20   Q.   Who?
21   A.   My neurologist.
22   Q.   Who's that?
23   A.   Dr. Bains.
24   Q.   Could you spell that last name?

---

132

1    A.   B-A-I-N-S.  She is in Mashpee.  She is
2 the only one in Mashpee.
3    Q.   Had you seen Dr. Bains previously for
4 anything?
5    A.   Yes.
6    Q.   For what?
7    A.   Migraines.
8    Q.   Anything else?
9    A.   No.
10   Q.   When did you first see Dr. Bains for
11 migraines?
12   A.   I don't remember.
13   Q.   Approximately what age were you?
14   A.   The same age.
15   Q.   Was this in December that you are talking
16 about?
17   A.   This is when I worked for Wal-Mart, yes.
18   Q.   In December of 2003, is that the first
19 time that you saw Dr. Bains?
20   A.   I don't know if it was the first time.  I
21 couldn't tell you.
22   Q.   But it was during your employment, as far
23 as you remember?
24   A.   Yes.

---

133

1    Q.   Had you ever seen any other health care
2 provider in connection with your migraines?
3    A.   No.
4    Q.   Did someone refer you to Dr. Bains?
5    A.   No.
6    Q.   How did you end up going to see a
7 neurologist?
8    A.   I needed a neurologist down on the Cape.
9    Q.   Did you have a neurologist?
10   A.   I did a long time ago.
11   Q.   When was that?
12   A.   When I lived back in Milford.
13   Q.   What did you see that neurologist for?
14   A.   Migraines.
15   Q.   That was when you were still living with
16 your mother?
17   A.   Yes.
18   Q.   Who was that neurologist?
19   A.   It varied.  I had a couple of different
20 ones.
21   Q.   Do you remember any of them?
22   A.   Not right now.
23   Q.   Were you ever prescribed any medications
24 for migraines?

---

**Rebecca Lee Coelho**
**June 28, 2005**

134

1    A.  Yes.
2    Q.  What were the medications?
3    A.  Tegretol.
4    Q.  Anything else?
5    A.  Amitriptyline.
6    Q.  Anything else?
7    A.  Nortriptyline.
8    Q.  Who prescribed these medications?
9    A.  Dr. Steven First.
10   Q.  F-I-R-S-T?
11   A.  Yes.
12   Q.  Was he in Milford?
13   A.  Marlboro.
14   Q.  When was this?
15   A.  2000 or 1999.
16   Q.  Did he ever identify anything that
17 triggered your migraines?
18   A.  No.
19   Q.  I just want to make sure I am clear.  You
20 saw Dr. Steven First, and then you went to someone
21 in Milford?
22   A.  No.  He was my primary care physician
23 when I lived in Milford.  He was one of many.
24   Q.  Prior to December of 2003, had you ever

135

1 had any problems with your stomach to cause you to
2 see a health care provider?
3    A.  I had a small bacterial infection.
4    Q.  When was that?
5    A.  2001.
6    Q.  Anything else?
7    A.  No.
8    Q.  Who did you see for that?
9    A.  Dr. Patell.
10   Q.  During your employment with Wal-Mart,
11 were you seeing any health care providers prior to
12 December 2003?
13   A.  Yes.  But I can't remember who I saw.
14   Q.  For what condition?
15   A.  Different things.
16   Q.  Like what?
17   A.  Polycystic cysts, kidney stones.
18   Q.  Anything else?
19   A.  Knee surgery.
20   Q.  When did you have knee surgery?
21   A.  When I was working for the cleaning
22 company in Cape Cod.
23   Q.  Is there anything else that you can think
24 of?

136

1    A.  Not right now.
2    Q.  So had you had issues with nausea or
3 stomach pain prior to December of 2003?
4    A.  Yes.
5    Q.  When?
6    A.  I don't know exactly.
7    Q.  Approximately.
8    A.  Maybe in 2003.  But I don't know exactly
9 when.  I had my gallbladder taken out.  I just
10 remembered that.
11   Q.  Anything else?
12   A.  I can't remember right now.
13   Q.  Did you tell Dr. Silva anything about
14 your employment with or separation from employment
15 with Wal-Mart?
16   A.  I made a remark about it.
17   Q.  Like what?
18   A.  Just that I was upset about what
19 happened.
20   Q.  Did you tell him what happened?
21   A.  Yes.
22   Q.  Did he say anything to you in response?
23   A.  No.
24   Q.  When was this that you had this

137

1 conversation with Dr. Silva?
2    A.  I don't remember.
3    Q.  Was it just one conversation?
4    A.  Yes.
5    Q.  Were you there for any particular reason
6 that day?
7    A.  I was there.  I had a reason to be there.
8 I don't know what it was at that time.
9    Q.  Did you tell him anything about your
10 employment with Wal-Mart?
11   A.  Yes.
12   Q.  What did you tell him?
13   A.  Just that I was having a problem.
14   Q.  Did you tell him what the problem was?
15   A.  Yes.
16   Q.  What did you tell him?
17   A.  That I had been harassed in my work
18 environment.
19   Q.  Did he say anything in response?
20   A.  Not really, no.
21   Q.  Did you have this conversation with
22 Dr. Dickstein while you were still employed?
23   A.  No.
24   Q.  Was it just one conversation?

Rebecca Lee Coelho
June 28, 2005

(Pages 138 to 141)

| | |
|---|---|
| **138** | **140** |

**138**

1    A.   Yes.
2    Q.   Was it in connection with a visit that
3 you had?
4    A.   Yes.
5    Q.   For what?
6    A.   My stomach.
7    Q.   Were you diagnosed with any stomach
8 disorder by Dr. Dickstein?
9    A.   Yes.
10    Q.   What is it?
11    A.   I have an inflammation to the colon and
12 to the intestines.
13    Q.   Did Dr. Dickstein tell you what he
14 believed caused that?
15    A.   He believed it was either Crohns or
16 Celiac Sprue.
17    Q.   Did he ever come to a conclusion?
18    A.   Yes.
19    Q.   Do you have both of them?
20    A.   It was questionable about the Crohns
21 because inflammation is too much.  So he did
22 biopsies and it proved to be sprue.  It is caused
23 by stress and over production of acid.
24    Q.   Other than your employment with Wal-Mart,

**140**

1 Dr. Patell?
2    A.   No.  I see Dr. Dickstein.  I don't see
3 Dr. Patell anymore.
4    Q.   Does the Zofran work for you?
5    A.   Not enough.
6    Q.   Did anyone give you any indication of
7 what the nausea is caused by?
8    A.   No.
9    Q.   What do you do during day?
10    A.   Nothing, really.  I take care of my
11 daughter, laundry, housework, stuff like that.
12    Q.   Is your daughter in school?
13    A.   Yes.
14    Q.   What do you do when she is at school?
15    A.   Housework.
16    Q.   Do you ever go anywhere?
17    A.   I can't.  I am kind of housebound.
18    Q.   Why is that?
19    A.   Because of my intestines.
20    Q.   What does that mean; do you have to use
21 the bathroom a lot?
22    A.   I have to stay very close to the
23 bathroom.
24    Q.   Do you take medication for that

**139**

1 what other stressful events were going on in your
2 life either before or immediately after?
3    A.   None.
4    Q.   Do you consider your separation with your
5 husband to be stressful?
6    A.   No.
7    Q.   What about your divorce?
8    A.   Nope.
9    Q.   Did anyone ever recommend that you
10 consult with a psychologist or psychiatrist for
11 your stress?
12    A.   Everyone.  My mom, my stepdad.
13    Q.   Did you ever consider seeing someone?
14    A.   I haven't been well enough to go to a
15 doctor's office.
16    Q.   Why do you say that?
17    A.   I have extreme nausea that I have to take
18 medication for.
19    Q.   What is that?
20    A.   It is called Zofran.
21    Q.   You have been to other appointments
22 though, right?
23    A.   For what?
24    Q.   You say you saw Dr. Dickstein and

**141**

1 condition?
2    A.   Yes.
3    Q.   Is that the one that you told me about
4 this morning?
5    A.   That is one of three.
6    Q.   What are the other ones?
7    A.   I can't explain about what the other one
8 is.  It is a packet that I have to mix and drink.
9 I don't know the name of it.
10    Q.   Did your health care provider give you a
11 prognosis about this condition, what they expect to
12 happen, like will it get better or will it get
13 worse?
14    A.   I will have to just wait for the
15 inflammation to go down.
16    Q.   Were you given any recommendations to try
17 and help it get better?
18    A.   No.
19    Q.   How frequently do you see Dr. Dickstein?
20    A.   I just saw her in the beginning of June.
21    Q.   How frequently do you usually see her,
22 every month?
23    A.   I haven't been able to get up to the Cape
24 to see her.  It is too long a drive, and I can't

Rebecca Lee Coelho
June 28, 2005

(Pages 142 to 145)

---

142

1  hold my intestines.
2     Q.  How have you made it here?
3     A.  I took some medication, and I stayed in
4  Worcester at a friend's so that I could make it
5  here.
6     Q.  So prior to June 2005, when was the last
7  time you saw Dr. Dickstein?
8     A.  I don't remember.
9     Q.  Do you remember whether it was several
10 months ago?
11    A.  Several months ago, possibly.
12    Q.  Have any of your physicians ever
13 recommended that you see a therapist or get any
14 counseling?
15    A.  Yes, my primary care physician.
16    Q.  Who was that now?
17    A.  It was George Silva.  I just started with
18 a new doctor just recently.
19    Q.  Who was that?
20    A.  Dr. Pryor in Bourne.  My insurance
21 cancelled.
22    Q.  You were on your husband's insurance
23 before?
24    A.  Yes.

---

143

1     Q.  Are you still on your ex-husband's
2  insurance?
3     A.  No, it is cancelled.
4     Q.  How do you get insurance?
5     A.  Through the state.
6     Q.  Have you been looking for positions,
7  anywhere, jobs?
8     A.  Yes, I have.
9     Q.  Where have you been looking?
10    A.  When I'm out at the grocery store, I have
11 stopped at T.J. Maxx, Marshalls, everywhere.
12    Q.  Did you ever fill out any applications?
13    A.  Yes, I did.
14    Q.  At what places?
15    A.  Marshalls, T.J. Maxx, Christmas Tree
16 Shops, Stop & Shop, CVS.
17    Q.  Are you able to go back to work now?
18    A.  I don't think so.
19    Q.  So why are you filling out
20 applications then?
21    A.  Because I need to make money to live.  I
22 have bills to pay.
23    Q.  But you don't believe that you can go
24 back to work?

---

144

1     A.  I want to believe that, but I know
2  physically that I can't.  My doctor knows that too.
3     Q.  What are the reasons; what are the
4  specific reasons keeping you from work, the
5  physical reasons, as you see them?
6     A.  That I've been very sick.
7     Q.  What though?  You need to use the
8  bathroom a lot?
9     A.  Right.  I'm not able to eat at all.
10    Q.  Why is that?
11    A.  Because of the inflammation in my
12 stomach.
13    Q.  Have you lost weight since your
14 separation?
15    A.  Yes, I have.
16    Q.  How much?
17    A.  I don't how much, but too much.  The
18 doctor is very concerned.
19    Q.  How much did you weigh when you were
20 working at Wal-Mart?
21    A.  I don't know.  A lot more than I do now.
22 I didn't weigh myself back then.
23    Q.  Have you weighed yourself at your
24 doctor's office?

---

145

1     A.  Yes, they did.
2     Q.  What did you weigh?
3     A.  I think it was 146 or 144.
4     Q.  Do you have any rough estimation of what
5  you weighed at Wal-Mart?
6     A.  I'm estimating, I'm not positive.  I
7  could have been 160 or more.
8     Q.  What is your ideal weight; what weight do
9  you want to be at?
10       MR. TOCCI:  Objection.  You can
11    answer.
12       THE WITNESS:  I don't have an ideal
13    weight.  I just want to be better.
14    Q.  (By Ms. Fabbo)  Are there any other
15 health care providers that you have seen since your
16 separation, other than the ones that you told me
17 about?
18    A.  As far as I can remember.
19    Q.  Have you had any medical procedures done,
20 any tests, any surgeries?
21    A.  Yes.  The ones that I told you about.  I
22 had an endoscopic procedure with the colonoscopy.
23    Q.  Anything else?
24    A.  No.

---

**Rebecca Lee Coelho**
**June 28, 2005**

146

1    Q.  Do you drive?
2    A.  Occasionally, yes.  I have my own car.
3    Q.  You had mentioned before that Mr. Correia
4  was telling other associates that you were in a
5  relationship or something to that effect.
6    A.  Yes.
7    Q.  Are you talking about the associates in
8  the lunchroom during that incident?
9    A.  Other associates out on the floor and in
10  the lunch room.
11    Q.  Do you have any record of who they were?
12    A.  No.
13    Q.  Are there any other incidents of
14  inappropriate behavior directed at you that you
15  haven't told me about?
16      MR. TOCCI:  Objection.  You can
17    answer.
18      THE WITNESS:  Like what?
19    Q.  (By Ms. Fabbo)  Is there anything else
20  that you can think of that you haven't said?
21    A.  Other than grabbing my hand and getting
22  in my face and yelling at me.  I don't know.  I
23  really can't think of anything right now.
24    Q.  What was your understanding, if you had

147

1  one, of Wal-Mart's sexual harassment complaint
2  procedure?
3    A.  Not to permit it.
4    Q.  The complaint procedure, what were you
5  supposed to do to complain?
6    A.  There was an open-door policy, that's all
7  I knew.
8    Q.  And did you ever see any postings about
9  sexual harassment, in the lunch room?
10    A.  No.
11    Q.  Did you ever see it in the break room or
12  any other place?
13    A.  No.
14    Q.  Did you see any postings about wages,
15  hours, worker's comp.?
16    A.  No.
17    Q.  What was your relationship with Bodie
18  prior to this December 11th incident?  By that I
19  mean, had you spoken to him on other occasions
20  about problems or did you know him at all?
21    A.  I didn't know him.  I knew he was the
22  store manager.
23    Q.  Did you have occasions to speak to him?
24    A.  About when the problem arised, that was

148

1  it.
2    Q.  What about with Chad; had you had much
3  interaction with him?
4    A.  Yes, he was my department manager.
5    Q.  Did you see him on a daily basis?
6    A.  Yes, sometimes.
7    Q.  Did you have a decent relationship with
8  him prior to this whole episode with Kevin Correia?
9      MR. TOCCI:  Objection.
10      THE WITNESS:  Not really.
11    Q.  (By Ms. Fabbo)  What were the issues with
12  that relationship?
13    A.  Just the problem with Nicole.  He was
14  having a problem with me because she kept telling
15  him that I was unteachable.
16    Q.  Even after you moved out of that area?
17    A.  No.  After that, I had nothing to do with
18  Chad.
19    Q.  What about Bruce; what was your
20  relationship with Bruce?
21    A.  I had no problems with Bruce.  I didn't
22  have much interaction with him either.
23    Q.  What about Rudi Eckerman; prior to the
24  time that you spoke to him in October, had you had

149

1  reason to speak to him about anything?
2    A.  No.
3    Q.  Did you know him at all?
4    A.  I knew he was a district office manager,
5  and this was about it.
6    Q.  Was Bodie the store manager when you
7  arrived at Wal-Mart and first started working?
8    A.  Yes.
9    Q.  Can you think of anyone else at the
10  Wal-Mart store that you did talk to about
11  Mr. Correia's behavior, that you haven't already
12  told me?
13    A.  Not that I can think of at this point.
14    Q.  What was the last department that you
15  were in, infants?
16    A.  Yes.
17    Q.  Who are the other employees in that
18  department?
19    A.  Joan.  She is the older woman.
20    Q.  Anyone else?
21    A.  And Crystal.
22    Q.  So just the three of you?
23    A.  No, not all the time.  Me and Joan would
24  work together sometimes, and Crystal wouldn't even

**Rebecca Lee Coelho**
**June 28, 2005**

(Pages 150 to 153)

---

150

1  be there at all.
2      Q.  Anyone else that worked in that
3  department on a different shift?
4      A.  No.
5      Q.  What about when you were in domestics;
6  who worked there?
7      A.  Me and Nicole, that's it.
8      Q.  And in jewelry?
9      A.  I can't remember about the other.  There
10 were two girls besides me and Lauren.  I don't know
11 who they were.
12     Q.  Did you get along well with Crystal?
13     A.  Yes.
14     Q.  What about Gigi?
15     A.  Fine.
16     Q.  Your complaint that was filed in this
17 action alleges that you suffered severe emotional
18 stress.  Can you describe what your symptoms are?
19     A.  I sleep too much.  I can't eat sometimes.
20 I'm sick all the time.
21     Q.  Sick being the symptoms that you already
22 told me about, your stomach?
23     A.  Yes.
24     Q.  Anything else?

---

151

1      A.  I think I suffer from depression.
2      Q.  Have you ever had issues with depression
3  in the past?
4      A.  Not much.
5      Q.  A little?
6      A.  Yes.
7      Q.  In connection with what?
8      A.  With my grandmother's death.
9      Q.  When was that?
10     A.  When I was 14 or 15.
11     Q.  Any other time?
12     A.  No.
13     Q.  Do you have any other symptoms?
14     A.  Just a lot of fatigue and not wanting to
15 get up and do anything because I don't feel well.
16     Q.  When you say you sleep too much, what is
17 your sleeping pattern?
18     A.  I get up in the morning and get my
19 daughter off to school.
20     Q.  What time do you get up?
21     A.  Seven o'clock, and then I get her off to
22 school and I come back and go to sleep.
23     Q.  Until what time?
24     A.  Until she is ready to come home, to be

---

152

1  picked up.
2      Q.  So what time does she get off to school?
3      A.  I get her there by like 8:40.
4      Q.  And then you would sleep until what time?
5      A.  About 2:30.
6      Q.  Then what; what time do you go to bed at
7  night?
8      A.  Sometimes I don't sleep at night.
9      Q.  What time would you go to bed normally?
10     A.  I go about 10:00 or 10:30.
11     Q.  How frequently would you say you don't
12 sleep at night?
13     A.  A lot.  Almost every night.
14     Q.  Have you tried staying up during the day?
15     A.  Yes.
16     Q.  Does that help you at all?
17     A.  No.  Then I'm a zombie because I don't
18 get any sleep.
19     Q.  What does your daughter do for the
20 summer?  Is your daughter home?
21     A.  Yes.
22     Q.  What do you do when she is home?
23     A.  There is nothing that I can do.  I don't
24 have an income.

---

153

1      Q.  Do you sleep when she is home?
2      A.  Sometimes, yes.
3      Q.  What does she do?
4      A.  Goes out and plays with her friends,
5  rides her bike.  My mother watches her.
6      Q.  What hours do you sleep during the day
7  when she is home?
8      A.  The same hours, basically.  That is not
9  every day, but almost.
10     Q.  Almost every day?
11     A.  Yes.
12     Q.  Have your symptoms gotten better or worse
13 or stayed the same since your separation from
14 Wal-Mart?
15     A.  Worse.
16     Q.  How so?
17     A.  Because I have been so depressed.  I
18 don't know how to explain that.  The pain in my
19 stomach got much worse.  I ended up in the
20 hospital.
21     Q.  When was that?
22     A.  In October.
23     Q.  Of 2004?
24     A.  Yes.

---

**Rebecca Lee Coelho**
**June 28, 2005**

(Pages 154 to 157)

---

154

1    Q.  What hospital?
2    A.  Framingham.
3    Q.  How did you end up in the hospital?
4    A.  I couldn't go to the bathroom.  I had
5  severe, severe pain in my stomach.  I had had this
6  on and off for a really long time since I had left
7  Wal-Mart, but it got much worse.  I couldn't
8  breathe.  I couldn't eat.
9    Q.  Did you bring yourself to the hospital?
10   A.  I made a phone call to the
11 gastroenterologist, which wasn't Dr. Patell, but it
12 was my doctor at the time.  That was how I became
13 in touch with Dr. Dickstein.  He referred me
14 immediately to the emergency room.
15   Q.  Did you drive?
16   A.  No.  I think my mom did.
17   Q.  So what time of day did you go to the
18 emergency room?
19   A.  I don't remember.  I think that it was at
20 night.  I don't remember what time it was.
21   Q.  Were you admitted to the hospital?
22   A.  Yes.
23   Q.  Were you given any medication at the
24 hospital?

---

155

1    A.  Yes.
2    Q.  What were you given?
3    A.  Morphine, Demerol, Phenergan, Zofran
4  Tigan, some kind of medication for the stomach.
5  Protonics, I think it was called, IV fluids because
6  I was dehydrated.  I can't remember.
7    Q.  Did Dr. Dickstein join you at the
8  hospital?
9    A.  He finally came the last two days I was
10 there, I think.
11   Q.  How long were you there?
12   A.  A week and a half.
13   Q.  Were there any other hospital stays since
14 your separation from Wal-Mart?
15   A.  Lots.
16   Q.  When?
17   A.  I can't remember.  There's so many.
18   Q.  Tell me the ones that you do remember.
19   A.  I can't.  They are all jumbled together
20 because there were so many of them.  I was in and
21 out.
22   Q.  Were they all at Framingham?
23   A.  Framingham, Leonard Morse in Natick,
24 Falmouth.

---

156

1    Q.  Falmouth?
2    A.  Yes.
3    Q.  Anywhere else?
4    A.  No.
5    Q.  Do you attribute these all to be related
6  to your employment at Wal-Mart?
7    A.  Yes.
8    Q.  What do you remember about the
9  circumstances of any of your other hospital stays?
10   A.  How do you mean?
11   Q.  Do you remember going in, what your
12 symptoms were, were you given any treatments?
13   A.  The same thing.
14   Q.  How long were those stays?
15   A.  It could range from a couple of hours to
16 a day or two.  I can't remember if I stayed
17 overnight or not.
18   Q.  Was the longest stay the one in
19 Framingham?
20   A.  Yes.
21   Q.  Were you diagnosed with anything at the
22 time?
23   A.  No.  I went back into the hospital -- I
24 can't remember when it was.  It was after October.

---

157

1  I was in the hospital for my birthday for a whole
2  week and a half.
3    Q.  When is your birthday?
4    A.  October 5th.  I was in the hospital, and
5  he arranged for me to have the endoscopic procedure
6  and the colonoscopy again, and he took biopsies.  I
7  don't know if that was August or before August.  I
8  can't remember.
9    Q.  Have you been prescribed any medications
10 for depression or anxiety?
11   A.  He prescribed some medication for my
12 stomach and it has medication in it for depression.
13   Q.  What is that?
14   A.  I don't know.
15   Q.  Do you take that now?
16   A.  I haven't been taking it because I needed
17 to be here.
18   Q.  Why, because it somehow affects your --
19   A.  Any medication affects me.
20   Q.  How so?
21   A.  It can make me sleepy, chronically tired.
22 I can be a zombie.
23   Q.  When was the last time you took that
24 medication?

---

Rebecca Lee Coelho
June 28, 2005

---

158

1    A.  I haven't been taking it.
2    Q.  At all?
3    A.  Not at all.
4    Q.  When is the last time that you took it?
5    A.  I didn't take it.
6    Q.  Are you going to start taking it?
7    A.  Yes, I have to.
8    Q.  Had anyone prescribed anything else for
9  anxiety or depression prior to this recent
10  prescription?
11    A.  No.
12    Q.  I'm sorry.  I know I asked you this.  Did
13  Dr. Dickstein ever recommend that you should go for
14  counseling or therapy?
15    A.  Yes.
16    Q.  Did he suggest who you should go to?
17    A.  No.  He doesn't know anybody in that
18  area.  He is from Framingham.
19    Q.  Did you ever attempt to contact anyone in
20  the phone book?
21    A.  No.
22    Q.  Do you plan on going for therapy?
23    A.  Yes.  I just got on the MassHealth.
24    Q.  So you need to find a provider on that

---

159

1  plan; is that what you are saying?
2    A.  Yes.  And there isn't many in that area.
3    Q.  Are there any other symptoms of the
4  emotional distress that you haven't told me about?
5    A.  Probably.  But I can't think of any right
6  now.
7    Q.  What is your understanding of why
8  Mr. Correia is no longer employed at Wal-Mart?
9    A.  I don't have one.
10    Q.  Did you ever hear any rumors that he had
11  been terminated for sexual harassment?
12    A.  No.
13    Q.  Had anyone ever told you that, that he
14  had been terminated?
15    A.  There was a bunch of talk.  There is
16  always talk.  I don't listen to it.
17    Q.  Had you ever heard he had been
18  terminated, first of all?
19    A.  Yes.
20    Q.  By whom?
21    A.  I think it was Jason, Jason Lund, that
22  told me at the mall.
23    Q.  Did he tell you why he thought he had
24  been terminated?

---

160

1    A.  Yes.  He thought that it was sexual
2  harassment.  He had been told it was sexual
3  harassment.  That he got caught doing something,
4  and that they made it look like he had stolen
5  something at the store.
6    Q.  Who is they?
7    A.  Management.
8    Q.  This is what Mr. Lund told you?
9    A.  Yes.
10    Q.  Anyone else tell you anything about
11  Mr. Correia?
12    A.  I don't talk to anyone else.
13    Q.  Have you asked anyone to testify in your
14  behalf in this lawsuit?
15    A.  No.
16        MS. FABBO:  Mark this, please.
17        (Exhibit RC-10, job description,
18        marked)
19    Q.  (By Ms. Fabbo)  You were a sales floor
20  associate for your whole employment, right?
21    A.  Yes.
22    Q.  Is that your signature on that document,
23  that is on what I believe is Exhibit 10?
24    A.  That is my signature, but I didn't check

---

161

1  that off.
2    Q.  Is this generally what you did at
3  Wal-Mart; is that what your duties were?
4    A.  Yes.  Except, you know --
5    Q.  Are you changing your answer?
6    A.  Yes.
7    Q.  Based on what?
8    A.  It says, "Operate the handheld/SMART
9  terminal, designated pricing and power equipment,
10  and use other assigned tools."
11        I did that, but I wasn't trained very
12  well on it.  Like I had told you, Nicole didn't
13  train me on that at all.  I didn't even have
14  numbers to get on to that, to log on to it.  I did,
15  however, try to go through the screens with
16  Crystal, when Crystal was available, but I didn't
17  get enough training on that.
18        Also the cash register stuff.  When they
19  had brought this to my attention, I told them they
20  were wrong about the cash register thing.  They
21  said I had checked it off.  So they asked me to
22  issue them a letter to prove that.
23    Q.  That is when you got moved to a different
24  area, after that?

---

Rebecca Lee Coelho
June 28, 2005

(Pages 162 to 165)

162

1    A.  No.  I just brought the letter home.
2    Q.  When did you get taken out of that area?
3    A.  I think it was around that time.
4    Q.  Was it a result of the information that
5  they got that you couldn't work the cash register?
6    A.  I think it was -- no.  I think it was
7  because, when I went from jewelry, they knew that I
8  didn't want to run the cash register.  They knew I
9  didn't feel comfortable to stay in domestics any
10  longer.
11         In order for me to remain in the store,
12  they needed to find a new area for me to fit into,
13  which didn't have to deal with the cash register.
14  The only other area was infants at the time.  So in
15  order for them to not put me on the cash register,
16  I had to show them that letter because they said
17  that I had checked it off.
18    Q.  Who did you work with, was it Mr. Moore,
19  Bodie, regarding moving around throughout the
20  store?
21    A.  No.  They came up with the idea and asked
22  me if I was willing to go into infants.
23    Q.  Who communicated that to you?
24    A.  Crystal and Gigi.

163

1    Q.  Did you want to go to infants at that
2  time?
3    A.  Yes.
4    Q.  You stated in some of your complaints and
5  other documents that Kevin Correia leered at you.
6  Can you explain to me what you mean by that?
7    A.  Staring at me constantly, stalking me
8  through the store.  He would sit outside in his car
9  and wait for me to come outside when we were all
10  dismissed from work at the end of the night.  We
11  all punched out at the same time.  He would wait
12  out in the parking lot for me.  He asked me again
13  when I got outside to go out with him.
14    Q.  Was he married?
15    A.  I don't know anything about his life.  I
16  would assume not, he was only 20 years old.  But I
17  could be wrong.
18    Q.  Did anyone that you know of or that you
19  can identify see or hear Mr. Correia in the
20  parking lot asking you out?
21    A.  Cathy Hennessey was always usually around
22  him.  They talked to each other and hung around
23  with each other and stuff like that.
24    Q.  Did she ever hear him in the parking lot

164

1  asking you to go out?
2    A.  She has heard him asking me that in the
3  store.
4    Q.  Do you have any recollection of anyone
5  hearing that in the parking lot?
6    A.  I don't really remember.
7    Q.  Are you aware of any other associates at
8  the Wal-Mart store -- do you know the number of
9  that store?
10    A.  Not anymore.
11    Q.  Do you know of anyone at the Wal-Mart
12  store that you worked at who complained about
13  sexual harassment?
14         Is that clear to you; do you want me to
15  repeat that?
16    A.  Yes.  Can you?
17    Q.  Do you know of anybody else that ever
18  complained of sexual harassment at that store?
19    A.  No.
20    Q.  Do you know of anybody else that was
21  complaining about Kevin Correia ever sexually
22  harassing them?
23    A.  Andrea.  She complained verbally to other
24  co-workers and to myself.

165

1    Q.  Do you know whether Mr. Correia had any
2  kind of mental disability?
3    A.  I didn't know much about him personally.
4    MS. FABBO:  Would you mark this?
5    (Exhibit RC-11, complaint, marked)
6    Q.  (By Ms. Fabbo)  Would you turn to Page 5,
7  please, Paragraph 39?
8    I think that you said that the first time
9  you remember talking to Bodie about the situation
10  was on December 11th.  Do you know what this is
11  referring to?
12    MR. TOCCI:  Objection.  Take your
13    time.  In fact, if you want to, go back to the
14    beginning and start.
15    Q.  (By Ms. Fabbo)  If you go to the next
16  paragraph, it goes into the conversation with
17  Mr. Moore.  I just want to know if you remember any
18  of this.
19    A.  This was towards the end of the
20  conversation.
21    Q.  Is that during the December 11th meeting?
22    A.  Yes.
23    Q.  All this took place during that meeting,
24  what is in Paragraph 39?

166

1    A.   Yes.
2    Q.   And 40?
3    A.   Yes.
4    Q.   Paragraph 51 indicates in quotes that
5  Mr. Moore said that you should take half the blame.
6  Are those his exact words that are in quotes there?
7    A.   Yes.  And then after that, he changed
8  that to: I was completely at fault for the way
9  that I reacted.
10    Q.   He changed that?
11    A.   Yes.
12    Q.   But that's not set forth in here; is that
13  what you are saying?
14        MR. TOCCI:  Objection.
15    Q.   (By Ms. Fabbo)  The romantic relationship
16  with another co-worker, is that Cory Silva, he said
17  you were dating him or something?
18    A.   I am trying to see what you are looking
19  at.
20        MR. TOCCI:  What paragraph?
21    Q.   (By Ms. Fabbo)  It is Paragraph 55.  I'm
22  sorry.
23    A.   That's correct.
24    Q.   In Paragraph 62, on the next page, it

167

1  says that you experienced nightmares.  Can you
2  describe that?
3    A.   It is true.
4    Q.   What were your nightmares, and how
5  frequently would they happen?
6    A.   Often.  I can't sleep.  It goes over and
7  over and over again in my head.  I cry a lot.  I
8  don't know.  Even the jobs that I applied for, they
9  don't call me back.
10        MR. TOCCI:  That's not the question.
11    Q.   (By Ms. Fabbo)  Tell me about your panic
12  attacks.
13    A.   My chest hurts a lot.
14    Q.   Any other symptoms?
15    A.   I just want to sleep.
16    Q.   What about nightmares; how frequently do
17  you have nightmares?
18    A.   Often.
19    Q.   Once a week, more than once a week?
20    A.   More than once a week.
21    Q.   How many times?
22    A.   Like I told you, I sleep quite often.
23  Sometimes, it is whenever I fall asleep.
24    Q.   What are your nightmares about?

168

1    A.   The whole thing going over again in my
2  head.
3    Q.   What do you mean "the whole thing"?
4    A.   The meeting with Bodie.  What happened
5  with Kevin.  Chad screaming and yelling at me
6  saying I have to take the blame for it.
7    Q.   Did you ever believe that Mr. Correia was
8  just very immature?
9        MR. TOCCI:  Objection.  You can answer.
10        THE WITNESS:  That was very obvious.
11    Q.   (By Ms. Fabbo)  Did you ever tell anyone
12  that?
13    A.   I didn't have to.  Other co-workers knew
14  that he was very immature.
15        MS. FABBO:  I don't have many other
16  questions.  I would like to keep the
17  deposition open, just if there is any followup
18  based on the discovery responses.  I doubt
19  there will be, but I would agree to go to the
20  Cape to her if there is anything.
21        MR. TOCCI:  I would say if you have
22  anything to ask, to ask it now.
23        MS. FABBO:  I want to see her discovery
24  responses.

169

1        MR. TOCCI:  You timed the deposition for
2  when you timed it.
3        MS. FABBO:  Right.  I believe they were
4  due already.
5        MR. TOCCI:  The service was complete
6  upon the mailing.  They were put in the mail
7  yesterday.
8        MS. FABBO:  As a courtesy, I would have
9  thought you would have brought them.
10        MR. TOCCI:  As a courtesy, and I think
11  that we have been courteous all along, but the
12  courtesy has not exactly been extended.
13  Wal-Mart has refused to accept service.  You
14  have got this guy down in Texas, one of the
15  defendants, who ducks.  The process server
16  calls me every day.
17        MS. FABBO:  This has nothing to do with
18  me.
19        MR. TOCCI:  It does.  It does.  This is
20  Wal-Mart, the client that you are representing.
21  So when we ask for courtesy from Wal-Mart, we
22  get nothing.  So when you are asking me for
23  courtesy --
24        MS. FABBO:  That is fine, if that is your

**Rebecca Lee Coelho**
**June 28, 2005**

170

1  position. My position is that I'm leaving the
2  deposition open in case there is any followup
3  from the discovery responses, in particular,
4  the notes that she references, that you didn't
5  seem to know anything about.
6      MR. TOCCI: Our position is clear in
7  that this deposition is terminated and closed
8  as of your final question today. Wal-Mart
9  chose when to take this deposition, we didn't.
10 You chose to take it before you received
11 discovery.
12     MS. FABBO: I assumed that you would give
13 it to me. I believed it was due on the 25th,
14 which is 30 days from service.
15     MR. TOCCI: The 25th is a Saturday,
16 and the next regular day, the service is
17 complete upon the mailing. It was put in the
18 mail yesterday. Service is complete.
19     MS. FABBO: That is fine. If there is
20 something in there that you don't want me to
21 question her about, I understand. We will
22 take it up with the judge.
23     MR. TOCCI: No, there is nothing in
24 there that -- that is not the issue. The

171

1  issue is that we didn't choose this date.
2      MS. FABBO: That is fine. I already said
3  that I would be willing to go to her to not
4  inconvenience her if there is anything in
5  there that I need to follow up on. But that
6  is fine. If it is your position that you are
7  not going to accommodate --
8      MR. TOCCIO: We will cooperate. It is
9  just a question of, this is discovery, this is
10 what you do. You could have taken this
11 deposition on Thursday.
12     MS. FABBO: I could have. I have already
13 stated my position there. I couldn't
14 take it this week, actually, or for the next
15 several weeks. That was the problem. But
16 that is fine. I am telling you on the record
17 that I am willing to go to her. I have no
18 intention of bringing her back unnecessarily.
19     MR. TOCCIO: I appreciate that.
20     MS. FABBO: I believed that I would have
21 the discovery today. That is fine with me if
22 we need to go to the court on that. That is
23 fine with me.
24     MR. TOCCIO: That is fine.

172

1      Q. (By Ms. Fabbo) Could you tell me whether
2  any of the inappropriate comments or behavior of
3  Mr. Correia ever took place in front of any
4  management personnel, that you know of?
5      A. I would say on a couple of occasions.
6      Q. Who and when?
7      A. Bodie, Gigi, Tye, Bruce.
8      Q. And Bruce?
9      A. Yes.
10     Q. I need to know what happened on each of
11 those occasions.
12     A. They were walking by as a group to look
13 at the store to see what needed to be done, what
14 end caps needed to be changed, stuff like that,
15 what areas needed to be fixed. And they were
16 walking by and he said, "I need to declare my
17 undying love for you, or I love Becky, I'm going to
18 marry Becky." Stupid remarks like that. And they
19 heard it, and they would just smile, and they
20 thought that it was cute or something.
21     Q. And you are saying that all of those
22 people heard it, Bodie, Gigi, Tye, Bruce. When was
23 that?
24     A. On one occasion or another. I don't

173

1  know the exact date.
2      Q. Were those Kevin's exact words?
3      A. Yes.
4      Q. Did he say or do anything else that you
5  believe that they saw, these managers?
6      MR. TOCCI: That you believe, or that you
7  witnessed? I am not clear on the question.
8      MS. FABBO: She doesn't know whether they
9  heard or not. It has to be her belief.
10     THE WITNESS: I believe that on that
11 occasion, that I just told you about, they
12 heard him.
13     Q. (By Ms. Fabbo) Because they were there,
14 right?
15     A. Yes.
16     Q. Anything else, any other comments that he
17 made that you believe that they heard?
18     A. One time I was very, very sick with an
19 ear infection. That was the time I had the
20 bronchitis or the pneumonia, and I had an ear
21 infection with that. I was very, very nauseous and
22 didn't know why yet because I hadn't been to a
23 doctor yet to get a diagnosis.
24     I was probably nauseous because of my

**Rebecca Lee Coelho**
**June 28, 2005**

174

1 stomach, but I had an ear infection. I was saying
2 how nauseous that I was, and I asked Bodie if I
3 could go home.
4     I told Bodie that I was going to go to
5 the bathroom. Kevin made a remark that he would
6 hold my hair back if you feel like vomiting and rub
7 your back. I said no thanks. Bodie heard that.
8     Q.  How do you know that he heard that?
9     A.  Because when I was in the meeting with
10 him on December 11th, he brought that up but
11 twisted the story around. He said that I invited
12 him in to the women's room with me to hold my hair
13 and rub my back while I threw up.
14     Q.  Did you have any reason to think that
15 Bodie didn't like you?
16     A.  No.
17     Q.  Do you have any suspicions as to why he
18 would have twisted the story, as you say?
19     A.  I knew he was irritated because of the
20 issues that I had and Nicole had with me in
21 domestics. Nothing else.
22     Q.  Were there issues with other employees in
23 the store?
24     A.  No. Not that I'm aware of.

175

1     Q.  Do you know whether anyone else
2 complained to management about Mr. Correia, about
3 anything other than that petition that you believe
4 was given to management?
5     MR. TOCCI: Objection. You can answer.
6     THE WITNESS: I don't really know.
7 There is all hearsay and rumors. You don't
8 know what is true, what is not.
9     Q.  (By Ms. Fabbo) What rumors did you hear?
10     A.  That David on numerous occasions, from
11 sporting goods or toys, went and complained about
12 Kevin.
13     Q.  To who?
14     A.  I don't know, to management. That's all
15 I know.
16     Q.  Do you have any belief as to why
17 Mr. Correia would have been retained as an employee
18 at the store when people were complaining about
19 him?
20     A.  No.
21     Q.  Is your mother employed?
22     A.  No.
23     Q.  Has she ever been employed?
24     MR. TOCCI: Objection.

176

1     THE WITNESS: Do I answer that?
2     MR. TOCCI: You can answer it. I
3 just don't know what her mother's employment
4 might have to do with anything, other than if
5 she was employed at Wal-Mart. I'll let you
6 answer the question, but I don't know where
7 it's going.
8     Q.  (By Ms. Fabbo) Where was the last place
9 your mother was employed?
10     A.  I don't know. She did temporary work. I
11 don't follow her employment. I have no idea.
12     Q.  When was the last time that she was
13 employed, do you remember?
14     A.  No, I don't.
15     Q.  What about your stepdad; is he employed?
16     A.  He is 90 years old.
17     Q.  He is 90?
18     A.  Yes, he is.
19     Q.  How old is your mother?
20     A.  She is 58.
21     Q.  So I guess that he is not working. Is
22 that what you are saying?
23     A.  No. He is very retired, and he is not
24 really there.

177

1     Q.  Where is he retired from?
2     A.  The fire department in Framingham.
3     MS. FABBO: I don't have any other
4 questions today.
5     MR. TOCCI: I have no cross-examination.
6     THE COURT REPORTER: Would you like a
7 copy, Mr. Tocci?
8     MR. TOCCI: Can you e-mail?
9     THE COURT REPORTER: Yes.
10     MR. TOCCI: Well, if you e-mail, I don't
11 need an ASCII, but I will take a printed
12 version with copies of the exhibits, and a
13 mini also.
14     MS. FABBO: I will take an electronic
15 version, a mini and an ASCII.
16
17     (Deposition concluded at 3:50 p.m.)
18
19
20
21
22
23
24

---

178

1  I, SHARON WASKIEWICZ, a Notary Public in and for
2  the Commonwealth of Massachusetts, do hereby
3  certify that REBECCA LEE COELHO appeared before me
4  on the 28th day of June, 2005, at SKOLER, ABBOTT, &
5  PRESSER, P.C., 255 Park Avenue, Worcester,
6  Massachusetts and was satisfactorily identified by
7  me and duly sworn to testify to the truth and
8  nothing but the truth as to her knowledge touching
9  and concerning the matters in this case; that she
10  was thereupon examined upon his oath and said
11  examination reduced to writing by me; and that the
12  statement is a true record of the testimony given
13  by the witness, to the best of my knowledge and
14  ability.
15  I further certify that I am not a relative or
16  employee of counsel/attorney for any of the
17  parties, nor a relative or employee of such
18  parties, nor am I financially interested in the
19  outcome of the action.
20  WITNESS MY HAND this 18th day of July, 2005.
21
22
23  Sharon Waskiewicz      My Commission expires:
24  Notary Public          August 20, 2010

---

179

1  Today's date:    July 16, 2005
2  To:              John F. Tocci, Esq.
3  Copied to:       Marylou Fabbo, Esq.
4  From:            Sharon Waskiewicz
5  Deposition of:   Rebecca Lee Coelho
6  Taken:           June 28, 2005
7  Action:          REBECCA COELHO vs.
8                   WAL-MART STORES, INC., et al.
9
10  Enclosed is a copy of the deposition of
11  Rebecca Lee Coelho. Pursuant to the rules of
12  Civil Procedure, Ms. Coelho has thirty days to
13  sign the deposition from today's date.
14  Please have Ms. Coelho sign the enclosed
15  signature page. If there are any errors, please
16  have her mark the page, line and error on the
17  enclosed correction sheet. She should not mark
18  the transcript itself. This addendum should be
19  forwarded to all interested parties.
20  Thank you for your cooperation in this
21  matter.
22
23
24

---

180

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 05-10703-RWZ


*******************************
REBECCA COELHO,              *
    Plaintiff          *
vs.                    *
WAL-MART STORES, INC., RUDI  *
ECKERMAN, CHAD GAUCHER,      *
WARREN "BODIE" MOORE, and    *
KEVIN CORREIA,               *
    Defendants        *
*******************************

I, REBECCA LEE COELHO, do hereby certify,
under the pains and penalties of perjury, that
the foregoing testimony is true and accurate, to
the best of my knowledge and belief.
WITNESS MY HAND, this    day of    ,
2005.
-----------------------------
sw        Rebecca Lee Coelho

---

181

Correction sheet
DEPONENT:  Rebecca Lee Coelho
CASE:    Rebecca Coelho vs.
         Wal-Mart Stores, Inc., et al.
DATE TAKEN: June 28, 2005
***************************************************
PAGE  / LINE / CHANGE OR CORRECTION AND REASON
***************************************************
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____
_____/_____/_____

---

# EXHIBIT
# 3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| REBECCA COELHO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 05-10703-RWZ |
| | ) | |
| WAL-MART STORES, INC., | ) | |
| CHAD GAUCHER, | ) | |
| RUDI ECKERMAN, | ) | |
| WARREN "BODIE" MOORE, and | ) | |
| KEVIN CORREIA, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S ANSWERS TO DEFENDANTS WAL-MART STORES, INC. AND CHAD GAUCHER'S FIRST SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 33, The plaintiff in the above-reference matter, Rebecca Coelho ("Ms. Coelho" or the "Plaintiff"), hereby responds to the defendants', Wal-Mart Stores, Inc. ("Wal-Mart") and Chad Gaucher ("Mr. Gaucher") (collectively, the "Defendants"), First Set of Interrogatories as follows:

## GENERAL OBJECTIONS

1.      Plaintiff objects to Defendants' Instructions and Definitions, to the extent that they do not accurately reflect the requirements of Rule 33 of the Federal Rules of Civil Procedure.

2.      Plaintiff objects to the Interrogatories to the extent that they call for information containing, reflecting or constituting privileged attorney-client communications, attorney work product or trial preparation material, or any other privilege or limitation on discovery of documents.

3.     Plaintiff objects to the Interrogatories to the extent that they do not specify a time period generally, and to the extent that it seeks information outside any time period that reasonably is related to the allegations contained in the Complaint and which, therefore, is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4.     Plaintiff objects to the Interrogatories to the extent that they exceed the scope of discovery permitted under the Federal Rules of Civil Procedure and will only provide information required to be produced under the applicable rules.

In addition to the general objections set forth above, Plaintiff sets forth below specific objections to individual interrogatories where appropriate, including objections that are not generally applicable to all of the interrogatories.  By setting forth such specific objections, Plaintiff does not intend to limit the general objections set forth above.  To the extent that the Plaintiff responds to interrogatories to which she objects, such objections are not waived by a response.  In addition, the inadvertent disclosure of privileged information shall not constitute a waiver of any applicable privilege.

The information provided herein is based upon, and is therefore limited by, the records and information in existence, presently recollected, and thus far discovered in the course of the preparation of these answers.  Consequently, the Plaintiff reserves the right to amend and/or supplement these answers if it appears at any time that omissions or errors have been made herein or that additional information is available.

## SPECIFIC ANSWERS AND OBJECTIONS

Subject to, and without waiver of the above general objections, the Plaintiff further objects and responds to the Interrogatories as follows:

### Interrogatory No. 1

Please state your full name, residential address, date of birth, social security number, occupation, present employer, business address, educational and employment background.

### Answer to Interrogatory 1

Plaintiff objects to this interrogatory to the extent that it seeks information which is highly personal and confidential and unrelated to the subject matter of this case. Plaintiff further objects to this interrogatory on the grounds that it is vague and therefor unduly burdensome as the phrase "educational and employment background" is not defined. Notwithstanding said objection and without waiving the same, my name is Rebecca L. Coelho. My address is 2 Second Ave., Pocasset, MA 02559. My date of birth is October 5, 1973. I am not currently working. I graduated from Riverview High School in East Sandwich, Massachusetts.

### Interrogatory No. 2

Please itemize with particularity any and all monetary damages, whether potential or actual, which you claim to have incurred as a result of any of the allegations in your Complaint, setting forth in complete detail the dollar value of each element of claimed damages. Identify any documents relied upon or referred to in your answer to this Interrogatory.

### Answer to Interrogatory 2

Plaintiff objects to this interrogatory on the grounds that it is not possible to "itemize with particularity any and all monetary damages, whether potential or actual," that Ms. Coelho has suffered due to the Defendants' illegal actions. Notwithstanding the foregoing and without waiving the same, I have incurred approximately forty thousand dollars ($40,000) in lost wages as a result of the defendants' sexual harassment based upon my full-time hourly wage of $8.50 at

the time of my separation and approximately eighteen months of unemployment. I also have

accrued hundreds of dollars in co-payments and other expenses relating to the medical treatment

I have received since suffering sexual harassment at the hands of Wal-Mart.

**Interrogatory No. 3**

If you contend that the Defendants' actions or inactions caused you to suffer emotional distress, set forth in complete detail the factual basis for that contention. Identify any documents relied upon or referred to in your answer to this Interrogatory.

**Answer to Interrogatory 3**

Plaintiff objects to this interrogatory on the grounds that the matter sought calls for an

opinion, contention, or legal conclusion. Notwithstanding said objection and without waiving

the same, the plaintiff refers your attention to the Complaint. In further answering, I have

experienced migraine headaches and digestive issues following the sexual harassment I suffered

while a Wal-Mart employee which were directly caused or exacerbated by the sexual harassment

I suffered at Wal-Mart. Additionally, since suffering the trauma of my Wal-Mart employment, I

have battled severe fatigue, depression and bouts of sleeplessness. I have been advised by

physicians and loved ones to seek counseling but have not.

**Interrogatory No. 4**

If you contend that the Defendants' actions or inactions caused you to suffer emotional distress, identify each healthcare provider with whom you have consulted, received treatment from, and/or have been examined by in connection with any and all physical, mental or other illnesses or conditions from January 2002 to the present, including the date(s) of the service(s), the nature of the service(s), including without limitation any diagnosis or prognosis rendered. Identify any documents relied upon or referred to in your answer to this Interrogatory.

**Answer to Interrogatory 4**

Plaintiff objects to this interrogatory to the extent that it seeks information which is

highly personal and confidential and unrelated to the subject matter of this case. Plaintiff further

objects to this interrogatory on the grounds that it is vague and unduly burdensome.

Notwithstanding said objection and without waiving the same, from January, 2002 through December, 2003, I was treated on occasion by Dr. Prakash R. Patel, a gastroenterologist, 115 Lincoln Street, Framingham. I was also treated during that time by Dr. Robert Canning, 61 Lincoln Street, #209, Framingham, in a procedure to remove my gallbladder and my OB/GYN at the time, Dr. Robert H. Gottleib, 761 Worcester Road, Framingham. Dr. Emanuel Friedman, 67 Union Street, Natick, served as my urologist from approximately 2002 and continues to treat me today. Since the time of the harassment at Wal-Mart, I treated with Dr. Patel on a frequent basis. In August of 2004, Dr. Desphande at Framingham Union Hospital treated me for lung problems. Dr. Leigh Anne Baines, 5 Industrial Drive, Mashpee, treated me for migraine headaches. In October, 2004, I was hospitalized at Framingham Hospital for an inflammation to the colon. I then began treating with Dr. Dickstein, 475 Franklin Street, Framingham, who took over for Dr. Patel as my gastroenterologist. My primary care physician was Dr. George Silva, 5 Industrial Drive, Mashpee, Massachusetts through April, 2005. I believe that my medical conditions were caused by or exacerbated by the emotional distress I suffered by Wal-Mart's illegal conduct.

**Interrogatory No. 5**

If you contend that the Defendants' actions or inactions caused you to suffer emotional distress set forth *by name, dosage and any dates(s) any* and all prescribed medications you have taken from January 2002 to the present, including who prescribed them. Identify any documents relied upon or referred to in your answer to this Interrogatory.

**Answer to Interrogatory 5**

Plaintiff objects to this interrogatory to the extent that it seeks information which is highly personal and confidential and unrelated to the subject matter of this case in that the request seeks information pertaining to medication Ms. Coelho was prescribed prior to the time of her employment at Wal-Mart. Plaintiff further objects to this interrogatory on the grounds that

it is vague, ambiguous and unduly burdensome. Notwithstanding said objection and without

waiving the same, I have taken the following medication since January 1, 2003:

Metronidazole – Dr. Patel – 8/6/04
Desipramine -- 4/29/05 --
Protonix – 10/9/04 – antacid
Dicyclomine – 11/15/04—from gastroenterologist.
Relpax – Migraine medication right after Wal-Mart for cluster migraines
Emitrix – migraine medication – given after Relpax to see what was going to work
Zofran – nausea
Samotidine – for my stomach
Belladonna – for my stomach
Bentyle – for stomach
Spray medication for tongue – 2003/4
Morphine, demoral in hospital

I am unsure of the specific dosages of these prescribed medications.

## Interrogatory No. 6

Please identify by name, address and area of expertise each person whom you expect to call as an
expert witness at trial, stating the subject matter on which each expert is expected to testify, the
substance of the facts and opinions to which each expert is expected to testify and a summary of
the grounds for each opinion. Identify any documents relied upon or referred to in your response
to this Interrogatory.

## Answer to Interrogatory 6

Plaintiff states that she has not yet identified expert witnesses who will testify at trial.

## Interrogatory No. 7

Please identify by name, occupation, address, and telephone number all individuals you believe
to be current or former employees of Defendant with whom you have communicated since your
resignation from employment with Defendant in 2003. Identify any documents relied upon
or referred to in your response to this Interrogatory.

## Answer to Interrogatory 7

I spoke to Corey Silva, occupation and address unknown, 508-540-1325, in December,

2003. I also spoke to Jason Lunne, occupation and address unknown, 508-685-4082, at that

time. I ran into a former Wal-Mart employee, Lance, last name, occupation, and address

If you have received income from any source, not identified in your response to the preceding Interrogatory, subsequent to your employment with Defendant (such as from, but not limited to, unemployment compensation benefits, disability insurance, social security, rental properties, etc.), please identify such source and the dates and amounts received on such dates. Identify any documents relied upon, relevant to or referred to in your answer to this Interrogatory.

## Answer to Interrogatory 10

I received unemployment compensation, however I am not sure how much I received per week or for how long I received it.

## Interrogatory No. 11

Please provide the name, case or docket number and a brief description of any other legal actions, civil or criminal, to which you have been a party. Identify any documents relied upon, relevant to or referred to in your answer to this Interrogatory.

## Answer to Interrogatory 11

Plaintiff objects to this interrogatory to the extent that it seeks information which is highly personal and confidential and unrelated to the subject matter of this case.

Notwithstanding said objection and without waiving the same, I was a party to a complaint for divorce filed in Middlesex Probate and Family Court, Docket #04-D3680DV1.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 7th DAY OF
JULY, 2005.

Rebecca Coelho

As to Objections:

John F. Tocci, Esq., BBO# 562139
Amanda B. Shipley, Esq., BBO#655844
Tocci, Goss & Lee, PC
35 India Street, 5th Floor
Boston, MA  02110
(617) 542-6200

July 7, 2005

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document.
was served upon the attorney of record for each other
party by [hand/mail] on 3/8/05

**EXHIBIT**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RECEIVED
AUG 1 6 2005
By_____

|  |  |
|---|---|
| REBECCA COELHO, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | )    CIVIL ACTION NO. 05-10703-RWZ |
|  | ) |
| WAL-MART STORES, INC., | ) |
| CHAD GAUCHER, | ) |
| RUDI ECKERMAN, | ) |
| WARREN "BODIE" MOORE, and | ) |
| KEVIN CORREIA, | ) |
|  | ) |
| Defendants. | ) |

## PLAINTIFF'S SUPPLEMENTAL ANSWERS TO DEFENDANTS WAL-MART STORES, INC. AND CHAD GAUCHER'S FIRST SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 33, The plaintiff in the above-reference matter, Rebecca Coelho ("Ms. Coelho" or the "Plaintiff"), hereby supplements her responses to the defendants', Wal-Mart Stores, Inc. ("Wal-Mart") and Chad Gaucher ("Mr. Gaucher") (collectively, the "Defendants"), First Set of Interrogatories as follows:

## GENERAL OBJECTIONS

1.     Plaintiff objects to Defendants' Instructions and Definitions, to the extent that they do not accurately reflect the requirements of Rule 33 of the Federal Rules of Civil Procedure.

2.     Plaintiff objects to the Interrogatories to the extent that they call for information containing, reflecting or constituting privileged attorney-client communications, attorney work product or trial preparation material, or any other privilege or limitation on discovery of documents.

3.    Plaintiff objects to the Interrogatories to the extent that they do not specify a time period generally, and to the extent that it seeks information outside any time period that reasonably is related to the allegations contained in the Complaint and which, therefore, is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4.    Plaintiff objects to the Interrogatories to the extent that they exceed the scope of discovery permitted under the Federal Rules of Civil Procedure and will only provide information required to be produced under the applicable rules.

In addition to the general objections set forth above, Plaintiff sets forth below specific objections to individual interrogatories where appropriate, including objections that are not generally applicable to all of the interrogatories.  By setting forth such specific objections, Plaintiff does not intend to limit the general objections set forth above.  To the extent that the Plaintiff responds to interrogatories to which she objects, such objections are not waived by a response.  In addition, the inadvertent disclosure of privileged information shall not constitute a waiver of any applicable privilege.

The information provided herein is based upon, and is therefore limited by, the records and information in existence, presently recollected, and thus far discovered in the course of the preparation of these answers.  Consequently, the Plaintiff reserves the right to amend and/or supplement these answers if it appears at any time that omissions or errors have been made herein or that additional information is available.

## SPECIFIC ANSWERS AND OBJECTIONS

Subject to, and without waiver of the above general objections, the Plaintiff further objects and responds to the Interrogatories as follows:

### Interrogatory No. 1

Please state your full name, residential address, date of birth, social security number, occupation, present employer, business address, educational and employment background.

### Answer to Interrogatory 1

Plaintiff objects to this interrogatory to the extent that it seeks information which is highly personal and confidential and unrelated to the subject matter of this case. Notwithstanding said objection and without waiving the same, I worked at the Radisson Hotel in Milford, Massachusetts (11 Beaver Street) in approximately 2001. After that, I worked at Zainy Brainy in Sherwood Plaza, Natick, Massachusetts. I then worked at the Filenes in Marlborough, Massachusetts (Solomon Pond Mall, 627 Donald Lynch Blvd.). In 2001-2002, I worked for McGarr Services which was based in Boston, but which assigned me to jobs on the Cape.

### Interrogatory No. 8

Please identify each person, including, but not limited to, employers and employment services or agencies, with whom you have been in contact regarding potential employment or business association subsequent to your employment with Defendant, setting forth the address of each such person, the date(s) of such contact and the nature of the employment sought in each such contact. Identify any documents relied upon, relevant to or referred to in your answer to this Interrogatory.

### Answer to Interrogatory 8

Plaintiff objects to this interrogatory on the grounds that it is overly broad and unduly burdensome. Notwithstanding said objection and without waiving the same, I have applied for sales positions at the following companies:

- Christmas Tree Shop, at the Sagamore (Cranberry Highway, Route 6A, P.O. Box 277, Sagamore, MA 02561) and Falmouth (Falmouth, Route 28, Davis Straits, Falmouth, MA 02540) locations. I have applied to positions at both of these stores, multiple times since my separation from Wal-Mart.

- CVS, at the Mashpee (38 Nathan Ellis Highway, Mashpee, Ma 02649) and Falmouth (105 Davis Straights, Route 28, Falmouth, MA 02450) locations. I have applied to positions at both of these stores, multiple times since my separation from Wal-Mart.

- Marshalls, at the Cape Cod Mall (65 Independence Drive, Hyannis, MA 02601). I have applied for a position at this store two or three times since my separation from Wal-Mart.

- TJ Maxx, at the Cranberry Plaza (2991 Cranberry Highway, Wareham, MA 02571). I have applied for a position at this store multiple times since my separation from Wal-Mart.

- Homegoods at the Festival Mall B (1070 Iyanough Road, Hyannis, MA 02601). I have applied more than once for a position at this store since my separation from Wal-Mart.

- Stop & Shop, at the Cranberry Plaza (2991 Cranberry Highway, Wareham, MA 02571). I applied for a position approximately one year ago.

- Toys R Us (1070 Route 132, Hyannis, Ma 02601). I have applied for a position at this store multiple times since my separation from Wal-Mart.

I worked for TLC Solutions located at 1 Quissett Harbor Road, Falmouth, MA 02540 in the Summer of 2004. I also worked through an agency called Labor Ready located at 233 Barnstable Road, Hyannis, MA 02601 for one week in May, 2005.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 8/3/05 DAY OF AUGUST, 2005.**

Rebecca Coelho

As to Objections:

John F. Tocci, Esq., BBO# 562139
Amanda B. Shipley, Esq., BBO#655844
Tocci, Goss & Lee, PC
35 India Street, 5th Floor
Boston, MA 02110
(617) 542-6200

August 1, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by (hand)(mail) on 8/12/05